UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
LONG ISLAND ANESTHESIOLOGISTS PLLC,                 :
                                                    :
                      Plaintiff,                    :
                                                    :          **COMPLAINT**
        -against-                                   :
                                                    :
UNITEDHEALTHCARE INSURANCE                           :          **JURY TRIAL DEMANDED**
COMPANY OF NEW YORK INC., as Program                :
Administrator, THE EMPIRE PLAN                       :
MEDICAL/SURGICAL PROGRAM and                        :          Case No.
MULTIPLAN INC.,                                     :
                                                    :
                      Defendants.                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiff, Long Island Anesthesiologists PLLC ("LI Anesthesia") by its attorneys, Harris Beach PLLC, alleges for its Complaint against the Defendants, UnitedHealthcare Insurance Company of New York Inc., as Program Administrator, The Empire Plan Medical/Surgical Program ("United") and MultiPlan Inc. ("MultiPlan"), as follows:

## INTRODUCTION

1.      High-quality and easily accessible anesthesia services are vitally important for the health and well-being of the New York metropolitan area's 18 million residents.  These services enable patients to undergo lifesaving and life-changing medical procedures safely and comfortably and manage their pain. Without anesthesia services, much of modern medicine would be impossible. LI Anesthesia is a high-quality anesthesia provider located in southwestern Suffolk County.

2.      United – described by the New York Attorney General earlier this year as a "behemoth" health insurer and plan provider – has significant market power in the New York metropolitan area. In addition to being a major commercial insurer and health plan provider, it

also is the administrator of the Empire Plan, which is the health plan for over 1 million public-sector employees.

3.     United, as administrator of the Empire Plan, has significant market power. Anesthesiologists cannot pick and choose their patients and cannot turn away patients because of their health coverage or other issues. Given the number of public employees in the New York metropolitan area, anesthesia providers are largely at the mercy of United. For LI Anesthesia, and many other area anesthesia practices, approximately 40% of their revenue comes from the Empire Plan.

4.     The Empire Plan historically reimbursed anesthesia providers at usual, customary, and reasonable rates. This changed in January 2022 when, at United's behest, it decreased reimbursement rates by more than 80%. United then enlisted MultiPlan to assist it in a scheme to pressure and prevent anesthesia providers into accepting these rates while requiring onerous and burdensome documentation.

5.     Thus, during a time of significant economic upheaval and inflation, vitally essential anesthesia providers are suffering an unsustainable and unending 80+% reimbursement cut. This will certainly decrease the availability of high-quality anesthesia services in the New York metropolitan area; many providers will be forced out of business entirely, and others will be forced to significantly curtail their services and recruitment and retention of well-trained clinicians.

6.     But these savings are not being passed on to United's customers or Empire Plan enrollees. Far from it, United is currently seeking a 19% rate increase for next year, even though it generated net earnings of over $17 billion.

7.    Rather, United is reducing reimbursement rates by 80+% -- and pressuring anesthesia providers into accepting these rates – *to force these providers out of business.* As we explain below, eliminating LI Anesthesia and other similarly situated anesthesia providers benefits United because it directly provides physician services – including anesthesia services – to patients throughout the United States, including in the New York metropolitan area. Thus, eliminating LI Anesthesia and its fellow anesthesia practices is good for United's business; it removes competitors and harms competition in the market to United's advantage.

8.    For these reasons, this Court must step in and immediately put an end to United's illegal, improper, and anticompetitive conduct.

## PARTIES

9.    Plaintiff, Long Island Anesthesiologists PLLC ("LI Anesthesia"), is a New York professional limited liability company.

10.    LI Anesthesia's principal place of business is located at 1000 Montauk Highway, West Islip, New York.11795.

11.    Defendant UnitedHealthcare Insurance Company of New York ("United") is licensed by the New York State Department of Financial Services to provide accident and health insurance in New York under New York Insurance Law § 1113(a).

12.    Upon information and belief, United's principal place of business is located at 185 Asylum Street, Hartford, Connecticut 06103.

13.    United is the Program Administrator of The Empire Plan Medical/Surgical Program.

14.    Defendant MultiPlan, Inc. ("MultiPlan") is a New York domestic business corporation.

3

15.     Upon information and belief, MultiPlan's principal place of business is located at 115 Fifth Avenue, 7th Floor, New York, New York 10003.

## JURISDICTION AND VENUE

16.     This Court has subject-matter jurisdiction over the Sherman Act claims in this lawsuit under 28 U.S.C. § 133, which provides original jurisdiction in this Court over "a claim or right arising under" the laws of the United States.

17.     This Court has subject-matter jurisdiction over the New York state law claims in this lawsuit under 28 U.S.C. § 1367(a), which provides supplemental jurisdiction in this Court over "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

18.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the acts complained of have occurred within this District.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

**LI Anesthesia**

19.     LI Anesthesia is a private anesthesiology practice located in West Islip, New York. It is owned by the anesthesiologists who provide services for the practice.

20.     LI Anesthesia's principal line of business is to provide the anesthesia services at Good Samaritan Hospital Medical Center ("Good Samaritan") in West Islip, New York. LI Anesthesia has been providing these services since shortly after Good Samaritan opened in 1959.

21.     LI Anesthesia has no ownership interest in Good Samaritan; and Good Samaritan has no ownership in LI Anesthesia. Good Samaritan is a not-for-profit hospital that is part of the Catholic Health system on Long Island.

22.     During this time, Good Samaritan has grown from a 175-bed general hospital to a 537-bed tertiary care, Level II trauma center and teaching facility serving the diverse populations of central and south Long Island.

23.     Good Samaritan has some of New York's highest volume emergency services, cardiac surgery services, a busy and active labor and delivery area, ambulatory and major surgery units including robotic surgery capabilities, adult and pediatric endoscopy suites, general and intensive care pediatric and neonatology units, advanced interventional cardiology, electrophysiology, and vascular suites, and dedicated surgical and medical intensive care units. LI Anesthesia's anesthesiologists care for patients in all these areas.

24.     In addition to its diverse practice at Good Samaritan, LI Anesthesia additionally provides anesthesia services at physician offices and surgery centers around New York and Long Island.

25.     Currently, LI Anesthesia employs 36 full-time anesthesiologists, trained mainly at the nation's top academic medical centers.  Thirty-four are board-certified by the American Board of Anesthesiology.

26.     Many of these anesthesiologists have areas of focus or training in major anesthesiology subspecialties such as pediatrics, obstetrics, cardiothoracic anesthesia, neuroanesthesia, critical care, regional anesthesia for orthopedics, and pain management.

