**EXHIBIT 1**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ALBANY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - )    Index No. _____/2022

WAYNE JOSEPH; THOMAS COTTONE, SONYA HWANG
COTTONE: LORETTA POST; LONG ISLAND
ANESTHESIOLOGISTS, PLLC; LONG ISLAND
ANESTHESIA PHYSICIANS, LLP.; NEW YORK
CARDIOVASCULAR ANESTHESIOLOGISTS, P.C.;
SUFFOLK ANESTHESIOLOGY ASSOCIATES, P.C.;
ADVANCED PLASTIC SURGERY OF LONG ISLAND,
PLLC.; DA MEDICAL SERVICES PLLC; DA SILVA
PLASTIC & RECONSTRUCTIVE SURGERY, P.C.; HAND
ASSOCIATES OF LONG ISLAND, P.C.; ISLANDWIDE
SURGICAL, P.C.; K. JACOB COHEN-KASHI, M.D. &
LAWRENCE C. LIN, MD, PLLC; LISA CORRENTE, M.D.,
P.C.; LONG ISLAND NEUROSURGICAL & PAIN
SPECIALISTS, PLLC; LONG ISLAND THORACIC
SURGERY, P.C.; MONTAUK MEDICAL ASSOCIATES
PLLC.; PERFORMANCE MEDICAL PRACTICE PLLC;
SAGTIKOS MEDICAL SERVICES, P.C.; SPINE MEDICAL
SERVICES, PLLC; and UNITED MEDICAL MONITORING,
P.C.,

Plaintiffs,

vs

REBECCA CORSO, as Acting Commissioner, NEW YORK
STATE DEPARTMENT OF CIVIL SERVICE;
UNITEDHEALTHCARE INSURANCE COMPANY OF NEW
YORK INC., as Program Administrator, THE EMPIRE PLAN
MEDICAL/SURGICAL PROGRAM; and ADRIENNE A.
HARRIS, as Superintendent, NEW YORK STATE
DEPARTMENT OF FINANCIAL SERVICES,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## **COMPLAINT**

Plaintiffs, Wayne Joseph, Thomas Cottone, Sonya Hwang Cottone, Loretta Post,; Long

Island Anesthesiologists, PLLC; Long Island Anesthesia Physicians, LLP.; New York

Cardiovascular Anesthesiologists, P.C.; Suffolk Anesthesiology Associates, P.C.; Advanced

Plastic Surgery of Long Island, PLLC.; DA Medical Services PLLC; Da Silva Plastic & Reconstructive Surgery, P.C.; Hand Surgery Associates of Long Island, P.C.; Islandwide Surgical, P.C.; K. Jacob Cohen-Kashi, M.D. & Lawrence C. Lin, MD, PLLC; Lisa Corrente, M.D., P.C.; Long Island Neurosurgical & Pain Specialists, PLLC.; Long Island Thoracic Surgery, P.C.; Montauk Medical Associates PLLC; Performance Medical Practice PLLC; Sagtikos Medical Services, P.C.; Spine Medical Services, PLLC; and United Medical Monitoring, P.C., by their attorneys, Harris Beach PLLC, for their Complaint against the Defendants, Rebecca Corso, as Acting Commissioner, New York State Department Of Civil Service; UnitedHealthcare Insurance Company Of New York Inc., as Program Administrator, The Empire Plan Medical/Surgical Program; and Adrienne A. Harris, as Superintendent, New York State Department of Financial Services, allege as follows:

## PRELIMINARY STATEMENT

1. As the health benefit plan for New York public employees and their dependents, the Empire Plan is one of the largest health plans in New York, with over 1.2 million enrollees. It funds and provides health benefits directly to those enrollees, using UnitedHealthcare as its Medical/Surgical Program plan administrator. The state agency responsible for overseeing the Plan is the Department of Civil Service. Put simply, the Empire Plan plays a vital role in ensuring the health, safety, and well-being of the hundreds of thousands of New Yorkers who protect us, teach us, move us, lead us, and keep the Empire State running. Particularly during these last two years of a global pandemic, the Empire Plan is a cornerstone of New York's health care system.

2. The Legislature first permitted the Empire Plan to provide health benefits directly to enrollees using the state's funds in 2010. At the same time, the Legislature through Civil Service Law § 162 directed the Plan to comply with all New York insurance laws and be subject to state

regulation, which currently is provided by the Department of Financial Services. In the Legislature's view, the state regulation mandated by Civil Service Law § 162 is vital to ensure that New York public employees and their dependents receive the high-quality health care they so justly deserve.

3.      Since inception, the Empire Plan has been designed to provide its enrollees with broad access to the best physicians this state has to offer, regardless of whether those physicians are in the Plan's network, or out-of-network. Historically, the Empire Plan has reimbursed out-of-network physicians at the Usual, Customary, and Reasonable (UCR) rates, approximating those set by the state-sanctioned FAIR Health© benchmarking database. The Empire Plan also reimbursed in full covered services provided by out-of-network radiologists, anesthesiologists, and pathologists at in-network hospitals.

4.      This broad coverage was furthered in March 2015 when the New York Emergency Medical Services and Surprise Bills Act (the "Surprise Bill Law") became effective.[1] The Surprise Bill Law applies to all fully insured health coverage in New York and, through Civil Service Law § 162, to the Empire Plan.

5.      Accordingly, out-of-network physicians had the ability, for interactions that met the surprise bill or emergency services criteria, to submit a reimbursement dispute to a state independent dispute resolution (IDR) entity, which was required to consider the FAIR Health benchmarking database when determining the reasonable fee. This ensured that out-of-network physicians were regularly reimbursed near the UCR rate.

───────────────

[1] Financial Services Law §§ 601-08.

6.      In December 2020, Congress enacted the No Surprises Act,[2] which took effect on January 1, 2022. The Act establishes a federal IDR process to determine the out-of-network rate in certain circumstances when a "specified state law" does not apply.  New York's Surprise Bill Law constitutes a "specified state law" under the No Surprises Act because, for health plans and circumstances governed by it, the Surprise Bill Law has a method for determining the fairness of amounts payable to out-of-network physicians.

7.      Thus, health plans and circumstances covered by the Surprise Bill Law, that Surprise Bill Law, and not the No Surprises Act, governs the reimbursement of out-of-network physicians.  The Department of Financial Services itself has recognized this in its Circular Letter No. 10.[3]

8.      Starting in January 2022, however, the Empire Plan unilaterally determined itself no longer subject to New York insurance law or Department of Financial Services' regulation. Consequently, the Empire Plan considers itself no longer obligated to reimburse out-of-network physicians at the long-standing UCR rates used in New York. As a result, starting in 2022, Empire Plan unilaterally cut reimbursement to out-of-network physicians by more than 80%.

