UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :

LONG ISLAND ANESTHESIOLOGISTS PLLC,  :
                        :

            Plaintiff,      :

                        :

   -against-          :   Case No. 2:22-cv-04040-HG

                        :

UNITEDHEALTHCARE INSURANCE     :
COMPANY OF NEW YORK INC., as Program  :
Administrator, THE EMPIRE PLAN    :
MEDICAL/SURGICAL PROGRAM and    :
MULTIPLAN INC.,            :

                        :

           Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

Roy W. Breitenbach, Esq.
Harris Beach, PLLC
333 Earle Ovington Blvd, Suite 901
Uniondale, NY 11553
(516) 880-8484

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ............................................... 1

ARGUMENT ..................................................................... 5

    I.     Given That Colorado River Abstention "Is The Exception Rather
            Than The Rule," And This Lawsuit Does Not Create Significant
            Concerns Of Piecemeal Litigation, Inconsistent Determinations,
            Or Other Issues, This Court Should Not Abstain From Proceeding ...................... 5

    II.    LIA Has Suffiiciently Alleged Antitrust Injury Caused By Defendants'
            Anti-Competitive Conduct ..................................................... 9

    III.   LIA Has Sufficiently Alleged The Existence Of A Plausible Agreement
            To Support A Conspiracy ..................................................... 16

    IV.   LIA Sufficiently Alleges Anti-Competitive Conduct That Violates The Rule
            Of Reason ...................................................................... 23

    V.    LIA Has Plead Plausible Section 2 Monopsony Claims ....................................... 30

    VI.   LIA Has Sufficiently Alleged An Unjust Enrichment Claim
            Against Defendants………………………………………………………33

    VII.  In The Alternative, The Court Should Grant Plaintiff Leave To Amend The
            Complaint ...................................................................... 34

CONCLUSION ................................................................ 35

# TABLE OF AUTHORITIES

**Cases**                                                                                            **Page(s)**

*Aetna Cas. & Sur. Co. v. LFO Constr. Corp.*,
   207 A.D.2d 274 (1st Dep't 1994) ................................................................................. 34

*Anderson News, LLC v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012) ....................................................................................... 16

*Anesthesia Associates of Ann Arbor, PLLC v. Blue Cross Blue Shield of Michigan*,
   2021 U.S. Dist. LEXIS 174021 (E.D. Mich. Sept. 14, 2021) ........................................... 13

*Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*,
   917 F.2d 1413 (6th Cir. 1990) ................................................................................. 32, 33

*Atlantic Richfield Company v. USA Petroleum CO.*,
   495 U.S. 328 (1990) ................................................................................................. 31

*Balaklaw v. Lovell*,
   14 F.3d 793 (2d Cir. 1994) ...................................................................................... 9, 10

*Barrett v. Fields*,
   924 F. Supp. 1063 (D. Kan. 1996) ............................................................................. 30

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ......................................................................................... 17, 19, 20

*Berkovits v Berkovits*,
   190 A.D.3d 911 (2d Dept 2021) ................................................................................. 33

*Bethlehem Contracting Co. v. Lehrer/McGovern, Inc.*,
   800 F.2d 325 (2d Cir. 1986) ....................................................................................... 5

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*,
   996 F.2d 537 (2d Cir. 1993) ...................................................................................... 23

*Colorado River Water Conservation District v. U.S.*,
   424 U.S. 800 (1976) ................................................................................................ 5, 6

*Compass, Inc. v. Real Estate Bd. of N.Y.*,
   2022 U.S. Dist. LEXIS 60871 (S.D.N.Y. Mar. 31, 2022) ................................................ 16

*Cortec Indus., Inc. v. Sum Holding L.P.*,
   949 F.2d 42 (2d Cir. 1991) ..................................................................................... 34-35

*Daniel v. Am. Bd. of Emergency Med.*,
   988 F. Supp. 112 (W.D.N.Y. 1996) ............................................................................ 35

*Davitashvili v. Grubhub Inc.*,
   2022 U.S. Dist. LEXIS 58974 (S.D.N.Y. Mar. 30, 2022) ................................................ 26

*Defiance Hosp., Inc. v. Fauster-Cameron, Inc.*,
   344 F. Supp. 2d 1097 (N.D. Ohio 2004) ................................................................. 25, 26

i

*In re Delta Dental, Antitrust Litig.*,
484 F. Supp. 3d 627 (N.D. Ill. 2020) ................................................................... 11, 29, 31

*Dittmer v. County of Suffolk*,
146 F.3d 113 (2d Cir. 1998) .................................................................................. 5

*Eastman Kodak Co. v. Image Tech. Servs.*,
504 U.S. 451 (1992) .............................................................................................. 32

*Fineman v. Armstrong World Indus.*,
980 F.2d 171 (3d Cir. 1992) .................................................................................. 21

*FTC v. Indiana Fed. of Dentists*,
476 U.S. 447 (1986) .............................................................................................. 24, 29

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*,
386 F.3d 485 (2d Cir. 2004) .................................................................................. 24, 26

*Kartell v. Blue Shield*,
749 F.2d 922 (1st Cir. 1984) ................................................................................. 31

*Kelco Disposal, Inc. v. Browning-Ferris Indus.*,
845 F.2d 404 (2d Cir. 1988) .............................................................................. 31, 32, 33

*Kopchik v. Town of E. Fishkill*,
759 Fed. Appx. 31 (2d Cir. 2018) ......................................................................... 35

*Meredith Corp. v. Sesac, LLC*,
1 F. Supp. 3d 180 (S.D.N.Y. 2014) ...................................................................... 21, 23

*Mochary v. Bergstein*,
42 F.4th 80 (2d Cir. 2022) .................................................................................... 5

*Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) ................................................................................................. 6

*N. Cal. Minimally Invasive Cardiovascular Surgery, Inc. v. Northbay Healthcare Corp., No. C 15-06283 WHA*,
2016 U.S. Dist. LEXIS 52444 (N.D. Cal. Apr. 19, 2016) ................................... 26

*National Gear & Piston, Inc. v. Cummings Power Sys. LLC*,
861 F. Supp. 2d 344 (S.D.N.Y. 2012) .................................................................. 16

*New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*,
54 F. Supp. 3d 1189 (D.N.M. 2014) ................................................................. 11, 15, 31

*New York City Health & Hosps. Corp v WellCare of N.Y., Inc.*,
35 Misc. 3d 250 (Sup. Ct. N.Y. Cnty. 2011) ....................................................... 34

*Newcal Industries, Inc. v. Ikon Office Solution*,
513 F.3d 1038 (9th Cir. 2008) .............................................................................. 26

*Oltz v. Saint Peter's Cmty. Hosp.*,
861 F.2d 1440 (9th Cir. 1988) .............................................................................. 25, 26

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
    524 F. Supp. 2d 1031 (N.D. Ill. 2007) .............................................................. 11, 12, 31

*Presque Isle Colon & Rectal Surgery v. Highmark Health*,
    391 F. Supp. 3d 485 (W.D. Pa. 2019) .................................................................. *passim*

*Primetime 24 Joint Venture v. NBC*,
    219 F.3d 92 (2d Cir. 2000) ...................................................................................... 16, 23

*Reazin v. Blue Cross & Blue Shield*,
    899 F.2d 951 (10th Cir. 1990) ...................................................................................... 30

*Rebel Oil Co. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) .................................................................................. 32, 33

*Retrophin, Inc. v. Questcor Pharm.*,
    41 F. Supp. 3d 906 (C.D. Cal. 2014) ......................................................................... 32

*Rome Ambulatory Surg. Ctr v. Rome Mem. Hosp.*,
    349 F. Supp. 2d 389 (N.D.N.Y. 2004) .................................................................. *passim*

*Rubio v. Aquila, 22 CV 00153-HG-AYS*,
    2022 U.S. Dist. LEXIS 160411 (E.D.N.Y. Sep. 6, 2022) ............................................. 7

*Shak v. JPMorgan Chase & Co.*,
    156 F. Supp. 3d 462 (S.D.N.Y. 2016) ........................................................................ 32

*Starr v. Sony BMG Music Ent.*,
    592 F.3d 314 (2d Cir. 2010) .................................................................................. 16, 21

*Telsat v. Entm't & Sports Programming Network*,
    753 F. Supp. 109 (S.D.N.Y. 1990) ............................................................................. 31

*In re Tether & Bitfinex Crypto Asset Litig.*,
    576 F. Supp. 3d 55 (S.D.N.Y. 2021) .......................................................................... 31

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) .............................................................................. 25, 26, 29

*United States v. Aetna, Inc.*,
    855 F.3d 345 (D.C. Cir. 2017) .............................................................................. 10, 12

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) (en banc) ................................................................. 32, 33

*United States v. Visa U.S.A., Inc.*,
    344 F.3d 229 (2d Cir. 2003) .................................................................... 24, 26-27, 29

*Us v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ...................................................................................... 32

*Village of Westfield v. Welch's*,
    170 F.3d 116 (2d Cir. 1998) .......................................................................................... 5

*West Penn Allegheny Health Sys. v. UPMC*,
   627 F.3d 85 (3d Cir. 2010) ......................................................... *passim*

*Wilk v. American Med. Ass'n*,
   895 F.2d 352 (7th Cir. 1990) ............................................................ 30

*Woodford v. Cmty. Action Agency of Greene Cty., Inc.*,
   239 F.3d 517 (2d Cir. 2001) .......................................................... 5, 6

**Statutes**

42 U.S.C. § 300gg-111 ................................................................................. 6

Mich., 20-CV-12916-TGB-APP ............................................................... 13

N.Y. Financial Services Law §§ 601-08 ..................................................... 6

§ 1 ...................................................................................................... *passim*

§ 1.2b .............................................................................................. 10, 11

§ 2 ............................................................................................ 3, 4, 30, 31

**Rules**

Fed. R. Civ. P. 12 ........................................................................................ 3

Rule 12 .................................................................................... 16, 17, 26

<u>**PRELIMINARY STATEMENT**</u>

This lawsuit concerns access to high-quality anesthesia services for the 18 million residents of the NY metropolitan area. These services enable patients to undergo lifesaving and life-changing medical procedures safely and comfortably; without them, much of modern medicine would be impossible.