27.     At all locations, LI Anesthesia cares for patients with the same exacting standards.  Its patients can be assured of care by highly qualified physicians with experience and expertise in complex perioperative management, from the pre-anesthesia assessment, through the delivery of anesthesia, to the alleviation of pain, and, when necessary, care for critical illness. LI Anesthesia is committed to its patients having the best outcomes possible, and the

best anesthetic experience available. LI Anesthesia highly values the privilege of patient care amidst Long Island's unique and diverse patient population.

28.     Unlike most medical specialties, anesthesiologists are unable to choose their patients or to turn away prospective patients. Anesthesiologists provide services to all patients undergoing surgical or certain medical procedures at the facilities in which they work regardless of the patient's ability to pay or health coverage status.

29.     This is certainly the case with LI Anesthesia. Its agreements with Good Samaritan for example obligate it to provide anesthesia and related services to all patients, without exception, and without regard to the patient's ability to pay or health coverage status.

30.     Accordingly, anesthesia practices in general – and LI Anesthesia in particular – are at the mercy of health plans and other third-party payers of health care. Anesthesia practices such as LI Anesthesia cannot pick and choose what health plans to deal with or avoid treating patients of health plans that have low reimbursement rates or are otherwise difficult to deal with.

31.     Accordingly, LI Anesthesia must deal with all health plans and other third-party payers of health care.

**Anesthesia Reimbursement**

32.     Generally, there are two types of relationships that medical practices have with health plans. The first is an "in-network" or "participating provider" relationship. The second is an "out-of-network" or "non-participating provider" relationship.

33.     In an in-network relationship, the health plan accepts the practice's clinicians as credentialed participating providers, and the parties enter into a participating provider agreement.

6

34.     The parties' participating provider agreement in an in-network relationship governs the amount that the health plan will reimburse the provider for covered services, how claims are submitted, how claims are paid, how disputes are resolved, and such issues as prior approval and pre-certification.

35.     The advantages that a medical practice derives from an in-network relationship are (a) being listed in the health plans' material as a participating provider (and thereby increasing referrals of health plan members); and (b) receiving reimbursement directly from the carrier.

36.     The other relationship that health plans have with medical practices is an out-of-network relationship. In that type of relationship, there is no contractual agreement between the health plan and the practice. Instead, whether, and to what extent, an out-of-network provider is reimbursed for services that out-of-network providers render to the health plan's members and beneficiaries is dictated by the terms of the health plan documents. Out-of-network providers have no say or control in the terms of these plan documents.

37.     Historically, in-network reimbursement rates were lower than out-of-network reimbursement rates. This is because health plans contended that the lower rates were appropriate given the increased referrals the practices would obtain from being listed in health plan directories and other materials. Health plans also contended that the lower rates were appropriate because network participating providers were receiving payment directly from the health plans, which was quicker and easier than what occurs with out-of-network providers.

38.     LI Anesthesia, like most anesthesia practices in the New York metropolitan area, typically derive no benefit from being listed in participating provider directories, and accordingly have traditionally chosen to remain out of network with health plans.

**United's Size**

39.     United is a subsidiary of UnitedHealth Group Incorporated (UHG), which is a multi-national managed healthcare and insurance company based in Minnetonka, Minnesota.

40.     UHG is the world's eighth largest company by revenue, and the second largest health care company by revenue (only CVS Health is larger). It is the largest insurance company in the United States by net premiums.

41.     UHG's 2021 revenues were $287.597 billion, a 12% increase over 2021. Its 2021 net earnings were $17.285 billion.

42.     As the New York Attorney General stated earlier this year, UHG is a "behemoth in the healthcare industry." It has purchased over 35 healthcare companies in the last decade.

43.     UHG operates, among other things, the largest health insurance company in the United States; a large network of physician groups, outpatient surgical centers, and other healthcare providers, including over 53,000 physicians across 15 states; a pharmacy benefits manager that handles over a billion prescriptions every year; and a healthcare technology business that facilitates the transmission, analysis, and review of health insurance claims.

44.     UHG has been subject to significant antitrust and related scrutiny in the last several years because of its size and anticompetitive conduct. *See, e.g.*, *United States v. UnitedHealth Group Incorporated*, 22 Civ. 00481 (D.D.C. filed Feb. 24, 2022); *U.S. Anesthesia Partners v. UnitedHealthcare Insurance Company*, 2021CV31061 (Colo. Dist. Ct. Denver Cty. filed Mar. 31, 2021); *U.S. Anesthesia Partners v. UnitedHealthcare Insurance Company*, DC-2021-04103 (Tex. Dist. Ct. Dallas Cty. filed Mar. 31, 2021); *Fremont Emergency Services (Mandavia) v. UnitedHealth Group*, A-19-792978-B  (Nev. 8th Dist. Ct. verdict Dec. 6, 2021) ($62.65 million jury award against UnitedHealthcare).

45.     UHG divides its business into two main "platforms": Optum and UnitedHealthcare.

**Optum Care Competes with LI Anesthesia**

46.     Optum describes itself as purportedly serving "the broad health care marketplace, including payers, care providers, employers, governments, life sciences companies and consumers, through its Optum Health, Optum Insight and Optum Rx businesses. These businesses improve overall health system performance by optimizing care quality and delivery, reducing costs, and improving consumer and provider experience, leveraging distinctive capabilities in data and analytics, pharmacy care services, health care operations, population health and health care delivery."

47.     One of Optum Health's businesses is OptumCare, which acquires physician and other health care practices throughout the United States, and then directly manages them. In 2021, Optum Health generated approximately $54 billion in revenue.

48.     Currently, OptumCare is largest employer of physicians in the United States, with more than 53,000 doctors, including anesthesiologists and anesthesia practices, and 1,450 neighborhood clinics across the country. Its current patient base is 19 million people.  Last year, it set a growth target of adding 10,000 physicians.

49.     In the New York area, OptumCare manages ProHealth, a large multi-specialty practice with 300 locations throughout the metropolitan area. It employs or is affiliated with over 1,000 physicians and other health care providers.

50.     Founded on Long Island, ProHealth has practitioners and clinics in virtually every Long Island community. There are six practices alone in West Islip, where LI Anesthesia is

located. ProHealth offers anesthesia services on Long Island, upon information and belief employing at least 22 anesthesiologists.

51.     OptumCare also manages CareMount Medical, which currently serves patients throughout New York City, Westchester, Putnam, Dutchess, Columbia, and Ulster Counties.

52.     CareMount owns and operates seven urgent care locations, clinical laboratories and radiology services, as well as endoscopy suites and infusion suites. It is affiliated with Massachusetts General Hospital and Northwell Health.  Upon information and belief, it currently employs 31 anesthesiologists.

53.     OptumCare also manages Riverside Medical Group, a large multi-specialty provider that services patients throughout New Jersey and southern Connecticut.

54.     All totaled, OptumCare has 2,100 providers in the New York metropolitan area, including over 50 anesthesiologists. It serves more than 1.6 million patients.