9.      Historically, when a state-regulated health plan failed to reimburse an out-of-network physician at the proper UCR rate, the physician could file a complaint with the Department of Financial Services. If a surprise or emergency services bill was involved, the physician could also submit the dispute as a New York IDR per the Surprise Bill Law.

---

[2] Consolidated Appropriations Act, 2021 (Public Law 116-260; Division BB, § 109).
[3] "Since New York has a specified state law, the New York IDR process will continue to apply to out-of-network emergency services and surprise bills."

10.     Since January, however, the Empire Plan has responded to Department of Financial Services' complaints made by out-of-network physicians by contending that it is no longer subject to that agency's regulation.  The Empire Plan also has responded to New York IDR proceedings by contending its reimbursements are no longer reviewable on the state level.

11.     The Empire Plan also is attempting to persuade the federal Centers for Medicare and Medicare Services that it is not legally subject to the Surprise Bill Law and, therefore, the No Surprises Act exclusively applies to its out-of-network reimbursement procedures.

12.     As we explain in detail below, the Empire Plan cannot prevail in these efforts to override Civil Service Law § 162 by unilaterally declaring itself no longer subject to state law or regulation. Civil Service Law § 162 specifically and unambiguously mandates that the Empire Plan's actions "shall be subject to review by the superintendent of financial services for the purposes of ensuring compliance with applicable insurance law and any and all associated insurance rules and regulations as noted in this subdivision" (*id.*).

13.     Accordingly, the Empire Plan's actions are illegal and must cease immediately. The Empire Plan also must comply with Civil Service Law § 162 by confirming it remains subject to state insurance law and Department of Financial Services' regulation, including the Surprise Bill Law.

14.     Judicial intervention here is sorely needed because the Empire Plan's illegal actions are causing substantial and irreparable harm.  If these actions do not immediately cease, thousands of high-quality, well-respected out of network physician practices that provide medically necessary surgical and specialty medical services to Plan enrollees will go out of business or drastically curtail their services.  Those that survive in the short run will be severely hampered in

their ability to recruit and retain high quality recently trained physicians or acquire new medical equipment and information systems, causing New York to lose its' status as a center for high-quality, innovative medical care.  The current accessibility of quality medical care available to Empire Plan's 1.2 million enrollees will be severely impacted, and irreparably so for those patients that require such care now.

15.    Empire Plan's actions will disrupt longstanding relationships that its enrollees have with their chosen out-of-network physicians. In many instances, these physicians have treated enrollees' and their families for years and have managed their unique medical conditions.  All of this will be lost due to Empire Plan's unilateral actions, thereby jeopardizing the health and well-being of New York's public employees and their dependents, as well as the New York health system generally, during these very stressful times.

16.    Additionally, the Empire Plan's illegal actions will directly and significantly impact the availability of emergency medical services at hospitals throughout the state.  Many hospitals depend on out-of-network physicians to "take call" and come into hospitals in order to provide emergency care.  Right now, many of the specialists in the state who provide such emergency care are out-of-network.  Thus, Empire Plan's actions will cause Plan enrollees, and patients in this state as a whole, to lose access to life-saving emergency treatment.

17.    For years, a major selling point of public employment in New York has been the Empire Plan's out-of-network benefit, giving enrollees a wide option of high-quality physicians to choose from. Unfortunately, if the Empire Plan's actions are allowed go unchecked, this sadly will no longer be the case.

18. For all these reasons, this Court should grant the requested declaratory judgment that the Empire Plan's unilateral attempt to override Civil Service Law § 162 is illegal, improper, and contrary to law. This Court should also permanently enjoin Defendants from contending to any person or agency that the Empire Plan is not subject to state law or Department of Financial Services regulation and award such other relief that the Court deems proper, including an award of attorneys' fees to Plaintiffs under the Equal Access to Justice Act (CPLR Article 86).

## PARTIES

19. Plaintiff Wayne Joseph is an enrollee of the Empire Plan. He resides at 329 Archer Street, Freeport, New York 11520.

20. Plaintiff Thomas Cottone is an enrollee of the Empire Plan. He resides at 1 Evans Lane, Setauket, New York 11733.

21. Plaintiff Sonya Hwang Cottone is an enrollee of the Empire Plan. She resides at 1 Evans Lane, Setauket, New York 11733.

22. Plaintiff Loretta Post is an enrollee of the Empire Plan. She resides at 740 East Broadway, Apt #5A, Long Beach, New York 11561.

23. Plaintiff Long Island Anesthesiologists, PLLC is a New York professional medical limited liability company with an address of 1000 Montauk Highway, West Islip, New York 11795.

24. Plaintiff Long Island Anesthesia Physicians, LLP. is a New York professional medical limited liability company with an address of 333 Route 25A, Suite 225, Rocky Point, New York 11778.

25.     Plaintiff New York Cardiovascular Anesthesiologists, P.C. is a New York professional medical corporation with an address of 100 Port Washington Boulevard, Roslyn, New York 11576.

26.     Plaintiff Suffolk Anesthesiology Associates, P.C. is a New York professional medical corporation with an address of 50 Route 25A, Smithtown, New York 11787.

27.     Plaintiff Advanced Plastic Surgery of Long Island, PLLC is a New York professional medical limited liability company with an address of 1800 Merrick Road, Merrick, New York 11566.

28.     Plaintiff DA Medical Services PLLC is a New York professional medical limited liability company with an address of 160 East 56th Street, New York, New York 10022.

29.     Plaintiff Da Silva Plastic & Reconstructive Surgery, P.C. is a New York professional medical corporation with an address of 3072 East Jericho Turnpike, Suite 202, East Northport, New York 11731.

30.     Plaintiff Hand Surgery Associates of Long Island, P.C. is a New York professional medical corporation with an address at 166 East Main Street, Huntington, New York 11743.

31.     Plaintiff Islandwide Surgical, P.C. is a New York professional medical corporation, with an address of 1129 Northern Boulevard, Manhasset, New York 11030.

32.     Plaintiff K. Jacob Cohen-Kashi, M.D. & Lawrence C. Lin, MD, PLLC is a New York professional medical limited liability company, with an address of 935 Northern Boulevard, Great Neck, New York 11024.

33.     Plaintiff Lisa Corrente, M.D., P.C. is a New York professional medical corporation with an address of 160 East 56th Street, 4th Floor, New York, New York 10022.