Tragically, access to these services is endangered because of the actions of Defendants. Specifically, Defendant United, the world's seventh largest company and largest healthcare company by revenue – $285 billion in 2021 – is one of the largest healthcare payers in the NY metropolitan area. It has an approximately 50% share of the commercial health insurance market and is the administrator of the Empire Plan, which is the health plan for over 1.2 million public-sector employees. United was described earlier this year by the NY AG as a "behemoth" health insurer and plan provider.

As the Complaint explains in detail, United, with the assistance of Defendant MPI, has used its market power to force out-of-network anesthesia practices in the NY metropolitan area to accept dramatically lowered Empire Plan reimbursement rates for their medically necessary services. These cuts have totaled more than 80% since the beginning of the year.

Defendants' actions have had, and will continue to have, significantly adverse economic effects on the hospital-based out-of-network anesthesia providers in the NY metropolitan area, including the Plaintiff, LIA. Unlike many other physicians, anesthesiologists cannot pick and choose their patients and cannot turn away patients because of their health coverage or other issues. Given the number of public employees in the NY metropolitan area, anesthesia providers are

largely at the mercy of United. For LIA, and many other area anesthesia practices, approximately 40% of their revenue comes from the Empire Plan

Thus, during a time of significant economic upheaval and inflation, vitally essential anesthesia providers are suffering an unsustainable and unending 80+% reimbursement cut. This has decreased, and will continue to decrease, the availability of high-quality anesthesia services in the New York metropolitan area; many providers will be forced out of business entirely, and others will be forced to significantly curtail their services and recruitment and retention of well-trained clinicians.

This entire situation is more tragic given that the reimbursement rate reductions are not being passed on to United's customers or Empire Plan enrollees. Far from it, United is currently seeking a 19% rate increase for next year, even though it generated net earnings of over $17 billion.

Rather, United is reducing reimbursement rates by 80+% – and pressuring anesthesia providers into accepting these rates – to force these providers out of business. As we explain in the Complaint, eliminating LIA and other similarly situated anesthesia providers benefits United because it directly provides physician services – including anesthesia services – to patients in the NY metropolitan area. Thus, eliminating LIA and its fellow anesthesia practices is good for United's business; it removes competitors and harms competition in the market to United's advantage.

Given the above, LIA commenced this lawsuit in July asserting claims against United and MPI for violations of Sherman Act § 1, the New York Donnelly Act, and unjust enrichment.[1] It

---

[1] A copy of this Complaint [Dkt 1] is attached to the Breitenbach Declaration as Exhibit 1.

also asserts claims against United for monopsony and attempted monopsony in violation of Sherman Act § 2. Defendants now move to dismiss these claims under Fed. R. Civ. P. 12(b)(6). As we explain in detail below, this Court should deny Defendants' motions in their entirety.

*First*, United contends that this Court should not even reach the sufficiency of the Complaint's allegations because the entire lawsuit should be stayed, or dismissed, as a result of *Colorado River* abstention because there is a lawsuit pending in NY state courts in which LIA and United are parties, among others, challenging certain Empire Plan actions regarding rate reimbursements as violative of the NY Civil Service Law. As we explain below in Point I, however, while the state court lawsuit contains some similar allegations to this lawsuit, there is no potential for inconsistent and mutually contradictory determinations. Accordingly, this case does not fit into the exceeding rare circumstances where *Colorado River* abstention applies.

*Second*, Defendants contend that, with respect to LIA's antitrust claims, it has failed to sufficiently allege antitrust injury because it is complaining about lower reimbursement rates, which it contends are pro-competitive. However, as we explain in Point II, where a payer such as United has monopsony power, its' lowering of reimbursement rates to below competitive levels does cause antitrust injury, particularly, where, as here, the purposes of the payers' actions is to force the anesthesia practices out of business to benefit United's affiliated anesthesiologists.

*Third*, Defendants contend that, with respect to LIA's Sherman Act § 1 and Donnelly Act claims, there are insufficient allegations of a conspiracy between United and MPI. As we explain in Point III, this is incorrect. There is a long history of a close relationship between United and MPI, in which MPI provides substantial assistance to United to enable it to significantly reduce

reimbursement rates to below competitive benefits. This is a cornerstone of MPI's business, and it derives substantial revenue from this practice.

*Fourth*, Defendants contend that, with respect again to LIA's Sherman Act § 1 and Donnelly Act claims, LIA has failed to allege the existence of anti-competitive conduct sufficient to violate the Rule of Reason. However, as we explain in Point IV, Defendants' conduct has caused significant, adverse economic effects in the market for anesthesia services in the NY metropolitan area, including the reduction of quality and output. These allegations are sufficient at the motion-to-dismiss stage to meet the requirement of demonstrating anti-competitive conduct that violates the Rule of Reason.

*Fifth*, United contends that, with respect to the Sherman Act § 2 claims, LIA has failed to allege plausible Section 2 monopsony and attempted monopsony claims. As we explain in Point V, this is incorrect. While United states that LIA can only make out viable monopsony claims by establishing the existence of predatory pricing or bidding, this is not the law. Courts have sustained monopoly claims under fact patterns strikingly similar to those present here. And, as we further explain, there are more than sufficient allegations from which United's monopsony power can be established.

*Sixth*, Defendants contend that LIA has failed to adequate allege a claim for unjust enrichment. As we explain in Point VI, however, LIA's unjust enrichment claim satisfies the pleading requirements established under NY law.

Finally, as we explain in Point VII, while we believe that the Complaint more than adequately alleges sufficient facts to sustain all of the claims asserted in the Complaint, LIA

requests leave to serve an amended complaint in the event that this Court determines that there are deficiencies in the pleading.

## **ARGUMENT**

### I. **GIVEN THAT COLORADO RIVER ABSTENTION "IS THE EXCEPTION RATHER THAN THE RULE," AND THIS LAWSUIT DOES NOT CREATE SIGNIFICANT CONCERNS OF PIECEMEAL LITIGATION, INCONSISTENT DETERMINATIONS, OR OTHER ISSUES, THIS COURT SHOULD NOT ABSTAIN FROM PROCEEDING**

As a threshold matter, United contends that this Court should either dismiss or stay this action based on the abstention doctrine established by *Colorado River Water Conservation District v. U.S.*, 424 U.S. 800 (1976). By United's own admission, however *Colorado River* abstention is the "exception rather than the rule," *id.* at 813, and applies in only the rarest of circumstances, *see Mochary v. Bergstein*, 42 F.4th 80, 84-85 (2d Cir. 2022) (reversing district court's grant of *Colorado River* abstention). This is because, where, as here, a federal court has subject matter jurisdiction, it has a "'virtually unflagging obligation to exercise that jurisdiction, even if an action concerning the same matter is pending in state court." *Bethlehem Contracting Co. v. Lehrer/McGovern, Inc.*, 800 F.2d 325, 327 (2d Cir. 1986). "The abstention doctrine comprises a few extraordinary and narrow exceptions to a federal court's duty to exercise its jurisdiction," and "[i]n this analysis, the balance is heavily weighted in favor of the exercise of jurisdiction." *Woodford v. Cmty. Action Agency of Greene Cty., Inc.*, 239 F.3d 517, 522 (2d Cir. 2001).

Accordingly, this Court's discretion "must be exercised within the narrow and specific limits prescribed by the particular abstention doctrine involved. Thus, there is little or no discretion to abstain in a case which does not meet traditional abstention requirements." *Village of Westfield v. Welch's*, 170 F.3d 116, 120 (2d Cir. 1998) (reversing district court's grant of abstention); *see also, Dittmer v. County of Suffolk*, 146 F.3d 113, 116 (2d Cir. 1998) (same).