55.     OptumCare also owns Sound Physicians, a large physician practice group in the Midwest and Southwest that is a substantial and growing anesthesia provider.

**UnitedHealthcare's Market Presence**

56.     UnitedHealthcare offers a full-range of health benefits and insurance plans through four segments: (a) UnitedHealthcare Employer & Individual, which serves employers ranging from sole proprietorships to large, multi-site and national employers, public sector employers and individual consumers; (b) UnitedHealthcare Medicare & Retirement delivers health and well-being benefits for Medicare beneficiaries and retirees; (c) UnitedHealthcare Community & State manages health care benefit programs on behalf of state Medicaid and community programs and their participants; and (d) UnitedHealthcare Global provides health

and dental benefits and hospital and clinical services to employer groups and individuals in South America, and through other diversified global health services.

57.     In terms of size, UnitedHealthcare's provider networks include over 1.5 million physicians and other health care professionals, and more than 7,000 hospitals and other facilities throughout the United States.

58.     As of December 31, 2021, UnitedHealthcare Employer & Individual provides access to medical services for 26.6 million people on behalf of its customers and alliance partners, including employer customers, serving people across all 50 states, the District of Columbia and most U.S. territories. Products are offered through affiliates licensed as insurance companies, health maintenance organizations (HMOs), or third-party administrators (TPAs). Large employer groups typically use self-funded arrangements where UnitedHealthcare Employer & Individual earns a service fee. Smaller employer groups and individuals are more likely to purchase risk-based products because they are less willing or unable to bear a greater potential liability for health care expenditures.

59.     In 2021, UnitedHealthcare's national accounts and large group employer commercial health insurance plans had about 23 million members and generated an estimated $31 billion in revenue.

60.     UnitedHealthcare Medicare & Retirement provides health benefit services to individuals aged 50 and older in all 50 states, the District of Columbia and most U.S. territories. It served 6.5 million people through its Medicare Advantage products as of December 31, 2021. It also currently serves 4.4 million seniors nationwide through various Medicare Supplement products in association with AARP.

61.    UnitedHealthcare Community & State provides services to state programs caring for the poor, the medically underserved and those without the benefit of employer-funded health care coverage, typically in exchange for a monthly premium per member from the state program. As of December 31, 2021, UnitedHealthcare Community & State participated in programs in 32 states and the District of Columbia and served 7.7 million people: including nearly 1.4 million people through Medicaid expansion programs in 18 states under the Patient Protection and Affordable Care Act (ACA).

62.    UnitedHealthcare has a significant share of the market in the New York area. For example, an analysis by the American Medical Association determined that UnitedHealthcare had the largest market share of health care insurers (all products) as of January 1, 2020, in the New York-Newark-Jersey City, NY-NJ-PA Metropolitan Statistical Area, at 26%. For point-of-service products, UnitedHealthcare's share soars to 66%.

63.    Likewise, another study of the market share of commercial insurers in the New York City market (defined as Suffolk, Nassau, Queens, Kings, Richmond, New York, Bronx, Westchester, Putnam, and Rockland Counties) as of the third quarter of 2019 reported that UnitedHealthcare's share was 50%.

**The Empire Plan**

64.    In the New York market, UnitedHealthcare is not just a commercial insurer. Its United subsidiary also acts as the administrator of the Medical/Surgical Program of the Empire Plan, which is part of the New York State Health Insurance Program (NYSHIP). This Program provides health coverage for public employees in New York.

65.     Initially, NYSHIP provided health coverage for state and local government employees in New York by purchasing health insurance contracts from heavily state regulated, not-for-profit medical indemnity companies (Civil Service Law § 162[1]).

66.     In 2010, however, the State Legislature granted the Department of Civil Service the authority to do what private sector employers were able to do: "provide health benefits directly to plan participants" using the State's own funds (Civil Service Law § 162[1][a]).

67.     Based on this statutory authority, NYSHIP's Empire Plan pays for covered hospital services, physicians' bills, prescription drugs, and other covered medical expenses of eligible public employees and their dependents. The Empire Plan has contracted with United to administer its Medical/Surgical Program.

68.     Many New York state residents are covered by the Empire Plan. This is because the Plan covers not only New York state employees and their residents, but also employees and dependents of state-related entities, municipalities (county, town, city, and village), school districts, and special purpose government districts.

69.     Currently, NYSHIP protects over 1.2 million State and local government employees, retirees, and their families. It is one of the largest employer-sponsored group health insurance programs in the United States. Approximately 800 local government employers currently offer NYSHIP's Empire Plan to their employees.

70.     Historically, the Empire Plan granted its enrollees the freedom to not only receive coverage from participating, in-network physicians, but also from non-participating, out-of-network physicians, such as the Plaintiff physician practices here. This was designed to ensure that New York's public employees had broad access to the finest physicians in the state, regardless of whether those physicians were in network with the Empire Plan or out of network.

13

71.    This "freedom of choice" to obtain covered care from any physician, including out-of-network physicians, was long a major feature of the Empire Plan and a significant benefit for public employees.

**Empire Plan Reimbursement**

72.    Historically, the Empire Plan reimbursed out-of-network physicians for providing covered medical services to Plan enrollees at amounts approximating the usual, customary, and reasonable (UCR) rate for the medical services in the geographic area where the services are provided.  (2018 Empire Plan Certificate at 44).

73.    The UCR rate used by the Empire Plan for out-of-network reimbursement was determined using the benchmarking databases maintained by FAIR Health, established in October 2009 as part of the settlement of an investigation by the Attorney General into conflicts of interest involving UnitedHealthcare[1] involving the adjudication of claims. FAIR Health was formed to create an independent, trusted and transparent source of data to support claims adjudication and to meet the healthcare cost and utilization information needs of all participants in the healthcare community (https://www.fairhealth.org/mission-origin).

74.    While Empire Plan's standard out-of-network reimbursement rates were based on the FAIR Health-determined UCR, covered services provided by out-of-network radiologists, anesthesiologists – such as LI Anesthesia –or pathologists at an in-network hospital were reimbursed in full by the Empire Plan. The certificate provides: "If [enrollee] receive[s] anesthesia, radiology or pathology services in connection with covered inpatient or outpatient Hospital services at an Empire Plan Network Hospital and The Empire Plan provides

---

[1]  To settle allegations of misconduct with regard to its operation of the Ingenix benchmarking database, UnitedHealthcare contributed $50 million to the creation of FAIR Health Attorney General Cuomo Announces Historic Nationwide Reform Of Consumer Reimbursement System For Out-Of-Network Health Care Charges | New York State Attorney General (ny.gov)).

[enrollee's] Primary Coverage, covered charges billed separately by the anesthesiologist, radiologist or pathologist will be paid in full by the Medical/ Surgical Program" (2018 Empire Plan Certificate at 63).