34.     Plaintiff Long Island Neurosurgical & Pain Specialists, PLLC is a New York professional medical limited liability company, with an address of 1175 Montauk Highway, Suite 6, West Islip, New York 11795.

35.     Plaintiff Long Island Thoracic Surgery, P.C. is a New York professional medical corporation, with an address of 444 Merrick Road, Suite 380, Lynbrook, New York 11563.

36.     Plaintiff Montauk Medical Associates PLLC. is a New York professional medical limited liability company with an address of P.O. Box 129, Old Westbury, New York 11568.

37.     Plaintiff Performance Medical Practice PLLC is a New York professional medical limited liability company with an address of 141 East 56th Street, New York, New York 10022.

38.     Plaintiff Sagtikos Medical Services, P.C. is a New York professional medical corporation with an address of 1175 Montauk Highway, Suite 6, West Islip, New York 11795.

39.     Plaintiff Spine Medical Services, PLLC is a New York professional medical limited liability company with an address of 140 Adams Avenue, Suite B-13, Hauppauge, New York 11788.

40.     Plaintiff United Medical Monitoring P.C. is a New York professional medical corporation with an address of 50 Rose Place, Garden City Park, New York 11040.

41.     The above Plaintiff physician practices all provide medically necessary, covered medical services to Empire Plan enrollees.

42.     The above Plaintiff physician practice are either out of network for the Empire Plan or have physicians as employees or equity owners who are out of network for the Empire Plan.

43.     Defendant Rebecca Corso is Acting Commissioner of the New York State Department of Civil Service. She is also Acting President of the New York State Civil Service Commission.

44.     The main office of the New York Department of Civil Service is located at the Alfred E. Smith State Office Building, Albany, New York 12239.

45.     Defendant UnitedHealthcare Insurance Company of New York Inc. is the Program Administrator of The Empire Plan Medical/Surgical Program.

46.     UnitedHealthcare's New York office is located at 1 Pennsylvania Plaza, New York, New York 10119.

47.     Adrienne A. Harris is the Superintendent of the New York State Department of Financial Services.

48.     The main office of the New York State Department of Financial Services is One State Street, New York, New York 10004.

## FACTS COMMON TO ALL CAUSES OF ACTION

49.     Plaintiffs repeat and re-allege the allegations set forth above as if more fully set forth herein.

**NYSHIP**

50.    For decades, state and local government employees in New York have received health coverage through the New York State Health Insurance Program, known as NYSHIP.

51.    NYSHIP is a comprehensive health insurance program for New York State public employees that consists of (a) The Empire Plan and (b) NYSHIP-approved health maintenance organizations (HMOs).

52.    Currently, NYSHIP protects over 1.2 million State and local government employees, retirees, and their families. It is one of the largest employer-sponsored group health insurance programs in the United States. Approximately 800 local government employers currently offer NYSHIP's Empire Plan to their employees.

53.    The Civil Service Law places responsibility for overseeing NYSHIP with the State Department of Civil Service (Civil Service Law §§ 160-79). Section 161 provides, in relevant part, that the Department of Civil Service is "hereby authorized and directed to establish a health benefit plan for state officers and employees and their dependents . . . which, subject to the conditions and limitations contained in this article, and in the regulations of the [Department of Civil Service], will provide for group hospitalization, surgical and medical insurance against the financial costs of hospitalization, surgery, medical treatment and care, and may include, among other things prescribed drugs, medicines, prosthetic appliances, hospital in-patient and out-patient service benefits and medical expense indemnity benefits" (Civil Service Law § 161[1]).

54.    Initially, NYSHIP provided health coverage for state and local government employees in New York by purchasing health insurance contracts from heavily state regulated, not-for-profit medical indemnity companies (Civil Service Law § 162[1]).

**Civil Service Law § 162**

55.     In 2010, however the State Legislature granted the Department of Civil Service the authority to do what private sector employers were able to do: "provide health benefits directly to plan participants" using the State's own funds rather than purchasing insurance (Civil Service Law § 162[1][a]).

56.     The Legislature did, however, put some important limits on the direct provision of health benefits under Civil Service Law § 162.

57.     For example, NYSHIP had to ensure that it provided all health coverage and benefits mandated by state insurance law, rule, or regulation. Civil Service Law § 162(1)(b)(i) provides that "[a]ny and all health insurance coverage mandated by any law, rule or regulation, including but not limited to coverage mandated pursuant to article forty-three of the insurance law, applicable to contracts for health insurance entered into under this section shall be provided in a manner assuring uninterrupted continuance of coverage for all covered persons. For the purposes of this paragraph 'coverage' shall include but shall not be limited to all benefits, services, rights, privileges and guarantees allowed by law" (*id.*).

58.     Second, the Legislature stipulated that, if NYSHIP provided direct health benefits rather than purchase insurance, it still would be subject to, and required to comply with, the full range of New York insurance law and regulations (Civil Service Law § 162[1][b][iv]). The statute states: "the provision of direct benefits as per this subdivision shall be subject to review by the superintendent of financial services for the purposes of ensuring compliance with applicable insurance law and any and all associated insurance rules and regulations as noted in this subdivision" (*id.*).

## The Empire Plan

59.     Based on this statutory authority, NYSHIP created the Empire Plan, which pays for covered hospital services, physicians' bills, prescription drugs and other covered medical expenses of eligible public employees and their dependents. The Empire Plan has contracted with UnitedHealthcare Insurance Company of New York to administer its Medical/Surgical Program.

60.     Many New York state residents are covered by the Empire Plan. This is because the Plan covers not only New York state employees and their residents, but also employees and dependents of state-related entities, municipalities (county, town, city, and village), school districts, and special purpose government districts.

61.     Historically, the Empire Plan granted its enrollees the freedom to not only receive coverage from participating, in-network physicians, but also from non-participating, out-of-network physicians, such as the Plaintiff physician practices here. This was designed to ensure that New York's public employees had broad access to the finest physicians in the state, regardless of whether those physicians were in network with the Empire Plan or out of network.

62.     This "freedom of choice" to obtain covered care from any physician, including out-of-network physicians, has long been a major feature of the Empire Plan and a significant benefit for public employees.

63.     Historically, the Empire Plan reimbursed out-of-network physicians for providing covered medical services to Plan enrollees at amounts approximating the usual, customary, and reasonable (UCR) rate for the medical services in the geographic area where the services are provided.  (2018 Empire Plan Certificate at 44). A true and correct copy of Empire Plan's 2018 certificate is annexed to this Complaint as Exhibit A and incorporated by reference herein.