Before applying *Colorado River* abstention, the Court must make a threshold determination that the federal and state cases are parallel, meaning substantially the same parties are litigating substantially the same issues in both forums. If the proceedings are parallel, the Court then must consider six factors to determine whether it is one of the rare circumstances where abstention is appropriate. These factors are: (1) whether the litigation involves assumption of jurisdiction over a *res*; (2) the inconvenience of the forum; (3) the avoidance of piecemeal litigation; (4) the order in which the actions were filed; (5) the law that provides the rule of decision; and (6) the protection of the federal plaintiff's rights. *Colorado River*, 424 U.S. at 813.

In applying these factors, "the balance [is] heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983). "Only the clearest of justifications will warrant dismissal." *Colorado River*, 424 U.S. at 819. Accordingly, "the facial neutrality of a factor is a basis for retaining jurisdiction, not for yielding it." *Woodford*, 239 F.3d at 522 (reversing district court's finding of abstention).

Here, United contends that this lawsuit presents the "threshold legal question" of whether the Empire Plan is subject to the New York Surprise Bill Law (N.Y. Financial Services Law §§ 601-08) or the federal No Surprises Act (42 U.S.C. § 300gg-111(a)(3)(I)). United goes on to explain that this same legal question is the "threshold question" in the pending state court lawsuit in which LIA and United are parties.[2] United contends that abstention is appropriate here because there is a potential for inconsistent and mutually contradictory determinations. United is wrong.

---

[2] *Joseph v. Corso*, Index No. 902227-2022 (N.Y. Supreme Court, Albany County filed Mar. 28, 2022). The Complaint in this lawsuit is annexed to the Breitenbach Declaration as Exhibit 2.

Indeed, United bases abstention on two faulty premises: that (1) the threshold legal question in this lawsuit is whether the Empire Plan is subject to the NY Surprise Bill Law or the federal No Surprises Act; and (2) if the Empire Plan is, in fact, subject to the federal No Surprises Act, then LIA's antitrust claim here necessarily fails. Neither premise is correct.

The actual theory underlying LIA's antitrust claims is that United, through its role as administrator of the Empire Plan, is abusing its monopsony power to drive down the out-of-network reimbursement rate for medical necessary anesthesia services and thereby cause significant anticompetitive effects and resulting antitrust injury in the market for the delivery of anesthesia services in the New York metropolitan area. While United has misused the No Surprises Act to aid it in its anticompetitive efforts, those efforts began before the passage of the No Surprises Act and will not necessarily stop just because of a court determination that the Empire Plan is governed by New York insurance law or regulation.[3]

Indeed, United, before the No Surprises Act was enacted in December 2020, attempted to drive down the reimbursement rates applicable to local anesthesia providers such as LIA by pressuring them to accept artificially low in-network rates and engaging in inappropriate denial and underpayment practices. (Complaint ¶ 92).[4] Likewise, United's post-No Surprises Act practices, aided by MPI's collusion, of employing extreme pressure on anesthesia providers who challenge low reimbursement rates, is not dependent on the No Surprises Act applying to reimbursement disputes. United and MPI can easily apply these tactics to reimbursement disputes governed by New York insurance law and regulation. The Empire Plan, through United's urging

---

[3] The differences in issues between the state lawsuit and this lawsuit distinguishes this case from the Court's decision in *Rubio v. Aquila*, 22 CV 00153-HG-AYS, 2022 U.S. Dist. LEXIS 160411 (E.D.N.Y. Sep. 6, 2022).
[4] *See also* August 31, 2022 Affidavit of Daniel Yanulavich *Joseph v. Corso* ¶ 31 (reimbursement rates for in-network services significantly lower than out-of-network anesthesia reimbursement rates) (Affidavit annexed as Breitenbach Decl, Exh. 3).

and assistance, has already taken steps to bake in the artificially low reimbursement rates by changing the terms of the Empire Plan out-of-network reimbursement provisions effective July 1, 2023.[5]

Accordingly, contrary to United's contentions, there is no potential for inconsistent and mutually contradictory determinations here. A finding in the state court that the No Surprises Act applies to the Empire Plan will not defeat the antitrust claims here. Likewise, a finding in state court that New York insurance law and regulation applies to the Empire Plan will not establish the antitrust claims here. In fact, as is indicated throughout this memorandum of law, this Court does not have to reach the issue of whether federal or state law applies to the Empire Plan to determine the pending motions.

At most, the issue of whether the No Surprises Act or New York insurance law applies to the Empire Plan is only relevant to damages.[6] This, of course, is not at issue on this motion and will not be at issue until far later in the proceedings. Given that, as of today, the state court is considering dispositive motions in the state court litigation, the overwhelming likelihood is that the issue will be decided long before damages become relevant in this case.

As United acknowledges in its motion papers, the other five *Colorado River* factors are, at best neutral. Accordingly, under applicable Second Circuit case law, these factors all point in favor of this Court retaining jurisdiction here. For these reasons, this Court should deny United *Colorado River* abstention.

---

[5] Yanulavich Affidavit (Breitenbach Decl. Exh. 3) ¶ 31.
[6] The docket in the *Joseph v. Corso* matter is annexed to the Breitenbach Declaration as Exhibit 4.

## II.  LIA HAS SUFFIICIENTLY ALLEGED ANTITRUST INJURY CAUSED BY DEFENDANTS' ANTI-COMPETITIVE CONDUCT

United contends the Court should dismiss LIA's antitrust claims because it fails to allege antitrust injury caused by Defendants' anti-competitive conduct. United is wrong.

To state a claim, LIA must show that the Defendants' anti-competitive conduct caused "antitrust injury," which is defined as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' act unlawful." *Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir. 1994).  This requires LIA to show that Defendants' conduct has had an actual adverse effect on competition as a whole in the relevant market rather than just LIA being harmed as an individual competitor. *See Balaklaw*, 14 F.3d at 797.

The theory underlying LIA's antitrust claims is that United, through its role as administrator of the Empire Plan, is abusing its monopsony power to drive down the out-of-network reimbursement rate for medical necessary anesthesia services and thereby cause significant anticompetitive effects and resulting antitrust injury in the market for the delivery of anesthesia services in the New York metropolitan area.  United, contends that this theory does not establish antitrust injury because it results in lower, not higher, practices. This, however, is incorrect both legally and economically.

As the United States Department of Justice, Antitrust Division, and the Federal Trade Commission stated almost two decades ago in *Improving Health Care: A Dose of Competition - A Report by the Federal Trade Commission and the Department of Justice*:

> Conceptually, monopsony power is the mirror image of monopoly power. A buyer has monopsony power when it can profitably reduce prices in a market below competitive levels by curtailing purchases of the relevant product or services. *The exercise of monopsony*

> *power causes competitive harm because the monopsonist will reduce purchases of the input, shift some purchases to a less efficient source, supply too little output in the downstream market, or do all three. When a monopsonist reduces purchases of inputs to reduce input prices, society foregoes the production of output whose value to consumers exceeds the resource costs of associated inputs, thereby creating a welfare loss to society.*

*Id.* (reprinted at https://www.justice.gov/atr/improving-health-care-dose-competition-report-federal-trade-commission-and-department-justice (accessed Nov. 6, 2022)); *see also Testimony of Barbara L. McAneny, M.D., American Medical Association before the Committee of the Judiciary, Subcommittee on Regulatory Reform, Commercial and Antitrust Law, Re: The State of Competition in the Health Care Marketplace: The Patient Protection and Affordable Care Act's Impact on Competition* (Sept 01, 2015) at 10-11; Roger D. Blair and Jeffrey L. Harrison, *Monopsony in Law and Economics* 207 (2d Ed. 2010) (setting physician reimbursement rates below the competitive level "leads to fewer services provided to patients" and "could lead to reduced quality as physicians may spend less time with each patient").

As then-Judge Kavanagh wrote in *United States v. Aetna, Inc.*, 855 F.3d 345, 377-78 (D.C. Cir. 2017) (dissenting):

> Monopsony power describes a scenario in which Anthem-Cigna would be able to wield its enhanced negotiating power to unlawfully push healthcare providers to accept rates that are below competitive levels. That may be an antitrust problem in and of itself. Moreover, the exercise of monopsony power to temporarily reduce consumer prices does not qualify as an efficiency that can justify an otherwise anti-competitive merger. The consumer welfare implications (and consequently, the antitrust law implications) of monopsony power and ordinary bargaining power are very different. Although both monopsony and bargaining power result in lower input prices, ordinary bargaining power usually results in lower prices for consumers, whereas monopsony power usually does not, at least over the long term. See 4A Phillip E. Areeda & Herbert Hovenkamp, Antitrust [***86] Law ¶ 980, at 108 (3d ed. 2009); Herbert Hovenkamp, Federal Antitrust Policy § 1.2b, at 15 (4th ed. 2011).