75.    As a result of these provisions, LI Anesthesia, as well as other anesthesia groups in the New York metropolitan area, were able to obtain reasonable reimbursement for providing high-quality, medically necessary anesthesia services to Empire Plan enrollees.

76.    Given that this reimbursement was based, in large part, on UCR rates established through Fair Health, the rates at which Empire Plan reimbursed LI Anesthesia, and other anesthesia groups, in the New York metropolitan area for providing medically necessary anesthesia services to Empire Plan enrollees were market rates.

77.    It was vitally important that the Empire Plan reimbursed LI Anesthesia and other anesthesia groups in the New York metropolitan area at these rates because, given the number of Empire Plan enrollees, Empire Plan reimbursement represented a significant amount of these groups' revenues.

78.    For example, in the years leading up to 2022, Empire Plan represented approximately 40% of LI Anesthesia's revenues.

79.    Upon information and belief, Empire Plan represented similar shares of revenues for other anesthesia groups in the New York metropolitan area.

80.    Empire Plan's reimbursement levels also significantly benefitted its enrollees. They had broad access to the finest out-of-network specialty physicians in the country. They were protected against the large balance bills and surprise bills that many other patients faced when they didn't have the protections that the Empire Plan enrollees had.

**New York Surprise Bill Law**

81.     Empire Plan enrollees and anesthesia practices such as LI Anesthesia were further benefitted in March 2015 when the New York Surprise Bill Law (Financial Services Law §§ 601-08) became effective.  Through Civil Service Law § 162, the Surprise Bill Law also applied to the Empire Plan (Civil Service Law § 162[1][b][iv]).

82.     Until January 2022, the Empire Plan was treated as subject to the Surprise Bill Law by all stakeholders, including the Empire Plan itself, the Department of Financial Services, state independent dispute resolution agencies, and out-of-network providers.

83.     Under the Surprise Bill Law, out-of-network providers, such as LI Anesthesia, were prohibited from billing patients if the bill would meet the Law's definition of a "Surprise Bill" or was a bill for "Emergency Services" (Financial Services Law § 606[a]).

84.     The Empire Plan and other health plans subject to the Surprise Bill Law were required under the Law to reimburse the out-of-network physicians at a "reasonable amount" for their covered medical services (Financial Services Law §§ 607[a][3] [surprise bills], 605[a][1] [emergency services bills]).

85.     Then, if a dispute existed between the health plan and the out-of-network physician as to what is "reasonable reimbursement" for the covered medical services at issues, either party may submit the dispute to the independent dispute resolution (IDR) process established by the Surprise Bill Law (Financial Services Law §§ 607[a][4] [surprise bills], 605[a][2] [emergency services bills]).

86.     A qualified independent dispute resolution (IDR) entity then reviewed the disputed bills code-by-code and selects either the out-of-network physician's fee or the health

plan's payment amount as the "reasonable fee for the services rendered" (Financial Services Law §§ 607[a][6] [surprise bills], 605[a][4] [emergency services bills]).

87.    In making its determination as to the reasonable fee for the services rendered, the Surprise Bill Law required the IDR entity to consider all relevant factors, including "the usual and customary cost of the service" (Financial Services Law § 604[f]).

88.    The Department of Financial Service's regulations regarding enforcement of the Surprise Bill Law defined "usual and customary cost," as set forth in Financial Services Law § 604(f), as "the 80th percentile of all charges for the particular health care service performed by a provider in the same or similar specialty and provided in the same geographical area as reported in a benchmarking database maintained by a nonprofit organization specified by the superintendent, which is not affiliated with a health care plan" (23 NYCRR §400.2[w]).

89.    Based on this regulation, the IDR entities used the FAIR Health database when selecting the reasonable fee on a code-by-code basis for the services rendered during the Surprise Bill Law dispute resolution process.

90.    Accordingly, at least for those circumstances constituting a surprise bill or an emergency services bill, out-of-network physicians, such as LI Anesthesia, had a remedy if Empire Plan failed to reimburse it near the UCR for covered medical services.

**LI Anesthesia Remains Out-of-Network**

91.    Indeed, these protections, and Empire Plan's reimbursement level, formed the basis of LI Anesthesia's refusal to enter into in-network participating provider agreements with UnitedHealthcare that included the Empire Plan business.

92.    Accordingly, when, in or around 2012, UnitedHealthcare started pressuring Good Samaritan Hospital to require LI Anesthesia to become an in-network participating provider, LI

Anesthesia agreed with UnitedHealthcare to become an in-network participating provider for its commercial health plan products, but expressly excluded the Empire Plan from the participating provider agreement. This preserved the favorable Empire Plan out-of-network reimbursement rates for LI Anesthesia. The in-network reimbursement rates imposed by UnitedHealthcare were significantly below these out-of-network reimbursement rates.

93.     Most other similarly situated anesthesia groups in the New York metropolitan area were similarly able to avoid entering into an in-network participating provider agreement that included the Empire Plan, to preserve the favorable out-of-network Empire Plan reimbursement rates for them as well.

**United's Dramatic Reduction in Reimbursement**

94.     All this has changed since January 1, 2022, when LI Anesthesia – and other out-of-network physicians – have begun being reimbursed by United for providing medically necessary anesthesia services to Empire Plan enrollees at amounts dramatically less than provided for in the Plan. The reimbursement to these anesthesiologists is in most cases **more than 80% less** than what they were reimbursed for the services in December 2021.

95.     United's explanation for this dramatic lowering of reimbursement is that it was "determined" that the Empire Plan no longer be subject to New York insurance laws or be subject to regulation by the Department of Financial Services.

96.     Rather, at United's insistence, the Empire Plan has "decided" that it will be treated like a non-governmental self-funded employee health plan, which are not subject to New York insurance laws or regulation by State's Department of Financial Services. The New York Surprise Bill Law does not apply to non-governmental self-funded employee health plans; the

out-of-network reimbursement procedures for those plans are governed by the federal No Surprises Act.

97.     Consequently, the Empire Plan is taking the position that it is no longer obligated to reimburse out-of-network physicians, including the Plaintiff physician practices, at the FAIR Health-determined UCR rates set forth in its plan certificates.

98.     In ordinary circumstances, when a New York regulated health plan fails to reimburse an out-of-network physician at the proper rate, the physician can file a complaint with the Department of Finance Services, and, if a surprise or emergency services bill is involved, submit the dispute to New York IDR.

99.     However, both avenues of redress would be unavailable if the Empire Plan is not subject to New York insurance law (including the Surprise Bill Law) or Department of Financial Services regulation.