64. The UCR rate used by the Empire Plan for out-of-network reimbursement is determined using the benchmarking databases maintained by FAIR Health, established in October 2009 as part of the settlement of an investigation by the Attorney General into conflicts of interest involving UnitedHealthcare[4] involving the adjudication of claims. FAIR Health was formed to create an independent, trusted and transparent source of data to support claims adjudication and to meet the healthcare cost and utilization information needs of all participants in the healthcare community (https://www.fairhealth.org/mission-origin [accessed Mar 13, 2022]).

65. While Empire Plan's standard out-of-network reimbursement rates were based on the FAIR Health-determined UCR, covered services provided by out-of-network radiologists, anesthesiologists, or pathologists at an in-network hospital were reimbursed in full by the Empire Plan. The certificate provides: "If [enrollee] receive[s] anesthesia, radiology or pathology services in connection with covered inpatient or outpatient Hospital services at an Empire Plan Network Hospital and The Empire Plan provides [enrollee's] Primary Coverage, covered charges billed separately by the anesthesiologist, radiologist or pathologist will be paid in full by the Medical/Surgical Program" (2018 Empire Plan Certificate at 63).

66. As a result of these provisions, Empire Plan enrollees had broad access to the finest out-of-network specialty physicians in the country. They were protected against the large balance bills and surprise bills that many other patients faced when they didn't have the protections that the Empire Plan enrollees had.

_____

[4] To settle allegations of misconduct with regard to its operation of the Ingenix benchmarking database, UnitedHealthcare contributed $50 million to the creation of FAIR Health Attorney General Cuomo Announces Historic Nationwide Reform Of Consumer Reimbursement System For Out-Of-Network Health Care Charges | New York State Attorney General (ny.gov) [accessed Mar 13, 2022]).

**New York Surprise Bill Law**

67.     This access was furthered in March 2015 when the New York Surprise Bill Law ((Financial Services Law §§ 601-08) became effective.  Through Civil Service Law § 162, the Surprise Bill Law also applies to the Empire Plan (Civil Service Law § 162[1][b][iv]).

68.     Until January 2022, the Empire Plan was treated as subject to the Surprise Bill Law by all stakeholders, including the Empire Plan itself, the Department of Financial Services, state independent dispute resolution agencies, and out-of-network providers.

69.     For example, for each year until 2022, Empire Plan issued Out-of-Network Disclosures to its enrollees, among other things, these Disclosures state: "The Emergency Medical Services and Surprise Bills law requires The Empire Plan to provide information regarding your out-of-network reimbursement, including details on referrals, costs, coverage and surprise bills. . . . [T]he law protects patients from being responsible for paying the full charge for surprise bills and generally applies only to services provided within New York State" (Empire Plan Out-of-Network Disclosures 2020 at 1). A true and correct copy of the Empire Plan Out-of-Network Disclosures for 2020 are annexed to this Complaint as Exhibit B and are incorporated by reference into the Complaint herein.

70.     Under the Surprise Bill Law, out-of-network providers, such as the Plaintiff physician practices here, were prohibited from billing patients if the bill would meet the Law's definition of a "Surprise Bill" or was a bill for "Emergency Services" (Financial Services Law § 606[a]).

71.     The Empire Plan and other health plans subject to the Surprise Bill Law are required under the Law to reimburse the out-of-network physicians at a "reasonable amount" for their

covered medical services (Financial Services Law §§ 607[a][3] [surprise bills], 605[a][1] [emergency services bills]).

72.     Then, if a dispute exists between the health plan and the out-of-network physician as to what is "reasonable reimbursement" for the covered medical services at issues, either party may submit the dispute to the independent dispute resolution (IDR) process established by the Surprise Bill Law (Financial Services Law §§ 607[a][4] [surprise bills], 605[a][2] [emergency services bills]).

73.     A qualified independent dispute resolution (IDR) entity then reviews the disputed bills code-by-code and selects either the out-of-network physician's fee or the health plan's payment amount as the "reasonable fee for the services rendered" (Financial Services Law §§ 607[a][6] [surprise bills], 605[a][4] [emergency services bills]).

74.     In making its determination as to the reasonable fee for the services rendered, the Surprise Bill Law requires the IDR entity to consider all relevant factors, including "the usual and customary cost of the service" (Financial Services Law § 604[f]).

75.     The Department of Financial Service's regulations regarding enforcement of the Surprise Bill Law define "usual and customary cost," as set forth in Financial Services Law § 604(f), as "the 80th percentile of all charges for the particular health care service performed by a provider in the same or similar specialty and provided in the same geographical area as reported in a benchmarking database maintained by a nonprofit organization specified by the superintendent, which is not affiliated with a health care plan" (23 NYCRR §400.2[w]).

76.     Based on this regulation, the IDR entities use the FAIR Health database when selecting the reasonable fee on a code-by-code basis for the services rendered during the Surprise Bill Law dispute resolution process.

77.     Accordingly, at least for those circumstances constituting a surprise bill or an emergency services bill, out-of-network physicians, such as the Plaintiff physician practices, had a remedy if Empire Plan fails to reimburse them near the UCR for covered medical services. Indeed, the Surprise Bill Law in New York has been very effective at protecting consumers from surprise medical bills while allowing for reasonable and fair reimbursement for physicians that see Empire Plan enrollees, thereby securing the continued access of Empire Plan enrollees to their chosen providers regardless of network status.

78.     Based on this, up until January 2022, the Empire Plan regularly reimbursed Plaintiff physician practices for covered medical services provided to Plan enrollees at or near the UCR rate.

79.     Indeed, the Surprise Bill Law has been publicly lauded for preserving the economic health of high-quality physician practices while also protecting patients against personal liability for unexpected medical bills.[5]

---

[5] https://www.dfs.ny.gov/reports_and_publications/press_releases/pr1909173 (accessed Mar. 18, 2022).

**No Surprises Act**

80.     In December 2020, the United States Congress enacted the No Surprises Act, which was signed into law as part of the Consolidated Appropriations Act of 2021 (Public Law 116-260; Division BB § 109) on December 27, 2020. It took effect on January 1, 2022.

81.     No Surprises Act § 103 amends 42 U.S.C. §§ 300gg *et seq.* to establish an IDR process for non-emergency services performed by non-participating physicians at in-network hospitals, hospital outpatient departments, critical access hospitals, and ambulatory surgical centers and out-of-network emergency services in the emergency department of a hospital or independent freestanding emergency department

82.     The No Surprises Act provides that the federal IDR process will apply and may be used by physicians and health plans to determine the out-of-network rate for emergency services in the emergency department of a hospital or independent freestanding emergency department and non-emergency items and services furnished by non-participating providers during a visit to a participating health care facility when a "specified state law" does not apply (42 U.S.C. § 300gg-111).