> Therefore, the exercise of bargaining power by Anthem-Cigna is
> pro-competitive because it usually results in lower prices for
> Anthem-Cigna's employer-customers. By contrast, the exercise of
> monopsony power by Anthem-Cigna may be anticompetitive
> because it may result in higher prices for Anthem-Cigna's employer-
> customers.

*Id.*

Courts have likewise followed the economic principle that the exercise of monopsony power can cause actionable antitrust injury. *See, e.g.*, *West Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 103-04 (3d Cir. 2010) ("It is certainly plausible that paying West Penn depressed reimbursement rates unreasonably restrained trade. Such short-changing poses competitive threats similar to those posed by conspiracies among buyers to fix prices, . . . and other restraints that result in artificially depressed payments to suppliers—namely, suboptimal output, reduced quality, allocative inefficiencies, and (given the reductions in output) higher prices for consumers in the long run."); *In re Delta Dental, Antitrust Litig.*, 484 F. Supp. 3d 627, 642 (N.D. Ill. 2020); *Presque Isle Colon & Rectal Surgery v. Highmark Health*, 391 F. Supp. 3d 485, 500 (W.D. Pa. 2019); *New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 54 F. Supp. 3d 1189, 1205 (D.N.M. 2014) ("Allegations that PHP used its market power in the private health insurance market to lower the price it was willing to pay to buy services from Plaintiff is sufficient to confer antitrust injury. Just as consumers can be injured by a monopolist-seller's practices, so too can a seller suffer antitrust injury by a monopsonist-buyer's power in a particular market."); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 524 F. Supp. 2d 1031, 1040 (N.D. Ill. 2007).

Indeed, the assumption underlying United's lack-of-antitrust-injury argument – that a monopsonist health plan's reduction of reimbursement rates will necessarily result in lower health plan premiums to consumers – is simply wrong as matter of economic principle. In *Monopsony in*

*Law and Economics,* Roger D. Blair and Jeffrey L. Harrison explain "Monopsony power involves the power to lower input prices below competitive levels. . . . Ironically, the reduced input prices do not lead to reduced output prices. In fact, when the monopsonist has market power in the output market, the reduced input prices clearly translate into *higher* output prices. Even when the monopsonist has no market power in the output market, its reduction in input will have some impact on the output price." *Id.* at 48; *see also United States v. Aetna,* 855 F.3d at 377-78 ("the exercise of monopsony power by Anthem-Cigna may be anticompetitive because it may result in higher prices for Anthem-Cigna's employer-customers"); *W. Penn Allegheny Health Sys.*, 627 F.3d at 103-04 (managed care companies depressing reimbursement rates to providers leads to higher prices in the long run); Areeda & Hovenkamp*, Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 575 (2022) ("One cannot assume that consumer prices will be lower simply because a defendant has obtained lower buying prices. If the defendant has monopoly power in the output market, prices will very likely be higher.").

Here, the facts demonstrate that United has not passed along lower premium or plan prices to consumers. This is not surprising because United has both monopsony power in the market for the "purchase" of, or reimbursement for, anesthesia services in the New York metropolitan area as well as market power in the New York metropolitan area health plan coverage market.[7] *See, e.g.*, *United States v. Aetna,* 855 F.3d at 377-78; Blair & Harrison, *Monopsony* at 45, 28; Areeda & Hovenkamp*,* ¶ 575. Thus, Defendants' contention that LIA cannot sufficiently plead antitrust injury because of lowered reimbursement rates is simply wrong.

---

[7] Complaint ¶¶ 36-45, 56-63; *see also* Point IV, *infra.*

United points to *Anesthesia Associates of Ann Arbor, PLLC v. Blue Cross Blue Shield of Michigan*, 2021 U.S. Dist. LEXIS 174021 (E.D. Mich. Sept. 14, 2021) as support for its contention that a health plan lowering reimbursement rates cannot satisfy the antitrust injury requirement. Earlier this year, however, the *Anesthesia Associates* court permitted the filing of an amended complaint in that lawsuit after it concluded that the new pleading sufficiently alleged antitrust injury resulting from the health plan's lowered reimbursement rates. *See Anesthesia Assocs. of Ann Arbor, PLLC v. Blue Cross Blue Shield of Mich.*, 20-CV-12916-TGB-APP, at 31 (E.D. Mich. Sept. 28, 2022).[8]  In reaching this decision, the court found that Anesthesia Associates new allegations established that more was occurring than a buyer merely determining the price at which it was willing to pay for an input. Rather, the court found that Anesthesia Associates had plausibly alleged that there was a conspiracy among Blue Cross Blue Shield plans nationwide to allocate markets and it was this conspiracy that gave the health plan the monopsony power needed to lower reimbursement rates. *Id.*

Accordingly, *Anesthesia Associates* does nothing more than acknowledge what other courts already have concluded: antitrust injury requires something more than a health plan lowering reimbursement rates to a physician practice. In *Anesthesia Associates*, that "something more" was that the ability to lower reimbursement rates was obtained through a horizontal conspiracy to allocate markets. *Id.*

In *West Penn Allegheny*, the "something more" was that the defendant health plan lowered the plaintiff physician practice's reimbursement rates "to hobble" plaintiff for the benefit of a competing medical group that had taken efforts to insulate defendant from competition from other

---

[8] A copy of this decision is annexed to the Breitenbach Declaration as Exhibit 5.

health plans. 627 F.3d at 103-04. In *Presque Isle Colon*, the "something more" was allegations that the defendant health plan lowered the plaintiff physician practice's reimbursement rates, subjected them to unnecessary audits, and engaged in steering activities all designed to disadvantage plaintiff and benefit competing physician practices owned by defendant health plan. 391 F. Supp. 3d at 499-500. As the court stated in *Presque Isle Colon*:

> First, there is plausible harm to competition. Plaintiff has alleged that Highmark uses its dominance on the "buy side" of the market, including insisting on unnecessary audits, inefficient procedure codes, and predatorily low reimbursement rates, to drive up the costs for and lower the income of independent physicians. All the while, according to Plaintiff, Highmark does not subject its own facilities to such treatment. And, according to Plaintiff, independent physicians "cannot avoid the anticompetitive or predatory effects" of Highmark's actions based on its market dominance, and its non-negotiable insistence on the All Products Clause. "This has and will result," according to Plaintiff, "in independent physicians providing fewer outpatient physician services, or going out of business entirely." Additionally, "independent physicians have lost substantial money as a result of Highmark's predatory reimbursement rates and related practices." In fact, this is the entire point according to Plaintiff, as Highland's dominance on the insurance end of the market allows it to unfairly compete on the physician services end of the market, driving independent physicians into the Hobson's choice between absorption or going out of business. Thus, these allegations are enough to establish anticompetitive conduct in differentiated treatment meant to harm competition on the provider side of the market by utilizing monopsony power on the insurance side of the market.
>
> Meanwhile, Plaintiff has also plausibly alleged harm to patients. Through weakening competition between independent physicians and Highmark facilities by exploiting its position as buyers of medical services, Plaintiff alleges that patients have been subjected to a "reduction in the quantity [and] a degradation in the quality of outpatient physician services. . . . "
>
> These allegations, taken as true and as a whole as the Court must, are sufficient to adequately plead at the 12(b)(6) stage that Highmark has engaged in anticompetitive conduct and that the alleged conduct has caused harm to competition and consumers.

*Id.*; *see also New Mexico Oncology*, 54 F. Supp. 3d at 1216-17 (D.N.M. 2014).

Here, LIA also alleges "something more" than just lowered reimbursement rates from a health plan. As in *Anesthesia Associates*, LIA alleges that the health plan has been able to exercise its monopsony power to lower reimbursement rates in part through a horizontal conspiracy, in United's case with MPI. (Complaint ¶¶ 118-33.) More significantly, LIA alleges that the motivation underlying the lowered reimbursement rates was to competitively hobble its practice for the benefit of OptumCare, a United affiliate that provides anesthesia services in direct competition with LIA. (*Id.* ¶¶140-51.) This is closely analogous to what occurred in *West Penn Allegheny*, *Presque Island Colon*, and *New Mexico Oncology* – all of which found antitrust injury sufficiently pled – and we submit, compels the same result here. *See West Penn Allegheny*, 627 F.3d at 103-04; *Presque Isle Colon*, 391 F. Supp. 3d at 500; *New Mexico Oncology*, 54 F. Supp. 3d at 1205.

Finally, it is important to note that, unlike many of the cases cited by United in its moving papers, LIA cannot choose to accept or reject the proffered reimbursement rate or do business with United or Empire Plan at all. (Complaint ¶¶ 28-31.) As a hospital-based anesthesia provider, LIA cannot pick and choose its patients based on their health coverage or its reimbursement rate. (*Id.*) It must provide services to all patients needing anesthesia service, regardless of their health coverage, the reasons they sought treatment at the hospital, or the amount of reimbursement. (*Id.*) Also, given these circumstances, and that LIA is already out-of-network for the Empire Plan, LIA has little recourse in the face of the lowered reimbursement rates. If it were to choose to go "in-network" – its only option – its reimbursement rate would likely be the same or less than it is now. (*See* Yanulavich Aff. (Breitenbach Decl. Exh. 3) ¶ 31.)