100.    And, indeed, since January, United has responded to complaints made to the Department of Financial Services by out-of-network physician practices by contending that the Empire Plan is no longer subject to regulation by that agency. Likewise, since January, United has responded to New York IDR proceedings initiated by out-of-network physician practices by contending that because it is no longer subject to New York insurance laws, its reimbursements are no longer reviewable in New York IDR.

101.    Empire Plan, at United's insistence, has also taken the extraordinary step of communicating with the federal Centers for Medicare and Medicare Services (CMS) to persuade CMS to find – wrongly – that the Empire Plan is not legally subject to the New York Surprise Bill Law and, therefore, the No Surprises Act applies to its out-of-network reimbursement procedures.

102.   United is also contending – wrongly – that all hospital-based anesthesia cases fall under the No Surprises Act and accordingly, intentionally reimbursing for ambulatory and day admission surgeries at artificially low rates.

**No Surprises Act**

103.   In December 2020, the United States Congress enacted the No Surprises Act, which was signed into law as part of the Consolidated Appropriations Act of 2021 (Public Law 116-260; Division BB § 109) on December 27, 2020. It took effect on January 1, 2022.

104.   No Surprises Act § 103 amends 42 U.S.C. §§ 300gg *et seq*. to establish an IDR process for non-emergency services performed by non-participating physicians at in-network hospitals, hospital outpatient departments, critical access hospitals, and ambulatory surgical centers and out-of-network emergency services in the emergency department of a hospital or independent freestanding emergency department

105.   The No Surprises Act provides that the federal IDR process will apply and may be used by physicians and health plans to determine the out-of-network rate for emergency services in the emergency department of a hospital or independent freestanding emergency department and non-emergency items and services furnished by non-participating providers during a visit to a participating health care facility when a "specified state law" does not apply (42 U.S.C. § 300gg-111).

106.   Under 42 U.S.C. § 300gg-111(a)(3)(I), a "specified state law" is a state law that provides for a method of determining the total amount payable in the case of an insured receiving an item or service from a non-participating provider at a participating facility or emergency services in the emergency department of a hospital or independent freestanding emergency department (42 U.S.C. § 300gg-111[a][3][I]).

107.   For a state law to determine the amount upon which cost-sharing is based and the out-of-network rate, the state law must apply to: [a] the plan, issuer, or coverage involved; [b] the non-participating provider or non-participating emergency facility involved; and [c] the item or service involved. (42 U.S.C. § 300gg-111).

108.   When a state has a specified state law, that state law and state IDR process, rather than the federal IDR process, will apply and the amount upon which cost-sharing is based and the out-of-network rate for emergency and non-emergency services subject to surprise billing protections are calculated based on such specified state law (*id.*).

109.   The No Surprises Act specifically deferred to state law, when there was one, precisely because its drafters recognized that states have differing, and unique health care systems and applicable state laws might therefore be more effective than a one-size-fits-all federal law. This is particularly apt here, given that New York since 2015 has had one of the most, complex, robust, and sophisticated surprise bill laws in the country.

110.   Accordingly, in New York, the provisions of the Surprise Billing Law constitutes a "specified state law" under the No Surprises Act, because, for health plans and circumstances governed by it, the Surprise Bill Law has a method for determining the total amount payable— the health plan pays what it determines to be a reasonable amount, and then either the health plan or the out-of-network physician can submit the matter to IDR, which will determine the reasonable payment amount using the Financial Services Law §§ 600-08.

111.   Thus, even after the No Surprises Act took effect this January, for health plans and circumstances covered by the Surprise Bill Law, that Law, and not the federal No Surprises Act, governs the reimbursement of out-of-network physicians.

112.   Indeed, the Department of Financial Services recognized this when it issued Circular Letter No. 10, in December 2021. In this Letter, the Department of Financial Services stated: "New York has an IDR process that applies to out-of-network emergency services, including inpatient services that follow an emergency room visit, in hospital facilities, and surprise bills in participating hospitals or ambulatory surgical centers and for services referred by a participating physician. The IDR process requires issuers, physicians, hospitals and ambulatory surgical centers, and providers to whom the patient was referred by their participating physician, to ensure that the insured incurs no greater out-of-pocket costs for emergency services and surprise bills than the insured would have incurred with an in-network provider.   **Since New York has a specified state law, the New York IDR process will continue to apply to out-of-network emergency services and surprise bills**" (New York State Department of Financial Services, Circular Letter 10 [2021]). A true and correct copy of this Circular Letter is annexed as Exhibit C and incorporated by reference in the Complaint herein.

113.   Moreover, through the Circular Letter, the Department of Financial Services broadened the coverage of the Surprise Bill Law to cover more scenarios, rather than have those scenarios default to the No Surprises Act.

114.   Following this provision, virtually all health plans subject to New York regulation recognized that the New York IDR process continues to apply to out-of-network emergency services and surprise bills since the No Surprises Act became effective January 1, 2022.

115.   The New York IDR process is preferable for out-of-network physicians over the federal IDR process, because the New York process is independent and fair, focusing on the FAIR Health-determined UCR rate, while the federal IDR process focuses on the Qualifying

Payment Amount (QPA), which is biased as solely determined by the health plan, and is based on its median in-network rates for the same service in a similar geographic area (42 U.S.C. § 300gg-111[a][3][E]), 111[c][5][C][i][I]).

116.   In virtually all circumstances, the QPA is significantly less than the FAIR Health-determined UCR amount. Indeed, use of  and reliance on the QPA has been roundly criticized in the health care industry (Don't skew surprise-billing regulations in health plans' favor | American Medical Association (ama-assn.org) [accessed Mar. 13, 2022]).   One federal court has even invalidated parts of the No Surprises Act regulations for being improperly too reliant on the QPA (Memorandum Opinion and Order [Dkt Entry 113], *Texas Med. Ass'n v. United States Dep't of Health & Human Servs.*, 6:21-cv-00425-JDK [ED Tex Feb. 23, 2022]).

117.   Unfortunately, United's efforts did not end with taking the position – wrongly – that the Empire Plan was no longer governed by New York law.[2]

**United's and MultiPlan's Scheme to Deprive Anesthesia Providers of Reimbursement**

118.   After Empire Plan refused to participate in New York IDR for disputed reimbursement claims, LI Anesthesia and other anesthesia groups believed they had no choice but to invoke the federal IDR process under the No Surprise Act.

119.   These groups have done so under complete reservations of rights; making it clear that they were seeking federal IDR only because of the Empire Plan's position. They believed that New York IDR was the proper vehicle for resolution of the disputed claims.

120.   Puzzlingly, Empire Plan's response to the invocation of the federal IDR process was to contend to the IDR entity that, somehow, it was exempt from the federal IDR process as well.

---

[2] LI Anesthesia, along with other out-of-network physician groups, have strongly disagreed with United's position regarding the Empire Plan and, accordingly, have commenced a lawsuit in the New York Supreme Court, Albany County, challenging Empire Plan's actions, contending that they violate New York Civil Service Law § 162.