83.     Under 42 U.S.C. § 300gg-111(a)(3)(I), a "specified state law" is a state law that provides for a method of determining the total amount payable in the case of an insured receiving an item or service from a non-participating provider at a participating facility or emergency services in the emergency department of a hospital or independent freestanding emergency department (42 U.S.C. § 300gg-111[a][3][I]).

84.     For a state law to determine the amount upon which cost-sharing is based and the out-of-network rate, the state law must apply to: [a] the plan, issuer, or coverage involved; [b] the

non-participating provider or non-participating emergency facility involved; and [c] the item or service involved. (42 U.S.C. § 300gg-111).

85.     When a state has a specified state law, that state law and state IDR process, rather than the federal IDR process, will apply and the amount upon which cost-sharing is based and the out-of-network rate for emergency and non-emergency services subject to surprise billing protections are calculated based on such specified state law (*id.*).

86.     The No Surprise Act specifically deferred to state law, when there was one, precisely because its drafters recognized that states have differing and unique health care systems and applicable state laws might therefore be more effective than a one-size-fits-all federal law. This is particularly apt here, given that New York since 2015 has had one of the most, complex, robust, and sophisticated surprise bill laws in the country.

87.     Accordingly, in New York, the provisions of the Surprise Billing Law constitutes a "specified state law" under the No Surprises Act, because, for health plans and circumstances governed by it, the Surprise Bill Law has a method for determining the total amount payable—the health plan pays what it determines to be a reasonable amount, and then either the health plan or the out-of-network physician can submit the matter to IDR, which will determine the reasonable payment amount using the Financial Services Law §§ 600-08.

88.     Thus, even after the No Surprises Act took effect this January, for health plans and circumstances covered by the Surprise Bill Law, that Law, and not the federal No Surprises Act, governs the reimbursement of out-of-network physicians.

89.     Indeed, the Department of Financial Services recognized this when it issued Circular Letter No. 10, in December 2021. In this Letter, the Department of Financial Services

stated: "New York has an IDR process that applies to out-of-network emergency services, including inpatient services that follow an emergency room visit, in hospital facilities, and surprise bills in participating hospitals or ambulatory surgical centers and for services referred by a participating physician. The IDR process requires issuers, physicians, hospitals and ambulatory surgical centers, and providers to whom the patient was referred by their participating physician, to ensure that the insured incurs no greater out-of-pocket costs for emergency services and surprise bills than the insured would have incurred with an in-network provider. **Since New York has a specified state law, the New York IDR process will continue to apply to out-of-network emergency services and surprise bills**" (New York State Department of Financial Services, Circular Letter 10 [2021]). A true and correct copy of this Circular Letter is annexed as Exhibit C and incorporated by reference in the Complaint herein.

90.     Moreover, through the Circular Letter, the Department of Financial Services actually broadened the coverage of the Surprise Bill Law to cover more scenarios, rather than have those scenarios default to the No Surprises Act.

91.     Following this provision, virtually all health plans subject to New York regulation recognize that the New York IDR process continues to apply to out-of-network emergency services and surprise bills since the No Surprises Act became effective January 1, 2022.

92.     The New York IDR process is preferable for out-of-network physicians over the federal IDR process, because the New York process is independent and fair, focusing on the FAIR Health-determined UCR rate, while the federal IDR process focuses on the Qualifying Payment Amount (QPA), which is biased as solely determined by the health plan, and is based on its median in-network rates for the same service in a similar geographic area (42 U.S.C. § 300gg-111[a][3][E]), 111[c][5][C][i][I]).

In virtually all circumstances, the QPA is significantly less than the FAIR Health-determined UCR amount. Indeed, use of and reliance on the QPA has been roundly criticized in the health care industry (Don't skew surprise-billing regulations in health plans' favor | American Medical Association (ama-assn.org) [accessed Mar. 13, 2022]). One federal court has even invalidated parts of the No Surprises Act regulations for being improperly too reliant on the QPA (Memorandum Opinion and Order [Dkt Entry 113], *Texas Med. Ass'n v. United States Dep't of Health & Human Servs.*, 6:21-cv-00425-JDK [ED Tex Feb. 23, 2022]).

**Empire Plan's Illegal Actions**

93.     Unfortunately, and to the great detriment of Empire Plan's 1.2 million enrollees as well as the Plaintiff physician practices, the Empire Plan has not recognized that the New York IDR process continues to apply to out-of-network emergency services and surprise bills since the No Surprises Act became effective January 1, 2022.

94.     Since January 1, 2022, the Plaintiff physician practices – and other out-of-network physicians – have been reimbursed by the Empire Plan for providing medically necessary, covered services at amounts dramatically less than provided for in the Empire Plan. The reimbursement from Empire Plan to these physicians is in most cases **more than 80% less** than what they were reimbursed for the services in December 2021.

95.     The Empire Plan's explanation for this dramatic lowering of reimbursement is that it has "determined" that the Plan no longer be subject to New York insurance laws or be subject to regulation by the Department of Financial Services.

96. Rather, the Empire Plan has "decided" that it will be treated like a non-governmental self-funded employee health plan, which are not subject to New York insurance laws or regulation by State's Department of Financial Services. The New York Surprise Bill Law does not apply to non-governmental self-funded employee health plans; the out-of-network reimbursement procedures for those plans are governed by the federal No Surprises Act.

97. Consequently, the Empire Plan is taking the position that it is no longer obligated to reimburse out-of-network physicians, including the Plaintiff physician practices, at the FAIR Health-determined UCR rates set forth in its plan certificates.

98. In ordinary circumstances, when a New York regulated health plan fails to reimburse an out-of-network physician at the proper rate, the physician can file a complaint with the Department of Finance Services, and, if a surprise or emergency services bill is involved, submit the dispute to New York IDR.

99. However, both avenues of redress would be unavailable if the Empire Plan is not subject to New York insurance law (including the Surprise Bill Law) or Department of Financial Services regulation.

100. And, indeed, since January, the Empire Plan has responded to complaints made to the Department of Financial Services by Plaintiff physician practices by contending that it is no longer subject to regulation by that agency.

101. Likewise, since January, the Empire Plan has responded to New York IDR proceedings initiated by Plaintiff physician practices by contending that because it is no longer subject to New York insurance laws, its reimbursements are no longer reviewable in New York IDR.