For all these reasons, LIA has sufficiently alleged antitrust injury.

III.    **LIA HAS SUFFICIENTLY ALLEGED THE EXISTENCE OF A PLAUSIBLE AGREEMENT TO SUPPORT A CONSPIRACY**

Defendants contend that this Court should dismiss LIA's Sherman Act § 1 and Donnelly Act claims because the Complaint insufficient pled the existence of a plausible agreement to support a conspiracy between United and MPI to restrain trade. Defendants are wrong.

To survive dismissal, LIA must allege "a combination or some form of concerted action between at least two legally distinct economic entities" that "constituted an unreasonable restraint of trade either *per se* or under the rule of reason." *Primetime 24 Joint Venture v. NBC*, 219 F.3d 92, 103 (2d Cir. 2000) (reversing district court's Rule 12(b)(6) dismissal). The facts alleged "must reveal a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012). This requires allegations of "direct or circumstantial evidence that reasonably tends to prove that [United] and [MPI] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* at 184; *see also Compass, Inc. v. Real Estate Bd. of N.Y.*, 2022 U.S. Dist. LEXIS 60871, *8 (S.D.N.Y. Mar. 31, 2022).[9]

This is not a high burden at the current motion-to-dismiss stage; LIA must "only allege 'enough factual matter (taken as true) to suggest that an agreement was made.'" *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 321 (2d Cir. 2010); *Compass*, 2022 U.S. Dist. LEXIS 60871 at *8 (S.D.N.Y. Mar. 31, 2022). The plaintiff need not pass a probability standard, only a plausibility one. *Anderson News*, 680 F.3d at 190. "[O]n a Rule 12(b)(6) motion[,] it is not the province of the

---

[9] As United acknowledges in its memorandum of law, the standard for a well-pleaded Donnelly Act claim is the same as a Sherman Act § 1 claim. *See National Gear & Piston, Inc. v. Cummings Power Sys. LLC*, 861 F. Supp. 2d 344, 370 (S.D.N.Y. 2012). Accordingly, analysis in this Point regarding Sherman Act § 1 claims applies to LIA's Donnelly Act claim.

court to dismiss the complaint on the basis of the court's choice among plausible alternatives." *Id.* "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts [establishing a conspiracy] is improbable, and that a recovery is very remote and unlikely." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

Here, the Complaint alleges that the mechanism by which United has implemented its anticompetitive scheme is through using its monopsony power to dramatically (80%+) lower Empire Plan reimbursement rates to out-of-network anesthesia providers, such as LIA. (Complaint ¶¶ 94-102, 118-33.) Logically, its efforts have a far greater chance to succeed if pressure is applied to out-of-network anesthesia providers to accept these rates without challenge or complaint.

United uses MPI to apply this pressure. (Complaint ¶¶ 118-33.) Under the No Surprises Act, there is an initial required 30-day negotiation period between the health plan and the provider for every out-of-network claim. United takes advantage of this negotiation period by having MPI make extremely low, and entirely unsupported, opening offers in every out-of-network claim, and then demanding that the practice respond, with data supporting its position, in time periods as short as 45-minutes after receiving the offer. MPI threatens the practice that failure to timely respond will be treated as a bad faith refusal to negotiate, causing the practice to lose its ability to challenge the reimbursement rate. (*Id.*) Accordingly, practices such as LIA must scramble to provide meaningful responses to MPI in virtually impossible time frames

Hospital-based anesthesia practices such as LIA typically treat many patients each day. Given the short time frames for responses and the volume of data involved, it becomes easy to see how MPI's actions can quickly overwhelm practices' ability to question or challenge Empire Plan reimbursement rates and simply accept them without complaint or challenge. And, when LIA has made complaints to MPI representatives about this impossible situation, these representatives have

agreed with LIA's predicament, but that these are their instructions from United. They also have acknowledged that, regardless of the practice's response, they have no authority to offer any more reimbursement to the practice beyond the initial lowball offer.[10] (Complaint ¶¶ 125, 129.)

In their opposition papers, Defendants attempt to explain away MPI's actions as mere isolated communications or recommendations that do not rise to the level of concerted action. But this is simply not correct; MPI's own materials indicate that its efforts are part of a coordinated strategy by the company to partner with United and other health plan clients to manage the entire No Surprises Act compliance process with the goal of significantly reducing the plans' reimbursement rates. https://www.MPI.us/no-surprises-act/ (accessed Nov. 11, 2022).[11] MPI then shares in the savings generated by United and the other health plans resulting from its negotiation efforts. As MPI stated in its most recent Annual Report:

> The [NSA] require[s] extensive data collection and analysis to identify claims as surprise bills under the law's definition; calculate the new QPA benchmark introduced by the law and append it to the claim; create an initial payment amount for the claim, typically by using the QPA as the reference point; negotiate a settlement as needed; and take claims through an independent dispute resolution process as needed. We leverage existing technology and expertise in data science, claim pricing and negotiation in offering these new services. They are used by all types of Payors that must comply with the NSA, and are priced either at a percentage of savings for the end-to-end service, or on a per-claim basis for individual components.

MPI Annual Report (SEC Form 10-K) at 13 (Feb. 25, 2022).[12]

---

[10] While Defendants' efforts currently are focused on the federal IDR process established by the No Surprises Act, because that is where they currently content disputes over Empire Plan reimbursement must be referred, Defendants would be able to employ similar manipulation in the NY IDR process under Financial Services Law article 6 if Empire Plan reimbursement disputes were properly considered to fall under that process.

[11] A copy of this MPI communication is annexed to the Breitenbach Declaration as Exhibit 6.

[12] Accessed at https://investors.MPI.us/financials/sec-filings/sec-filings-details/default.aspx?FilingId=15602015. A copy of this MPI Annual Report is annexed to the Breitenbach Declaration as Exhibit 7.

Also, MPI's efforts in connection with No Surprises Act compliance are part of a much larger strategy by MPI for over a decade to work with "substantially all of the largest health plans," *id.* at 17, to reduce out-of-network reimbursement rates, which MPI accomplishes "using data-driven negotiation and/or reference-based pricing methodologies," *id.* at 14. Specifically, MPI leverages its "information technology platform, public data sources, and the billions of claims that [it has] reviewed and are included in [its] database reflecting both network and out-of-network priced claims, as well as the results of clinical coding analyses." *Id.*

For compensation, MPI receives a percentage of the "savings" it generates through the reduction of reimbursement rates. *Id.* As it has publicly acknowledged, "because in most instances the fee for our services is directly linked to the savings utilized by our customers, our revenue model is aligned with the interests of our customers." *Id.* at 11. MPI has stated in marketing period that these products were "built to help [insurers and other] payers reduce the cost of . . . out-of-network" reimbursements to physician practices such as LIA. (*Id*).

MPI's clients for these services include not only United, but also Cigna, Anthem, Centene, and Humana.[13] All totaled over 700 managed care companies and 100,000 health plans/sponsors use MPI's services; these cover over 60 million beneficiaries throughout the United States. Annual Report at 16-17. The relationship between MPI and the plans are quite deep and longstanding. According to MPI's Annual Report, it "continue[s] to experience high renewal rates and our top ten customers based on full year 2021 revenues have been customers for an average of 25 years. Our customer relationships are further strengthened by high switching costs as MPI is electronically linked to customers in their time-sensitive claims processing functions, and we

---

[13] These are some of the largest health care companies in the world. United is 5 on the Forbes' list. Aetna (part of CVS Health) is 4, Cigna is 12, Anthem (now Elevance Health) is 20, Centene is 26, and Humana is 40 on the Forbes' list. https://fortune.com/fortune500/2022/search/ (accessed Nov. 12, 2022).

support highly flexible benefits offerings to an extensive group of customers who often feature a MPI logo on membership cards when networks are used." *Id.*

The relationship between MPI and United is particularly close and deep. United is MPI's largest customer, representing 30% of its revenue. As MPI stated last year, "Over the past three years, MPI's revenues from UHC have grown more than 30% to an all-time high. MPI and UHC have partnered on a series of strategic initiatives that we expect will further grow this business in 2022 and beyond. UHC is an extraordinary customer and partner of MPI. For nearly 30 years, MPI and UHC have worked together . . . utilizing MPI's unique set of technologies, independent industry-wide information and proprietary network. We are excited to continue that partnership in the years to come. . . ."[14]

MPI's efforts on behalf of managed care companies such as United to lower reimbursement rates for out-of-network services have been wildly successful. It receives claims data from over 700 payers and processes 360,000 claims each day. This totals approximately 135 million claims annually. (Breitenbach Aff. Exh. 9.) On these claims, MPI advertises that it generates over $15 billion in reimbursement rate reductions.[15] It has variously alleged that it has reduced out-of-network reimbursement payments throughout the country by anywhere from 18%-50%. (Breitenbach Aff. Exh. 9.)