121.   Accordingly, LI Anesthesia and other anesthesia groups received responses from the federal IDR entities that "[t]he non-initiating party has provided reason as to why this dispute does not apply for the IDR process. CMS will take a more detailed look into this dispute to determine eligibility. I am unable to provide a time frame at the moment but will keep you updated on the status. It was communicated to us that once a dispute is on hold the timeline is also on hold and therefore there will be no penalty if any deadlines are missed."

122.   There is no statute, regulation, guidance, or case that would make the Empire Plan exempt from both the NY state and federal IDR processes for the same claims during the same time frame.

123.   Unfortunately, the correspondence from the federal IDR entities was not the end of the saga. Several days after receiving the correspondence, LI Anesthesia started receiving written communications from MultiPlan, identifying itself as working with UnitedHealthcare.

124.   The communications purport to respond to LI Anesthesia's "Open Negotiation Notice," and state that the claims have "been identified as a No Surprises Bill under the No Surprises Act. We are offering the Qualifying Payment Amount to resolve this for payment in response to your Open Negotiation Notice. . .. Please note the following[:] upon expiration of the 30-business-day open negotiation period required by the No Surprises Act. If you choose to submit the Federal IDR Process, you must submit a Notice of IDR Initiation through the Federal IDR Portal. . . ."

125.   The first set of these notices demand a response in less than 24 hours' time. Thus, it appears from these communications, that UnitedHealthcare, through MultiPlan, was now acknowledging that the federal IDR process applied. When LI Anesthesia and other anesthesia

group representatives called MultiPlan to negotiate the payment amounts, MultiPlan representatives flatly refused, stating that they were only authorized to offer the QPA amount.

126.   Thereafter, LI Anesthesia and other anesthesia practices started receiving more notices from MultiPlan as UnitedHealthcare's representative. These notices demanded a response within 45 minutes of receipt, and ominously warned LI Anesthesia that the "No Surprises Act states you must provide justification for your offer on the Open Negotiation Notice request. Some common reasons could be patient severity and acuity, provider level of training, facility teaching status or market share. Our offer is based on the information we currently have available. Failure to provide the requested information will result in your Open Negotiation Notice request being closed without a good faith engagement."

127.  Once again, contrary to MultiPlan's representations, there is no statute, regulations, or guidance that obligates LI Anesthesia to provide it with detailed information regarding its reimbursement claims within 45 minutes of demand.

128.   To make such demands in connection with scores of reimbursement disputes is the height of bad faith, particularly given the threat that non-compliance will result in the closure of the Open Negotiation period and the implied loss of the right to pursue the disputes.

129.   The whole position is particularly disingenuous given that MultiPlan already has said that it has no intent to negotiate further. It is hard to conceive of a scenario other than that this whole process is a cynical attempt to foreclose LI Anesthesia from pursuing any type of IDR on these claims.

130.   Other anesthesia groups on Long Island similarly situated to LI Anesthesia received similar correspondence from United and MultiPlan.

131.   Not only does this correspondence serve to effectively deny LI Anesthesia and other similarly situated anesthesia providers the ability to contest these abysmally low reimbursement rates, but it is flooding each provider with such a large volume of correspondence demanding responses in ever shortening periods of time – as short of 15 minutes – as to make it impossible to keep up with the flood of correspondence and still keep up with the ability to routinely bill and collect for other anesthesia services.

132.   Given all the circumstances, the only logical conclusion that can be drawn is that this campaign of excessive correspondence with exceedingly short deadlines is designed to force anesthesia providers from abandoning their challenges to Empire Plan's low reimbursement.

133.   And this is exactly what has happened. Many practices receiving this torrent of correspondence from MultiPlan and United have made the decision not to challenge Empire Plan's low reimbursement rates simply because they lack the bandwidth or resources to keep up with the MultiPlan and United correspondence while at the same time performing routine billing and collection tasks.

**Anti-Competitive Harm Caused Anesthesia Providers**

134.   As a result of these actions, which continue to date, LI Anesthesia and other anesthesia groups are in the untenable and unenviable position where their reimbursement for providing medically necessary anesthesia services have been dramatically cut – more than 80% –by United, with the assistance of MultiPlan, and they have no viable avenue to redress these cuts.

135.   The actions of United and MultiPlan regarding the Empire Plan have caused significant harm. The sudden, precipitous decrease in reimbursement – to less than 20% of what

it was in December 2021 – is devastating to LI Anesthesia and other anesthesia providers, particularly given skyrocketing expenses due to inflation and the uncertain economic climate. As a result, many anesthesia practices will be forced to go out of business or dramatically curtail their services.

136.   Those out-of-network physician practices that survive in the short run will be severely hampered in their ability to recruit and retain high quality recently trained physicians or acquire new medical equipment and information systems.

137.   Since these practices provide medically necessary surgical and specialty medical services to Plan's 1.2 million enrollees, the enrollees' access to his high-quality care will be severely restricted, if not eliminated. Quality of care will decline. New York will lose its status as a center for high-quality, innovative medical care.

138.   Defendants' actions are disrupting longstanding relationships that its enrollees have with out-of-network physicians. These physicians intimately know the enrollees' unique medical conditions and how best to treat them.  All this will be lost, jeopardizing the health and well-being New York's public employees and their dependents during these very stressful times.

139.   Taken as a whole, the consequences that Empire Plan enrollees will suffer at the hands of Defendants include the loss of continuity of medical care, significant delays in the provision of care due to the lack of or restricted access to out-of-network physicians, potential exposures to surprise and balance bills, and significant increases in adverse health outcomes, including serious illness and the potential loss of life.

**Defendants' Anti-Competitive Motives**

140.   Defendants' conduct is particularly egregious given that its intent in undertaking this conduct is simply anticompetitive harm and restraint of trade.

141.   Put simply, United, aided by MultiPlan, is using its significant market power to drive down out-of-network anesthesia reimbursement rates in the New York metropolitan area knowing full well that the impact of lower reimbursement rates will be to drive out anesthesia providers such as LI Anesthesia.

142.   Driving anesthesia providers such as LI Anesthesia from the market will significantly benefit United because, as alleged above, United, through its OptumCare subsidiary, provides anesthesia services in market and is looking to expend its delivery of all healthcare services, including anesthesia services, in the New York metropolitan area.

143.   Thus, the elimination of independent anesthesia providers, such as LI Anesthesia, from the market, will significantly benefit United at the expense of LI Anesthesia and other similarly situated anesthesia providers.

144.   Not only will Defendants' actions harm LI Anesthesia, but they will also harm other anesthesia providers and, indeed, the whole market.