102.     Empire Plan has also taken the extraordinary step of communicating with the federal Centers for Medicare and Medicare Services (CMS) to persuade CMS to find – wrongly – that the Empire Plan is not legally subject to the New York Surprise Bill Law and, therefore, the No Surprises Act applies to its out-of-network reimbursement procedures.

103.     However, the Empire Plan cannot prevail in its effort to be treated like a non-governmental self-funded employee health plan not subject to New York insurance laws or Department of Financial Services regulation, because neither the New York State Department of Civil Services, nor UnitedHealthcare, have the legal ability to override Civil Service Law § 162 by opting out or declaring the Empire Plan no longer subject to New York insurance laws or Department of Financial Services regulation.

104.     As alleged above, Civil Service Law § 162(1)(b)(iv) requires that the Empire Plan's actions in providing benefits – such as reimbursement for covered medical services -- at all times "shall be subject to review by the superintendent of financial services for the purposes of ensuring compliance with applicable insurance law and any and all associated insurance rules and regulations as noted in this subdivision" (*id.*).

105.     Similarly, Civil Service Law § 162(1)(b)(i) requires that the Empire Plan provides that "[a]ny and all health insurance coverage mandated by any law, rule or regulation, including but not limited to coverage mandated pursuant to article forty-three of the insurance law, applicable to contracts for health insurance" under New York law. The statute goes on to state that "[f]or the purposes of this paragraph 'coverage' shall include but shall not be limited to all benefits, services, rights, privileges and guarantees allowed by law" (*id.*).

106.     Thus, Civil Service Law § 162 requires that the Empire Plan be subject to New York insurance laws – including the Surprise Bill Law – and the regulation of the Department of Financial Services. Neither the Department of Civil Service nor UnitedHealthcare can change this; only the Legislature can, with the Governor's approval.

107.     For these reasons, all actions taken by the Empire Plan since January 2022 that refuse to recognize the authority of New York insurance law or Department of Financial Services regulation are incorrect, improper, and illegal.

**The Irreparable Harm Caused by Empire Plan's Illegal Actions**

108.     Empire Plan's illegal actions have caused significant, irreparable harm. The sudden, precipitous decrease in reimbursement – to less than 20% of what it was in December 2021 – is devastating to many out-of-network physician practices, particularly given skyrocketing expenses due to inflation and the uncertain economic climate. As a result, many of these practices will be forced to go out of business or dramatically curtail their services.

109.     Those out-of-network physician practices that survive in the short run will be severely hampered in their ability to recruit and retain high quality recently trained physicians or acquire new medical equipment and information systems.

110.     Since these out-of-network physician practices provide medically necessary surgical and specialty medical services to Plan's 1.2 million enrollees, the enrollees' access to his high-quality care will be severely restricted, if not eliminated. Quality of care will decline. New York will lose its status as a center for high-quality, innovative medical care.

111.     Empire Plan's actions will disrupt longstanding relationships that its enrollees have with out-of-network physicians. These physicians intimately know the enrollees' unique medical

conditions and how best to treat them. All this will be lost, jeopardizing the health and well-being

New York's public employees and their dependents during these very stressful times.

112. Additionally, the Empire Plan's illegal actions will directly and significantly affect

the availability of emergency medical services at hospitals throughout the state. Many hospitals

depend on out-of-network physicians to provide emergency care. With less access to out-of-

network physicians as a result of Empire Plan's actions, Plan enrollees will lose access to life-

saving emergency treatment.

113. Taken as a whole, the consequences that Empire Plan enrollees will suffer at the

hands of the Plan include the loss of continuity of medical care, significant delays in the provision

of care due to the lack of or restricted access to out-of-network physicians, potential exposures to

surprise and balance bills, and significant increases in adverse health outcomes, including serious

illness and the potential loss of life.

114. The utter tragedy here is that all this can be avoided simply by maintaining state

regulation over the Empire Plan, as *state law requires.* This simple act will compel Empire Plan

to honor its commitments and be subject to insurance law and regulations that have been the

cornerstone of New York's health system for over a decade. Empire Plan should not be permitted

to put some nebulous money savings over the life and health of 1.2 million New York public

employees and their dependents.

115. For years, a major selling point of public employment in New York has been the

Empire Plan's out-of-network benefit, giving enrollees a wide option of high-quality physicians to

choose from. Unfortunately, if the Empire Plan's actions are allowed go unchecked, this sadly will

no longer be the case.

## **FIRST CAUSE OF ACTION**

116.     Plaintiffs repeat and re-allege the allegations set forth above as if more fully set forth herein.

117.     Since as early as January 1, 2022, Defendants have taken the position that the Empire Plan is no longer subject to New York state insurance law, including the Surprise Bill Law, as well as Department of Financial Services regulation.

118.     Defendants have taken this position in communications with one or more of the Plaintiffs, with other physicians in New York who are out of network with the Empire Plan, with representatives of the federal Centers for Medicare & Medicaid Services, with representatives of representatives of the Department of Civil Service, with representatives of Department of Financial Services, and with state IDR entities, among others.

119.     Defendants' position that the Empire Plan is no longer subject to state insurance law as well as Department of Financial Services regulations, and their communications of that policy, have directly and irreparably harmed Plaintiffs and other Empire Plan enrollees and out-of-network physicians because it has enabled the Empire Plan to dramatically reduce its reimbursement for medically necessary, covered treatment provided to Plan enrollees by more than than 80% since December 2021.

120.     If these actions do not immediately cease, thousands of high-quality, well-respected out of network physician practices – providing medically necessary surgical and specialty medical services to Plan enrollees – will go out of business or drastically curtail their services.  Those that survive in the short run will be severely hampered in their ability to recruit and retain high quality recently trained physicians or acquire new medical equipment and information systems, causing

New York to lose its' status as a center for high-quality, innovative medical care. The quality of medical care available to Empire Plan's 1.2 million enrollees will significantly decline.

121.     Empire Plan's actions will disrupt longstanding relationships that its enrollees have with out-of-network physicians. These physicians intimately know the enrollees' unique medical conditions and how best to treat them.  All this will be lost, jeopardizing the health and well-being New York's public employees and their dependents during these very stressful times.

122.     Additionally, the Empire Plan's illegal actions will directly and significantly affect the availability of emergency medical services at hospitals throughout the state.  Many hospitals depend on out-of-network physicians to provide emergency care. With less access to out-of-network physicians as a result of Empire Plan's actions, Plan enrollees will lose access to life-saving emergency treatment.