So vast and wildly successful have been MPI's relationships with United and other health plans that there are extensive allegations that MPI is at the hub of a horizontal conspiracy among the managed care companies to fix and reduce the amounts of out-of-network reimbursement

---

[14] https://www.MPI.us/MPI-corporation-releases-stockholder-update/#:~:text=UHC%20is%20an%20extraordinary%20customer,wide%20information%20and%20proprietary%20network (accessed Nov. 12, 2022). A copy of this statement from NPI is annexed the Breitenbach Declaration as Exhibit 8.
[15] https://www.MPI.us/services/analytics-based/ (accessed Nov. 12, 2022) A copy of this MPI statement is annexed to the Breitenbach Declaration as Exhibit 10.

payment they paid to United States healthcare providers. According to these allegations, the effects of this horizontal conspiracy has been reductions in out-of-network reimbursement patients totaling approximately $10 billion per year from 2012 through 2020, and beyond.[16]

This satisfies Sherman Act § 1 pleading requirements. *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010). As the alleged facts, and MPI's own statements demonstrate, it performs an essential role in implementing the lowered reimbursement rates through which United exercises its monopsony power. These efforts are part of a comprehensive and longstanding business relationship between United and MPI in which they share the common objective of, and mutually benefit from, the dramatic lowering of out-of-network reimbursement rates. It is a cornerstone of MPI's business strategy.

Additionally, Section 1 does not require that all parties to an agreement or combination share the same motive provided they intentionally – "consciously" – enter it. *See, e.g., Fineman v. Armstrong World Indus.*, 980 F.2d 171, 214 (3d Cir. 1992) ("Though ... co-conspirators must share a commitment to a common scheme which has an anticompetitive objective, they need not share an identical motive for engaging in concerted action in violation of section 1 of the Sherman Act.") Thus, it makes no difference if MPI's sole motive for its actions were the generation of additional profit through the creation of more shared savings because an actionable Sherman Act § 1 conspiracy does not require the MPI to have full knowledge of United's plans. *See Meredith Corp. v. Sesac, LLC*, 1 F. Supp. 3d 180, 213 (S.D.N.Y. 2014) ("To be held a part of a conspiracy, a conspirator need not know all dimensions of the wrongful conduct taken in its furtherance."). In any event, MPI cannot legitimately claim that it is unaware that the reimbursement rates at issue

---

[16] *See* Complaint in *VHS Liquidating Trust v. MPI Corporation*, CGC-21-594966 (Calif. Super. Ct. San Francisco County Sept 8, 2021) A copy of this Complaint is annexed as Breitenbach Declaration Exhibit 11.

21

are below competitive levels; through its extensive database of reimbursement claims and pricing, it has extensive knowledge of how low the rates are below market.

Finally, Defendants' contention that no conspiracy is sufficiently alleged because United merely provided recommendations to the Empire Plan misstates the nature of United's role regarding the Empire Plan.

As the State Comptroller has explained: "The Empire Plan provides its members with four types of health insurance coverage: medical/surgical, hospital, prescription drugs, and mental health and substance abuse. To administer the Empire Plan, [the Department of] Civil Service contracts with four vendors, one for each type of coverage. Each vendor is responsible for establishing a network of participating providers, establishing reimbursement rates, processing and paying claims from both participating and non-participating providers, and ensuring compliance with the requirements of the Empire Plan. Under the Empire Plan, each vendor is reimbursed by Civil Service for the claims they process and pay. Additionally, Civil Service pays each vendor an administrative fee." Thomas P. DiNapoli, *Preventing Inappropriate and Excessive Costs in the New York State Health Insurance Program* (N.Y. State Comptroller Audit 2016-D-1 (May 2018)) at 4-5.[17]

The State Comptroller goes on to explain "Civil Service contracts with United to administer the medical/surgical portion of the Empire Plan. . . . United contracts with in-network health care providers who agree to accept payments at rates established by United to furnish medical services to Empire Plan members. United remits payment directly to in-network providers based on claims submitted for services provided . . . Empire Plan members may also choose to

---

[17] A copy of this Report is annexed to the Breitenbach Declaration Exhibit 12.

receive services from out-of-network providers. . . . United bases its payments of out-of-network provider claims on the reasonable and customary (R&C) for the service. . . ." *Id.*

Based on this relationship, it becomes clear that United, far from simply recommending action to the Empire Plan, has substantial control over the Empire Plan by setting and determining reimbursement rates, selecting in-network providers, processing and adjudicating claims, paying claims, and negotiating dispute resolutions. It earns more money the more savings it generates. Given this level of authority, coupled with the significant competitive interest that United has in lowering the reimbursement rates for hospital anesthesia providers to below competitive levels, renders United's actionable involvement in this conspiracy plausible.

For all these reasons, LIA has met its obligation in the Complaint to allege "a combination or some form of concerted action between at least two legally distinct economic entities. . ." *Primetime 24 Joint Venture*, 219 F.3d at 103 (2d Cir. 2000).

## IV. LIA SUFFICIENTLY ALLEGES ANTI-COMPETITIVE CONDUCT THAT VIOLATES THE RULE OF REASON

In addition to alleging the existence of concerted action, a Sherman Act § 1 plaintiff also must allege that this concerted action "constituted an unreasonable restraint of trade either per se or under the rule of reason." *Primetime 24 Joint Venture*, 219 F.3d at 103.

Since LIA is pursuing this case based on a rule of reason theory, it "bears the initial burden of showing that the challenged action has had an actual adverse effect on competition as a whole in the relevant market . . . ." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 543 (2d Cir. 1993), *cert. denied*, 114 S. Ct. 388 (1993). While sometimes this requires an inquiry into the defendant's market power to determine whether the challenged conduct could have a substantial adverse impact on competition, "proof of actual detrimental effects, such as a reduction of output," can obviate the need for an inquiry into market power, which is but "a

surrogate for detrimental effect." *FTC v. Indiana Fed. of Dentists*, 476 U.S. 447, 460 (1986); *see also Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 509 (2d Cir. 2004) (proof of market power in § 1 cases not needed if "plaintiff can demonstrate an actual adverse effect on competition, such as reduced output").

For example, in *United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003), the Second Circuit examined rules of payment card networks that prohibited their member banks from issuing rival card networks' credit cards. The Second Circuit affirmed the district court's finding that the rules had harmed competition based on evidence that the rules had in practice reduced card output and available card features, decreased network services output, and stunted price and innovation competition. *Id.* at 241; *see also Rome Ambulatory Surg. Ctr v. Rome Mem. Hosp.,* 349 F. Supp. 2d 389, 409 (N.D.N.Y. 2004) (summary judgment denied because plaintiff raised genuine issue of material fact regarding actual adverse effects in form, among other things, reduced quality or choice).

Here, the Complaint alleges actual adverse effects on competition in the relevant product market regarding the delivery of the medically necessary anesthesia services to patients. There are three categories of participants in the market. First, there are Hospital-based anesthesia practices, such as LIA, that provide the medically necessary anesthesia services to patients. Second, there are the patients who need the anesthesia services and are therefore the market's consumers. And third, there are the payers, such as United, who reimburse the practices for the medically necessary anesthesia services provided to their enrollees. (Complaint ¶¶ 152-60.)

First, the delivery of anesthesia services is clearly a relevant product market. Only anesthesiologists have the necessary skills and training to provide these services; other physicians do not have the expertise to competently provide these services and therefore cannot be considered

reasonable substitutes. (*Id.*) Patients cannot look to other physicians to provide them anesthesia services, and other physicians cannot enter the market to provide these services without significant time and expense. (*Id.*) These factors indicate – at least at the pleading stage – that anesthesia services are a properly defined relevant market. *See, e.g., Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) ("[t]o survive motion to dismiss, "an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes – analysis of the interchangeability of use or the cross-elasticity of demand"); *Oltz v. Saint Peter's Cmty. Hosp.*, 861 F.2d 1440, 1447-48 (9th Cir. 1988); *Defiance Hosp., Inc. v. Fauster-Cameron, Inc.*, 344 F. Supp. 2d 1097, 1109 (N.D. Ohio 2004) ("Not all physician services are identical. Only anesthesiologists and CRNAs provide anesthesia services. Some physicians are anesthesiologists, but not all physicians are anesthesiologists: therefore, physicians' services are not reasonably interchangeable with those of anesthesiologists.").

As the Complaint also alleges, there is virtually no substitutability or cross-elasticity of demand in this market. Hospital-based anesthesia providers have no choice as to who the consumers of their services; they must provide anesthesia services to all patients needed anesthesia services in the hospital or facility where they work. (Complaint ¶¶28-31.) For the same reason, anesthesia providers also have no say in selecting the payers for their services. (*Id.*) They cannot avoid a low paying payer or re-focus their practice on higher paying payers. They must accept and treat all patients regardless of the level of payment. (*Id.*) Patients, too, have little choice over who their anesthesia providers are for a given surgery; hospitals typically have a single anesthesia provider, which selects the most appropriate anesthesiologist for a given surgery.