145.   Given United's size and market share, the dramatic lowering of its reimbursement rate for anesthesia services is causing, and will continue to cause, a significant number of anesthesia practices to leave the relevant market by either going out of business entirely or being forced to sell their practices to hospitals or multispecialty groups. Those that survive have will be seriously hampered in their ability to compete.

146.   This will result in decreased output and quality of anesthesia services.

147.   The dramatic lowering of reimbursement rates will also have a direct negative economic effect on patients, because those patients with high deductible plans or plans with large cost-sharing requirements for out-of-network services may have to pay significantly more out-of-pocket to receive medically necessary services.

148.   Because of all the foregoing, Defendants' actions have greatly and irreparably harmed competition in general and LI Anesthesia in particular.

149.   There is no reasonable, pro-competitive justification for Defendants' actions, much less one that outweighs these anti-competitive effects.

150.   Indeed, while United is decreasing the amount it pays for anesthesia services in the relevant market, it is not passing on these savings to patients or the purchasers of health care coverage.

151.   Indeed, premiums have increased. For 2022, United sought an increase in premiums for the small group market in the amount of 17.5%; it obtained an increase of 6.3%. For 2023, United seeks an increase of 19.1%.

## SUMMARY OF ANTITRUST ALLEGATIONS

### Relevant Product Market

152.   The relevant product market at issue here is the provision of medically necessary anesthesia services to patients.

153.   Anesthesia services comprises the use of various injected and inhaled medications to produce a loss of sensation in patients, making it possible to carry out procedures that would otherwise cause intolerable pain or be technically unfeasible.

154.   Safe anesthesia requires in-depth knowledge of various invasive and non-invasive organ support techniques that are used to control patients' vital functions while under the effects

of anesthetic drugs; these include advanced airway management, invasive and non-invasive hemodynamic monitors, and diagnostic techniques like ultrasonography and echocardiography. Anesthesiologists are expected to have expert knowledge of human physiology, medical physics, and pharmacology, as well as a broad general knowledge of all areas of medicine and surgery in all ages of patients, with a particular focus on those aspects which may impact on a surgical procedure

155. In recent decades, the role of anesthesiologists has broadened to focus not just on administering anesthetics during the surgical procedure itself, but also beforehand to identify high-risk patients and optimize their fitness, during the procedure to maintain situational awareness of the surgery itself to improve safety, as well as afterwards to promote and enhance recovery.

156. Anesthesiologists are also responsible for ensuring adequate pain relief for patients in the immediate postoperative period. The field comprises individualized strategies for all forms of analgesia, including pain management during childbirth, neuro-modulatory technological methods such as transcutaneous electrical nerve stimulation or implanted spinal cord stimulators, regional anesthesia and nerve blocks, and specialized pharmacological regimens.

157. Only appropriately educated, trained, and experienced anesthesiologists have the necessary skills and training to provide these services.

158. Other physicians or clinicians do not have the expertise to competently provide these services and therefore cannot be considered reasonable substitutes.

159. The relevant product market at issue here is the New York metropolitan area.

**Relevant Geographic Market**

160.  Given the chronic and urgent nature of most medical problems requiring procedures performed under anesthesia, patients need to seek this treatment close to where they live and work.

161.  Generally, most patients are willing to travel, under the best of circumstances, only about 30 minutes for health care services.[3]

162.  Accordingly, the relevant geographic market for anesthesia services in this lawsuit is no larger than the New York metropolitan area, including New York City, Nassau, Suffolk, and Westchester Counties.

**United's Market Power**

163.  LI Anesthesia participates in this market as a "seller" of anesthesia services. Other anesthesia providers – including OptumCare practices – also participate in this market as sellers.

164.  Accordingly, LI Anesthesia and other similarly situated anesthesia providers are horizontal competitors of United in this market.

165.  The patients of LI Anesthesia, as well as the patients of the other anesthesia providers in the relevant market participate in the relevant market as consumers of anesthesia services.

166.  In addition to competing in the market as a seller of anesthesia service, United -- through administering the Empire Plan and other health plans as well as directly providing health plans itself – also participates in the relevant market as a payer or "purchaser" of anesthesia services to the extent plan enrollees seek anesthesia services in the relevant market.

---

[3] https://altarum.org/sites/default/files/uploaded-publication-files/Altarum_Travel-and-Wait-Times-for-Health-Care-Services_Feb-22.pdf.

167.   Multiplan, to the extent that it assists plans in terms of calculating reimbursement levels and facilitating reimbursement, also constitutes a market participant as a payer or purchaser of anesthesia services.

168.   For these reasons, the provision of anesthesia services in the New York metropolitan area is the proper antitrust market in connection with this lawsuit.

169.   United has market power in this market.   As alleged above, Defendants' actions have had, and will continue to have, an actual adverse effect on competition in terms of decreased output and quality in the market for anesthesia services in the New York metropolitan area.

170.   Additionally, as alleged above, United has a significant share of the market in the New York area. Depending on the health plan product involved, United's market share is as high as 66%. Its share of commercial insurers in the New York City market (defined as Suffolk, Nassau, Queens, Kings, Richmond, New York, Bronx, Westchester, Putnam, and Rockland Counties) as of the third quarter of 2019 was 50%.

171.   And, in the New York market, United also acts as the administrator of the Empire Plan, which is part of the New York State Health Insurance Program (NYSHIP). This Program provides health coverage for over 1.2 million public employees in New York.

172.   In the New York metropolitan area, the Empire Plan represents a significant payer of reimbursement for anesthesia services. As alleged above, for LI Anesthesia and similarly situated anesthesia practices, approximately 40% of revenues is received from the Empire Plan.

**Defendants' Anti-Competitive Conduct**

173.   As alleged above, Defendants' anti-competitive conduct here has included significantly reducing reimbursement to anesthesia providers such as LI Anesthesia to more than 80% below previous market levels.

174.   Defendants have then taken steps such as bogus negotiations, applying unrealistic deadlines, and burying practices in mountains of correspondence, to force anesthesia practices to accept these low rates.

175.   These actions have been undertaken as part of a contract, combination, or conspiracy between United and MultiPlan.

176.   Under this contract, combination, or conspiracy, MultiPlan agreed to assist United in attempting to force low reimbursement rates and applying other pressure tactics upon LI Anesthesia and other anesthesia providers, in exchange for a share in the savings.

177.   MultiPlan undertook these actions knowing that they would cause significant competitive harm to LI Anesthesia and other anesthesia providers.

178.   Defendants' motive is to force LI Anesthesia and other similarly situated anesthesia providers from the market to provide a competitive advantage to United.

**Harm to Competition**

179.   This scheme has harmed, and will continue to harm, competition in the relevant market. Given United's size and market share, the dramatic lowering of its reimbursement rate for anesthesia services is causing, and will continue to cause, a significant number of anesthesia practices to leave the relevant market by either going out of business entirely or being forced to sell their practices to hospitals or multispecialty groups. Those that survive have will be seriously hampered in their ability to compete. This will result in decreased output and quality of anesthesia services.