123.     Taken as a whole, the consequences that Empire Plan enrollees will suffer at the hands of the Plan include the loss of continuity of medical care, significant delays in the provision of care due to the lack of or restricted access to out-of-network physicians, and significant increases in in adverse health outcomes, including serious illness and the potential loss of life.

124.     Additionally, Defendants' position has irreparably harmed the Plaintiff physician practices and other physicians out of network with the Empire Plan by eliminating the ability of those physicians to challenge Defendants' reimbursement procedure and level complaints to the Department of Financial Services or the state IDR process.

125.     Defendants' position that the Empire Plan is no longer subject to state insurance law as well as Department of Financial Services regulations is directly contrary to, and in violation of Civil Service Law § 162.

126. Defendants have not ceased in taking and advocating this position after its illegality has been called to their attention.

127. By reason of the foregoing, a dispute exists between the parties.

128. Plaintiffs have no adequate remedy at law.

129. Plaintiffs have not sought this or similar relief in this or any other Court.

130. By reason of all of the foregoing, Plaintiffs are entitled to a judgment from this Court pursuant to CPLR 3001 declaring that: (a) Civil Service Law § 162 requires that, at all times, the Empire Plan, and its provision of benefits and reimbursement, remain subject to New York insurance law, including the Surprise Bill Law, and regulation by the Department of Financial Services; (b) Civil Service Law § 162 and the Surprise Bill Law require that the state IDR process be available to resolve disputes between the Empire Plan and out-of-network physicians concerning situations that qualify as emergency medical services or surprise bills under Surprise Bill Law; (c) Defendants' position that the Empire Plan is no longer subject to the provisions of New York insurance law (including the Surprise Bill Law), state IDR procedures, and Department of Financial Services regulation violates and is contrary to the provisions of Civil Service Law § 162, which is valid and effective; and (d) Defendants' communications with one or more of the Plaintiffs, with other physicians in New York who are out of network for the Empire Plan, with representatives of the federal Centers for Medicare & Medicaid Services, with representatives of representatives of the Department of Civil Service, with representatives of Department of Financial Services, and with state IDR entities, among others, that they no longer are subject to the provisions of New York insurance law (including the Surprise Bill Law), state IDR procedures, and

Department of Financial Services regulation violates and is contrary to the provisions of Civil Service Law § 162, which is valid and effective .

131.     Plaintiffs are entitled to such other and further relief that the Court deems just, proper, and equitable including, but not limited to the costs, disbursements, and other allowances of this action, as well as an award of attorney's fees under the Equal Access to Justice Act (CPLR Article 86).

**SECOND CAUSE OF ACTION**

132.     Plaintiffs repeat and re-allege the allegations set forth above as if more fully set forth herein.

133.     Since as early as January 1, 2022, Defendants have taken the position that the Empire Plan is no longer subject to New York state insurance law, including the Surprise Bill Law, as well as Department of Financial Services regulation.

134.     Defendants have taken this position in communications with one or more of the Plaintiffs, with other physicians in New York who are out of network with the Empire Plan, with representatives of the federal Centers for Medicare & Medicaid Services, with representatives of representatives of the Department of Civil Service, with representatives of Department of Financial Services, and with state IDR entities, among others.

135.     Defendants' position is wrong on the law. Civil Service Law § 162 mandates that the Empire Plan be subject to New York law and regulation. Defendants cannot override or avoid the application of this clearly applicable law.

136.    By reason of the foregoing, Plaintiffs are likely to succeed on the merits of their claims.

137.    Moreover, Defendants' position that the Empire Plan is no longer subject to state insurance law as well as Department of Financial Services regulations, and their communications of that policy, have directly and irreparably harmed Plaintiffs, Empire Plan enrollees in general, and o physicians out-of-network with the Empire Plan.

138.    This is because, if the Empire Plans' actions do not immediately cease, thousands of high-quality, well-respected out of network physician practices – providing medically necessary surgical and specialty medical services to Plan enrollees – will go out of business or drastically curtail their services.  Those that survive in the short run will be severely hampered in their ability to recruit and retain high quality recently trained physicians or acquire new medical equipment and information systems, causing New York to lose its' status as a center for high-quality, innovative medical care. The quality of medical care available to Empire Plan's 1.2 million enrollees will significantly decline.

139.    Empire Plan's actions will disrupt longstanding relationships that its enrollees have with out-of-network physicians. These physicians intimately know the enrollees' unique medical conditions and how best to treat them.  All this will be lost, jeopardizing the health and well-being New York's public employees and their dependents during these very stressful times.

140.    Additionally, the Empire Plan's illegal actions will directly and significantly affect the availability of emergency medical services at hospitals throughout the state.  Many hospitals depend on out-of-network physicians to provide emergency care. With less access to out-of-

network physicians as a result of Empire Plan's actions, Plan enrollees will lose access to life-saving emergency treatment.

141.    Taken as a whole, the consequences that Empire Plan enrollees will suffer at the hands of the Plan include the loss of continuity of medical care, significant delays in the provision of care due to the lack of or restricted access to out-of-network physicians, and significant increases in in adverse health outcomes, including serious illness and the potential loss of life.

142.    Additionally, Defendants' position has irreparably harmed the Plaintiff physician practices and other physicians out of network with the Empire Plan by eliminating the ability of those physicians to challenge Defendants' reimbursement procedure and level complaints to the Department of Financial Services or the state IDR process.

143.    By reason of all the foregoing Plaintiffs will be irreparably harmed without the issuance of an injunction.

144.     The utter tragedy here is that all this can be avoided simply by maintaining state regulation over the Empire Plan, as *state law requires.* This simple act will compel Empire Plan to honor its commitments and be subject to insurance law and regulations that have been the cornerstone of New York's health system for over a decade. Empire Plan should not be permitted to put some nebulous money savings over the life and health of 1.2 million New York public employees and their dependents.

145.    By reason of the foregoing, the balance of equities favors Plaintiffs.

146.    Further, the public interest will be served by the requested injunction in that it will preserve the health and welfare of the 1.2 million New York public employees and the their dependents.

147.    Defendants have not ceased in taking and advocating their illegal position after its illegality has been called to their attention.