Second, the Complaint adequately alleges a relevant geographic market: the New York metropolitan area. This is because, given the chronic and urgent nature of most conditions

requiring anesthesia, patients need to seek treatment close to where they live and work. As explained in the Complaint, most patients are willing to travel only about 30 minutes for health care services. (Complaint ¶¶ 160-62.) Accordingly, the relevant geographic market for neurosurgery services in this lawsuit is no larger than the New York metropolitan area, including New York City, Nassau, Suffolk, and Westchester Counties. *See, e.g., Davitashvili v. Grubhub Inc.*, 2022 U.S. Dist. LEXIS 58974, at *15 (S.D.N.Y. Mar. 30, 2022) ("geographic market is normally the geographic area of effective competition, which courts measure by determining the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product."); s*ee also Defiance Hosp.*, 344 F. Supp. 2d at 1110 (limiting geographic market for anesthesia services to area 20 minutes away from relevant hospital).

These allegations, we submit, are sufficient to state a relevant antitrust market at the pleading stage. *See Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008) ("An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect. And since the validity of the relevant market is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial."); *Todd*, 275 F.3d at 200; *Oltz*, 861 F.2d at 1446; *N. Cal. Minimally Invasive Cardiovascular Surgery, Inc. v. Northbay Healthcare Corp.*, No. C 15-06283 WHA, 2016 U.S. Dist. LEXIS 52444, at *19 (N.D. Cal. Apr. 19, 2016).

As discussed above, to survive this motion to dismiss, LIA is not required to demonstrate that Defendants possess market power in the relevant antitrust market, so long as they allege facts plausibly indicating the existence of an actual adverse effect on competition in that market, such as through decreased quality or output. *See Geneva Pharms.*, 386 F.3d at 509; *Visa U.S.A.,* 344

F.3d at 241; *Rome Ambulatory Surg.*, 349 F. Supp. 2d at 409. Here, LIA alleges that United, through its role as administrator of the Empire Plan and its conspiracy with MPI, is driving down the out-of-network reimbursement rate for medical necessary anesthesia services to below competitive levels. Accordingly, all LIA need allege to survive dismissal here are facts plausibly indicating that these actions are causing adverse economic effects, such as decreased quality or output, in the market for the delivery of anesthesia services in the New York metropolitan area. *Id.*

The Complaint meets this requirement. It alleges that Defendants have generated a precipitous decrease in Empire Plan out-of-network reimbursement of more than 80%, which has caused LIA and other out-of-network anesthesia practices in the New York metropolitan area unabsorbable loss. This loss has been exacerbated by a severe shortage of quality providers in the New York metropolitan area, skyrocketing expenses due to inflation and the uncertain economic climate.

On average, the Empire Plan has historically represented about 40% of the revenues of out-of-network practices in the New York metropolitan area, including LIA and other anesthesia practices in the relevant market. (Complaint ¶¶78-79.) In any business, at any time, a precipitous 80+% decline in reimbursement from customers representing almost one-half of your business would be devastating but given that the costs of delivering care are skyrocketing due to inflation, the impact is particularly severe here. (*Id.* ¶¶ 134-39.) And, because of demographic and societal factors such as the "Great Resignation," there is a significant shortage of well-qualified clinicians, causing their compensation demands to soar. (*Id.*)

These factors have combined to impose significant financial pressure on LIA as well as other similarly situated anesthesia practices. These practices have responded by making difficult

but unavoidably necessary choices regarding the reduction of staff and clinical services. In recent months, anesthesia practices in the New York metropolitan have been forced to let go anesthesiologists, withdraw from providing anesthesia services at sites, divest related businesses, and suspend all new hires, lay off staff, eliminate sites of service and close affiliated practices. Practices have been forced to curtail purchases of new, state-of-art equipment. Many practices have been forced to curtail their recruitment of new, well-trained physicians because of an inability to meet compensation demands. Practices also have been forced to abandon expansion plans. (Complaint ¶¶ 134-39, 173-82.)

These developments have caused patients in the New York metropolitan area to lose access to new or enhanced services, highly qualified clinicians, and new, state-of-the medical equipment. It has negatively impacted the enrollees' quality of care, an effect that will worsen if Defendants' conduct persists. As alleged above, practices are beginning to withdraw from providing anesthesia at various sites or facilities, which is directly, and negatively, impacting the availability of health care services for enrollees. If these actions remain unchecked, lines of business will continue to be discontinued. (*Id.*)

LIA and most of the other anesthesia practices in the relevant market are exclusive anesthesia providers at hospitals or other facilities in the area. At these hospitals, there are no available in-network anesthesia physicians. There are also no other available out-of-network anesthesia physicians with privileges to provide anesthesia services at these hospitals. Due to the Empire Plan's actions, the ability of the anesthesia practices to serve these hospitals has been severely hampered and there is a resulting shortage of anesthesia providers to take call at these hospitals. As a result, these hospitals have been forced to shutter operating or procedure rooms,

or lengthen schedules or wait times, to account for these shortages. This directly impacts patient care at hospitals. (*Id.*)

These allegations are sufficient to meet LIA's obligation at this motion-to-dismiss stage to allege facts plausibly indicating the existence of an actual adverse effect on competition in that market. *See Presque Isle*, 391 F. Supp. 3d at 500 (allegations that lower reimbursement rates "have and will" result in independent physicians providing fewer services or going out of business "are enough to establish anticompetitive conduct in differentiated treatment meant to harm competition on the provider side of the market by utilizing monopsony power on the insurer side of the market"); *see also Todd*, 275 F.3d at 213-14; *Delta Dental*, 484 F. Supp. 3d at 642; *Rome Ambulatory*, 349 F. Supp. 2d at 409.

In their moving papers, Defendants focus on what they contend is its purported lack of market power as depicted by what it considers to be its relatively low market share.[18] However, in the Second Circuit, a threshold showing of market power is not a prerequisite for bringing a Sherman Act § 1 claim. *See Todd*, 275 F.3d at 206-07. Thus, provided the Complaint adequately alleges actual adverse anticompetitive effects – which it does – LIA has met its pleading requirement. *See id.*; *see also Indiana Fed. of Dentists*, 476 U.S. at 460; *Visa U.S.A.*, 344 F.3d at 241; *Todd,* 275 F.3d at 206-07; *Rome Ambulatory*, 349 F. Supp. 2d at 409.

In any event, review of relevant allegations does reveal that United possesses considerable market share. As discussed above, the relevant market is the market for the delivery of anesthesia services in the New York metropolitan area. United participates in that market as a payer of

---

[18] In its moving papers, United seems to contend that the question of whether it has market power depends on its relationship with OptumCare and whether OptumCare has market power in the relevant anesthesia market. This contention misstates LIA theory here. LIA contends that United, wholly divorced from its affiliate relationship with OptumCare, has market power in relevant anesthesia market because of its buying power in that market. The calculation of this power or share has nothing to do with OptumCare. LIA further alleges that United's motivation for exercising this market power is to benefit its corporate affiliate, Optum Care and to give it a leg up on its competitors in the market. As discussed above, this is the theory sustained in *West Penn Allegheny* and *Presque Isle*, among others.

anesthesia services. The Complaint alleges that the Empire Plan – administered by United – accounts for approximately 40% of the revenues of LIA and other similarly situated out-of-network anesthesia providers in the relevant market. (Complaint ¶¶ 78-79.) This makes sense, given that the Empire Plan – the health plan for New York public employees – has over 1.2 million enrollees in New York.

United's market power, however, is not just derived from being the administrator of the Empire Plan. It also participates in the market as a health insurer and administrator of employer self-funded plans. United's share of the commercial health insurance market in the New York metropolitan area was 50%. (Complaint ¶¶ 163-72.) When this is added to its Empire Plan share, a picture emerges of significant market power. *See, e.g., Reazin v. Blue Cross & Blue Shield*, 899 F.2d 951, 967 (10th Cir. 1990) (market share between 39 and 62 percent sufficient); *Wilk v. American Med. Ass'n*, 895 F.2d 352, 360 (7th Cir. 1990) (market share greater than 50 percent sufficient); *Barrett v. Fields*, 924 F. Supp. 1063, 1075 (D. Kan. 1996) (50 percent market share permits inference of market power). This market power is further enhanced by the fact that, as discussed above, the anesthesia providers in the relevant market have little control over the patients to whom they provide anesthesia services and, consequently, the payers with whom they must deal. Accordingly, the anesthesia providers do not have the ability to seek alternative patients or payers when confronted with a significantly lowered reimbursement rate from a payer.

For all these reasons, LIA has sufficiently alleged anti-competitive conduct that violates the Rule of Reason.