180.   The dramatic lowering of reimbursement rates will also have a direct negative economic effect on patients, because those patients with high deductible plans or plans with large cost-sharing requirements for out-of-network services may have to pay significantly more out-of-pocket to receive medically necessary services.

181.   Moreover, there is no reasonable, pro-competitive justification for Defendants' actions, much less one that outweighs these anti-competitive effects. Indeed, while United is decreasing the amount it pays for anesthesia services in the relevant market, it is not passing on these savings to patients or the purchasers of health care coverage.

182.   For these reasons, judicial intervention is vitally needed.

## **FIRST CAUSE OF ACTION**

183.   LI Anesthesia repeats and re-alleges each of the above paragraphs as though fully set forth herein.

184.   At all times relevant to this Complaint, under the circumstances listed above, Defendants have entered contracts, combinations, or conspiracies in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

185.   These contracts, combinations, or conspiracies have caused substantial anticompetitive effects, including the exclusion of competition by LI Anesthesia and other anesthesia providers, ultimately leading to lower quality and output of anesthesia services available to patients.

186.   These contracts, combinations, or conspiracies have no legitimate business justification or offsetting procompetitive benefit.  They achieve no legitimate efficiency benefit to counterbalance the anticompetitive effects that they cause.

187.   Because of the foregoing, LI Anesthesia has been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

188.   LI Anesthesia repeats and re-alleges each of the above paragraphs as though fully set forth herein.

189.   United possesses monopsony power in market for the reimbursement of anesthesia services in the New York metropolitan area.

190.   United is willfully maintaining that monopsony power through anticompetitive conduct including, but not limited to, dramatically decreasing the reimbursement rate for anesthesia services in the relevant market to below-market and below-cost levels to drive anesthesia providers from the market.

191.   United is leveraging that monopsony power to gain anticompetitive advantage in the market for the provision of anesthesia services in the New York metropolitan area.

192.   Because of the foregoing, LI Anesthesia has been damaged in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

193.   LI Anesthesia repeats and re-alleges each of the above paragraphs as though fully set forth herein.

194.   United has engaged in predatory or anticompetitive conduct including, but not limited to, dramatically decreasing the reimbursement rate for anesthesia services in the relevant market to below-market and below-cost levels to drive anesthesia providers from the market.

195.   United undertook this conduct with the specific intent to monopsonize.

196.   United has a dangerous probability of achieving monopsony power.

197.   Because of the foregoing, LI Anesthesia has been damaged in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**

198.   LI Anesthesia repeats and re-alleges each of the above paragraphs as though fully set forth herein.

199.   Defendants possess and exercise market power in the relevant product and geographic markets identified in this Complaint.

200.   At all times relevant to this Complaint, Defendants, have entered contracts, combinations, or conspiracies in unreasonable restraint of trade in violation of the Donnelly Act, General Business Law §§ 340, *et seq*.

201.   These contracts, combinations, or conspiracies have caused substantial anticompetitive effects, including the exclusion of competition by LI Anesthesia and other providers of anesthesia services, ultimately leading to lower quality anesthesia services available to patients.

202.   These contracts, combinations, or conspiracies have no legitimate business justification or offsetting procompetitive benefit.  They achieve no legitimate efficiency benefit to counterbalance the anticompetitive effects that they cause.

203.   Because of the foregoing, LI Anesthesia has been damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

204.   LI Anesthesia repeats and re-alleges each of the above paragraphs as though fully set forth herein.

205.   Defendants were enriched by receiving fees and retaining reimbursement through its scheme of improperly reducing LI Anesthesia's reimbursement.

206.   This enrichment was at the expense of LI Anesthesia.

207.   It is against equity and good conscience to permit Defendants to retain what is sought to be recovered.

208.   By reason of the foregoing, LI Anesthesia been damaged in an amount to be determined at trial.

209.   By reason of the foregoing, Defendants have engaged in reckless and morally reprehensible conduct, therefore entitling LI Anesthesia to recover punitive damages.

## DEMAND FOR RELIEF

**WHEREFORE**, the Plaintiff, Long Island Anesthesiologists, PLLC, respectfully requests the following relief:

(a)   On the first cause of action, a declaration that Defendants' conduct constitutes violations of Sherman Act § 1, 15 U.S.C. § 1; a permanent injunction preventing Defendants and their agents and employees from continuing their unlawful actions set forth herein, including engaging in retaliatory and punitive negotiations with Plaintiff; an award of damages in an amount to be determined at trial, to be trebled according to law, to compensate LI Anesthesia for the damages it incurred from Defendants' violations of law; an award of prejudgment interest; and an award of reasonable attorneys' fees and the costs of suit incurred.

(b)   On the second cause of action, a declaration that United's conduct constitutes violations of Sherman Act § 2, 15 U.S.C. § 2; a permanent injunction preventing United and its agents and employees from continuing their unlawful actions set

forth herein, including engaging in retaliatory and punitive negotiations with Plaintiff; an award of damages, in an amount to be determined at trial, to be trebled according to law, to compensate LI Anesthesia for the damages it incurred from United's violations of law; an award of prejudgment interest; and an award of reasonable attorneys' fees and the costs of suit incurred.

(c)     On the third cause of action, a declaration that United's conduct constitutes violations of Sherman Act § 2, 15 U.S.C. § 2; a permanent injunction preventing United and its agents and employees from continuing their unlawful actions set forth herein, including engaging in retaliatory and punitive negotiations with Plaintiff; an award of damages, in an amount to be determined at trial, to be trebled according to law, to compensate LI Anesthesia for the damages it incurred from United's violations of law; an award of prejudgment interest; and an award of reasonable attorneys' fees and the costs of suit incurred.

(d)     On the fourth cause of action, an award of damages in an amount to be determined at trial.

(e)     On the fifth cause of action, an award of compensatory and punitive damages in an amount to be determined at trial.

(f)     Such other and further relief this Court deems just and proper including the costs, disbursements, attorney's fees, and other allowances of this action.


Dated: Uniondale, New York
      June 30, 2022

                      HARRIS BEACH, PLLC.
                      *Attorneys for Plaintiff*

                      By _____
                          Roy W. Breitenbach
                          Daniel Hallak

                      The Omni
                      333 Earle Ovington Boulevard
                      Uniondale, New York 11553
                      (516) 880-8378

TO:    UNITEDHEALTHCARE INSURANCE
COMPANY OF NEW YORK, INC.
185 Asylum Street,
Hartford, Connecticut 06103

MULTIPLAN, INC.
115 Fifth Avenue, 7th Floor
New York, New York 10003