148.    Plaintiffs have no adequate remedy at law.

149.    Plaintiff have not sought this or similar relief in this or any other Court.

150.    By reason of all of the foregoing, Plaintiffs are entitled to a judgment from this Court permanently enjoining Defendants from (a) denying Plaintiff physician practices, and other physicians out-of-network with the Empire Plan, from access to the Department of Financial Services complaint procedures by reason of Defendants' assertion that the Empire Plan is no longer subject to the provisions of New York insurance law and Department of Financial Services regulation; (b) denying Plaintiff physician practices, and other physicians out-of-network with the Empire Plan, from access to the state IDR process to resolve disputes between the Empire Plan and out-of-network physicians concerning situations that qualify as emergency medical services or surprise bills under Surprise Bill Law by reason of Defendants' assertion that the Empire Plan is no longer subject to the provisions of New York insurance law and Department of Financial Services regulation; (c) communicating with one or more of the Plaintiffs, with other physicians in New York who are out-of-network for the Empire Plan, with representatives of the federal Centers for Medicare & Medicaid Services, with representatives of representatives of the Department of Civil Service, with representatives of Department of Financial Services, and with state IDR entities, among others, that they no longer are subject to the provisions of New York insurance law (including the Surprise Bill Law), state IDR procedures, and Department of Financial Services regulation violates and is contrary to the provisions of Civil Service Law § 162..

151.     Plaintiffs are entitled to such other and further relief that the Court deems just, proper, and equitable including, but not limited to the costs, disbursements, and other allowances of this action, as well as an award of attorney's fees under the Equal Access to Justice Act (CPLR Article 86).

**WHEREFORE**, Plaintiffs, Wayne Joseph; Thomas Cottone; Sonya Hwang Cottone; Loretta Post; Long Island Anesthesiologists, PLLC; Long Island Anesthesia Physicians, LLP.; New York Cardiovascular Anesthesiologists, P.C.; Suffolk Anesthesiology Associates, P.C.; Advanced Plastic Surgery of Long Island, PLLC.; DA Medical Services PLLC; Da Silva Plastic & Reconstructive Surgery, P.C.; Hand Surgery Associates of Long Island, P.C.; Islandwide Surgical, P.C.; K. Jacob Cohen-Kashi, M.D. & Lawrence C. Lin, MD, PLLC; Lisa Corrente, M.D., P.C.; Long Island Neurosurgical & Pain Specialists, PLLC.; Long Island Thoracic Surgery, P.C.; Montauk Medical Associates PLLC; Performance Medical Practice, PLLC; Sagtikos Medical Services, P.C.; Spine Medical Services, PLLC; and United Medical Monitoring, P.C., demand judgment against the Defendants, Rebecca Corso, as Acting Commissioner, New York State Department of Civil Service; UnitedHealthcare Insurance Company of New York Inc., as Program Administrator, The Empire Plan Medical/Surgical Program; and Adrienne A. Harris, as Superintendent, New York State Department of Financial Services, as follows:

A.     On the first cause of action, declaring pursuant to CPLR 3001 that (i) Civil Service Law § 162 requires that, at all times, the Empire Plan, and its provision of benefits and reimbursement, remain subject to New York insurance law, including the Surprise Bill Law, and regulation by the Department of Financial Services; (ii) Civil Service Law § 162 and the Surprise Bill Law require that the state IDR process be available to resolve disputes between the Empire Plan and out-of-network physicians concerning situations that qualify

as emergency medical services or surprise bills under Surprise Bill Law; (iii) Defendants'

position that the Empire Plan is no longer subject to the provisions of New York insurance

law (including the Surprise Bill Law), state IDR procedures, and Department of Financial

Services regulation violates and is contrary to the provisions of Civil Service Law § 162,

which is valid and effective; and (iv) Defendants' communications with one or more of the

Plaintiffs, with other physicians in New York who are out of network WITH the Empire

Plan, with representatives of the federal Centers for Medicare & Medicaid Services, with

representatives of representatives of the Department of Civil Service, with representatives

of Department of Financial Services, and with state IDR entities, among others, that they

no longer are subject to the provisions of New York insurance law (including the Surprise

Bill Law), state IDR procedures, and Department of Financial Services regulation violates

and is contrary to the provisions of Civil Service Law § 162, which is valid and effective .

     B.     On the second cause of action, permanently enjoining Defendants from (i)

denying Plaintiff physician practices, and other physicians out of-network with the Empire

Plan, from access to the Department of Financial Services complaint procedures by reason

of Defendants' assertion that the Empire Plan is no longer subject to the provisions of New

York insurance law and Department of Financial Services regulation; (ii) denying Plaintiff

physician practices, and other physicians out-of-network with the Empire Plan, from access

to the state IDR process to resolve disputes between the Empire Plan and out-of-network

physicians concerning situations that qualify as emergency medical services or surprise

bills under Surprise Bill Law by reason of Defendants' assertion that the Empire Plan is no

longer subject to the provisions of New York insurance law and Department of Financial

Services regulation; and (iii) communicating with one or more of the Plaintiffs, with other

physicians in New York who are out of network for the Empire Plan, with representatives

of the federal Centers for Medicare & Medicaid Services, with representatives of representatives of the Department of Civil Service, with representatives of Department of Financial Services, and with state IDR entities, among others, that they no longer are subject to the provisions of New York insurance law (including the Surprise Bill Law), state IDR procedures, and Department of Financial Services regulation violates and is contrary to the provisions of Civil Service Law § 162.

   C.  Such other and further relief that the Court deems just, proper, and equitable including, but not limited to the incidental damages caused Plaintiffs by reason of Defendants' actions, and the costs, disbursements, and other allowances of this action, as well as an award of attorney's fees under the Equal Access to Justice Act (CPLR Article 86).

Dated: Uniondale, New York
   March 28, 2022

          Respectfully submitted,

          HARRIS BEACH PLLC

          By: _____
             Roy W. Breitenbach
             Jack M. Martins
             Daniel S. Hallak
          The Omni
          333 Earle Ovington Blvd, Suite 901
          Uniondale, New York 11553
          Phone: 516.880.8484
          Fax:  516.880.8483

          677 Broadway, Suite 1101
          Albany, New York 12207
          Phone: 518.427.9700
          Fax:  518.427.0235

          *Attorneys for Plaintiffs*

TO:  REBECCA CORSO
    Acting Commissioner
    New York State Department of Civil Service
    Alfred E. Smith State Office Building
    Albany, New York 12239

UNITEDHEALTHCARE INSURANCE COMPANY OF NEW YORK INC.
Program Administrator
The Empire Plan Medical/Surgical Program
1 Pennsylvania Plaza
New York, New York 10119

ADRIENNE A. HARRIS
Superintendent
New York State Department of Financial Services
One State Street
New York, New York 10004

LETITIA JAMES
Attorney General
New York State Department of Law
The Capitol
Albany, New York 12224