## V.     LIA HAS PLEAD PLAUSIBLE SECTION 2 MONOPSONY CLAIMS

In this lawsuit, LIA alleges claims under Sherman Act § 2. To state a claim for actual monopsony, LIA must allege: (1) the possession of monopsony power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or

development as a consequence of a superior product, business acumen, or historic accident. *See In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55, 94 (S.D.N.Y. 2021); *Telsat v. Entm't & Sports Programming Network*, 753 F. Supp. 109, 112 (S.D.N.Y. 1990). For attempted monopsony, LIA must allege (1) anticompetitive or exclusionary conduct; (2) specific intent to monopolize; and (3) a 'dangerous probability' that the attempt will succeed. *See Kelco Disposal, Inc. v. Browning-Ferris Indus.*, 845 F.2d 404, 407 (2d Cir. 1988).

United seeks dismissal of these claims primarily because, since they are based on lowered reimbursement, it contends LIA can only establish antitrust injury if predatory pricing or bidding is established. This is wrong; indeed, the cases that United cites for this proposition – *Atlantic Richfield Company v. USA Petroleum CO.*, 495 U.S. 328 (1990) and *Kartell v. Blue Shield*, 749 F.2d 922 (1st Cir. 1984) – do not support its contention. They merely hold that, in the fact patterns before it, antitrust injury was not established.

In any event, as discussed in Point II, courts have long recognized the economic principle that the exercise of monopsony power can cause actionable antitrust injury, even without allegations of predatory pricing or bidding. *See, e.g.*, *West Penn Allegheny*, 627 F.3d at 103-04; *Delta Dental*, 484 F. Supp. 3d at 642; *Presque Isle Colon*, 391 F. Supp. 3d at 500 (W.D. Pa. 2019); *New Mexico Oncology*, 54 F. Supp. 3d at 1205; *Omnicare*, 524 F. Supp. 2d at 1040. We explain in Point II why, given the structure of the markets and United's monopsony power, LIA has sufficiently plead existence of antitrust injury here.

United's second argument to support dismissal of LIA's Section 2 claims is that LIA has not alleged facts indicating that United possesses monopsony power in a relevant market. This, too, is incorrect.

The market in which LIA's alleges that United has monopsony power is the market for the delivery of anesthesia services in the New York metropolitan area. As discussed above in Point IV, LIA has sufficiently pled this market at the motion-to-dismiss stage.

Monopsony power can be sufficiently alleged through direct evidence of the actual exercise of control over prices or the actual exclusion of competition from the relevant market. *See Eastman Kodak Co. v. Image Tech. Servs*., 504 U.S. 451, 477-78 (1992); *Toys "R" Us v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000); *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 482 (S.D.N.Y. 2016). Monopsony power can also be sufficiently alleged through evidence of a dominant share of the relevant market, and high barriers to entry. *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (en banc); *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *Retrophin, Inc. v. Questcor Pharm*., 41 F. Supp. 3d 906, 916 (C.D. Cal. 2014). If there is no evidence of a dominant share, a substantial share of the market will be sufficient to allege an attempted monopsony claim. *See Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1443 (6th Cir. 1990) (58%); *Kelco Disposal v. Browning-Ferris Indus.*, 845 F.2d 404, 409 (2d Cir. 1988) (55%), *aff'd on other grounds*, 492 U.S. 257 (1989).

Here, as discussed above, LIA has alleged facts plausibly indicating that United has substantial control over prices and is using this control to cause adverse economic effects, such as decreased quality or output, in the market for the delivery of anesthesia services in the New York metropolitan area. *See* Point IV, *infra*.

Moreover, the Empire Plan (administered by United) accounts for approximately 40% of the revenues of LIA and other similarly situated out-of-network anesthesia providers in the relevant market. (Complaint ¶¶78-79.) On top of this United also participates in the market as a health insurer and administrator of employer self-funded plans. United's share of the commercial

health insurance market in the New York metropolitan area was 50%. (*Id.* ¶¶ 163-72.) When this is added to its Empire Plan share, a picture emerges of significant, if not dominant, market power. *Microsoft Corp.*, 253 F.3d at 51; *Rebel Oil.*, 51 F.3d at 1434 *Arthur S. Langenderfer*, 917 F.2d at 1443; *Kelco*, 845 F.2d at 409.

As discussed above, this market power is further enhanced because the anesthesia providers in the relevant market have little control over the payers with whom they must deal. Accordingly, the anesthesia providers do not have the ability to seek alternative patients or payers when confronted with a significantly lowered reimbursement rate from a payer.

For all these reasons, LIA has sufficiently the existence of monopsony power on the part of United.[19]

## VI. LIA HAS SUFFICIENTLY ALLEGED AN UNJUST ENRICHMENT CLAIM AGAINST DEFENDANTS

Defendants seek dismissal of LIA's unjust enrichment claim. Under New York law, a claim for unjust enrichment only requires: (1) that the defendant was enriched; (2) at the plaintiff's expense; and (3) it would be inequitable to allow the defendant to retain the benefit. *See Berkovits v Berkovits*, 190 A.D.3d 911, 917 (2d Dept 2021). As the Nassau County Supreme Court correctly ruled in *Long Island Plastic Surgical Group, P.C. v. United HealthCare Insurance Company of New York, Inc.*, Index No. 605543/19 (Supreme Ct., Nassau Cnty. Feb. 18, 2020), "[t]o prevent injustice, an out-of-network provider who has not been paid at reasonable and customary rates may maintain an action for unjust enrichment" (citing *Josephson*, 2012 N.Y. Misc. LEXIS 3859).

---

[19] United also contends that it cannot exercise monopsony power because the reimbursement rates will ultimately be determined by the independent dispute resolution process. LIA's contention, however, is that United, with MPI's assistance, is misusing the dispute resolution process to its advantage. Also, as we explain above in Point III, there are more than sufficient facts to plausibly indicate United's ability to control the Empire Plan reimbursement process.

United incorrectly argues that it has not been enriched by the services provided by LIA. There can be no dispute, however, that the Empire Plan has an obligation to pay for medically necessary services, such as those provided to the NYSHIP members. Rather than pay the reasonable rate or in some case at all, United retained these funds, generating administrative fees and shared savings for itself. There is no doubt that United has benefitted by withholding funds which rightfully belong to LIA.

United also asserts that the claim for unjust enrichment cannot stand because the services were not provided at its behest. This position is premised on a flawed understanding of the law. Unlike claims for *quantum merui*t, "[a] claim for unjust enrichment does not require that the party enriched take an active role in obtaining the benefit" *New York City Health & Hosps. Corp v WellCare of N.Y., Inc*., 35 Misc. 3d 250, 258 (Sup. Ct. N.Y. Cnty. 2011) (holding that Plaintiff a public benefit corporation could proceed with its claim for unjust enrichment based on alleged underpayment for emergency services despite the fact that neither plaintiff nor any of its hospitals were contracted with the defendant, a private insurer authorized to provide benefits to Medicare recipients]) *Aetna Cas. & Sur. Co. v. LFO Constr. Corp.*, 207 A.D.2d 274, 277 (1st Dep't 1994) ("The unjust enrichment claim does not require that the party enriched take an active role in obtaining the benefit.").

Given the foregoing, United is not entitled to dismissal of the unjust enrichment claim.

## VII.  IN THE ALTERNATIVE, THE COURT SHOULD GRANT PLAINTIFF LEAVE TO AMEND THE COMPLAINT

LIA respectfully submits that it has met its burden, at this early stage of the lawsuit, to assert plausible claims under federal and state antitrust law as well as New York common law. However, if the Court is inclined to dismiss this action, or any claim or cause of action therein, then LIA respectfully requests leave to amend its Complaint to cure any pleading deficiencies. *See,*

*e.g., Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead."); *Kopchik v. Town of E. Fishkill*, 759 Fed. Appx. 31, 38 (2d Cir. 2018) ("The opportunity to amend the complaint is appropriately presented after the district court rules on a motion to dismiss."); *Daniel v. Am. Bd. of Emergency Med.*, 988 F. Supp. 112, 122 (W.D.N.Y. 1996), *report and recommendation adopted*, 988 F. Supp. 112 (W.D.N.Y. 1997) ("This standard is even more stringent when evaluating antitrust claims, where the proof often is in the hands of the alleged conspirators, and dismissals prior to giving the plaintiff ample opportunity for merit-based discovery should be granted sparingly.")

## CONCLUSION

For the foregoing reasons, LIA respectfully requests that this Court deny Defendants' motions to dismiss the complaint in their entirety.

Dated: Uniondale, New York
      November 14, 2022

                    HARRIS BEACH, PLLC.
                    *Attorneys for Plaintiff*

                  By

                      Roy W. Breitenbach
                      Daniel S. Hallak

                  The Omni
                  333 Earle Ovington Boulevard
                  Uniondale, New York 11553
                  (516) 880-8378