UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――――

LONG ISLAND ANESTHESIOLOGISTS
PLLC,

          Plaintiff,

v.

UNITED HEALTHCARE INSURANCE
COMPANY OF NEW YORK INC., as
Program Administrator, THE EMPIRE PLAN
MEDICAL/SURGICAL PROGRAM,
MULTIPLAN INC.,

          Defendants.

**MEMORANDUM & ORDER**
22-CV-04040 (HG)

**HECTOR GONZALEZ**, United States District Judge:

Defendants[1] have moved to dismiss Plaintiff's complaint, which asserts antitrust and unjust enrichment claims based on allegations that Defendants are using their market power to force out-of-network anesthesia practices in the New York metropolitan area to accept dramatically lower reimbursement rates for services provided to patients insured by the Empire Plan. ECF No. 1 (Complaint). For the reasons set forth below, the Court grants Defendants' motions to dismiss in full. *See* ECF Nos. 30 & 31 (Defendants' Motions to Dismiss).

## FACTUAL BACKGROUND

Plaintiff Long Island Anesthesiologists PLLC ("LIA") is a private anesthesia services provider located in Suffolk County, New York. ECF No. 1 ¶¶ 1, 19. LIA provides anesthesia

---

[1] Although the docket lists The Empire Plan Medical/Surgical Program as a defendant, the Court's understanding is that Plaintiff's intent in its case caption was to name as a defendant United Healthcare Insurance Company of New York Inc., in its role as Program Administrator of the Empire Plan Medical/Surgical Program. Additionally, Plaintiff has only served United Healthcare Insurance Company of New York Inc. and Multiplan Inc. *See* ECF Nos. 3–4. Accordingly, references in this Order to "Defendants" refer to United Healthcare Insurance Company of New York Inc. and Multiplan Inc.

services to patients at Good Samaritan Hospital Medical Center in West Islip, New York, and at other physician offices and surgery centers throughout the New York metropolitan area. *Id*. ¶¶ 1, 19, 24. LIA, like many anesthesiology practices in the New York metropolitan area, has an out-of-network relationship with most health insurance providers. *Id.* ¶¶ 36–38. Defendant UnitedHealthcare Insurance Company of New York Inc. ("United") is a health insurer and health plan provider and a subsidiary of UnitedHealth Group Incorporated ("UHG"), a multi-national managed healthcare and insurance company and the world's second largest healthcare company by revenue. *Id.* ¶¶ 2–3, 39–43. United is also the administrator of the Empire Plan, a health plan in which roughly 1.2 million public-sector employees in the New York metropolitan area are enrolled. *Id.* ¶¶ 2–3, 64–71. Approximately 40% of LIA's revenue comes from the Empire Plan and LIA estimates that the Empire Plan makes up a similar share of revenue for other anesthesia groups in the New York metropolitan area. *Id.* ¶¶ 3, 78–79. Although Plaintiff's complaint does not include specific details about Defendant MultiPlan Inc. ("MultiPlan"), MultiPlan provides billing support services to United. ECF No. 30-1 (MultiPlan Motion to Dismiss) at 2.[2]

According to LIA, prior to January 2022, the Empire Plan reimbursed out-of-network physicians at amounts approximating the usual, customary, and reasonable ("UCR") rate for medical services in the geographic area in which the services were provided. ECF No. 1 ¶ 72. This practice did not change when, in March 2015, the Empire Plan began using the independent dispute resolution ("IDR") process established by the New York Surprise Bill Law to settle reimbursement disputes between health plans and out-of-network physicians. *Id.* ¶¶ 81–90.

---

[2] Because this fact is not alleged in the complaint, the Court is only setting it forth here to provide background on MultiPlan. It is not a necessary fact that affected the Court's decision.

However, in January 2022, after the Federal No Surprises Act took effect,[3] LIA alleges that the Empire Plan decreased the rates at which it reimbursed out-of-network providers by more than 80% after determining that it was not bound by the New York Surprise Bill Law. *Id.* ¶¶ 4, 94–117.

Plaintiff alleges that after the Empire Plan determined that it was not covered by the New York Surprise Bill Law's IDR process, MultiPlan began to communicate with LIA and other anesthesiology providers, identifying itself as working with United, in an effort to pressure providers into accepting the lower reimbursement rates offered by MultiPlan. *Id.* ¶¶ 4, 123–30. In these communications, MultiPlan allegedly demanded rapid response times and requested onerous and detailed documentation from providers related to reimbursement claims. *Id.* ¶¶ 125–33. Plaintiff alleges that these communications are designed to force anesthesia providers to abandon their challenges to the Empire Plan's newly-decreased reimbursement rates and that the tactic has been effective because practices lack the resources to pursue challenges to the reimbursement amounts. *Id.* ¶ 132–33.

According to LIA, the lower reimbursement rates will decrease the availability of high-quality anesthesia services in the New York metropolitan area and hamper the ability of out-of-network practices to recruit and retain new talent. *Id.* ¶¶ 5, 135–37. Because of United's size and market share, LIA alleges that its decision to lower the Empire Plan's reimbursement rate for anesthesia services will cause a significant number of anesthesia practices to leave the relevant market by going out of business or being forced to sell their practices. *Id.* ¶¶ 7, 143–46. LIA also alleges that lower reimbursement rates will force patients with high-deductible plans or

---

[3]  According to Plaintiff, the IDR process under the Federal No Surprises Act provides for reimbursement at a substantially lower rate than the UCR. *Id.* ¶¶ 115–16.

plans with large cost-sharing requirements for out-of-network services to pay significantly more for medically necessary services. *Id.* ¶ 147.

LIA claims that United's actions in reducing reimbursement rates and pressuring anesthesia providers to accept these lower rates are intended to force anesthesia providers out of business to the benefit of another UHG subsidiary, Optum, which, through its OptumCare business, employs physicians, including anesthesia providers. *Id.* ¶¶ 7, 46–55, 142–44. According to LIA, OptumCare employs more than 50 anesthesiologists in the New York metropolitan area. *Id.* ¶ 54.

Plaintiff asserts five causes of action. First, it alleges that United and MultiPlan have engaged in an antitrust conspiracy to restrain trade in violation of Section 1 of 15 U.S.C. § 1 (the "Sherman Act"). ECF No. 1 ¶¶ 183–87. Next, LIA asserts that United possesses monopsony[4] power in the relevant market, that it is willfully maintaining that power through anticompetitive conduct, and that it is leveraging that power to gain an anticompetitive advantage in the relevant market, in violation of Section 2 of the Sherman Act. *Id.* ¶¶ 188–92. Third, LIA asserts that United has engaged in predatory or anticompetitive conduct in an attempt to acquire monopsony power and that it has a dangerous probability of achieving monopsony power, in violation of Section 2 of the Sherman Act. *Id.* ¶¶ 193–97. Fourth, LIA asserts that United and MultiPlan have engaged in an antitrust conspiracy to restrain trade in violation of New York's General Business Law §§ 340, *et seq.* (the "Donnelly Act"). *Id.* ¶¶ 198–203. Finally, LIA asserts that United and MultiPlan were unjustly enriched at LIA's expense by receiving fees and retaining reimbursement through their improper scheme. *Id.* ¶¶ 204–09.

---

[4] A monopsony is a market dominated by a single buyer who controls the market. *See* Monopsony, Black's Law Dictionary (11th ed. 2019).

**LEGAL STANDARD**

A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[5] "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of [p]laintiff'[s] claims for relief." *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 155 (E.D.N.Y. 2018). Although all allegations contained in a complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

**DISCUSSION**

The Court dismisses each of Plaintiff's claims for the reasons described more fully below. Plaintiff has not sufficiently alleged an antitrust injury. Accordingly, Plaintiff's Sherman Act Section 1 claim alleging an antitrust conspiracy against United and MultiPlan and Plaintiff's Sherman Act Section 2 claim against United related to allegations of monopsony power are dismissed. Plaintiff's Sherman Act Section 1 claims against both Defendants are also dismissed because Plaintiff fails to state a plausible claim against MultiPlan. Finally, after dismissing Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's Donnelly Act and unjust enrichment claims.

---

[5] Unless noted, case law quotations in this order accept all alterations and omit internal quotation marks, citations, and footnotes.

I.      **Plaintiff's Sherman Act Claims Against United and MultiPlan**

Plaintiff asserts three Sherman Act claims against United and one Sherman Act claim against MultiPlan. First, Plaintiff claims that United and MultiPlan engaged in an antitrust conspiracy to restrain trade in violation of Section 1 of the Sherman Act. ECF No. 1 ¶¶ 183–87. Next, Plaintiff alleges that United violated Section 2 of the Sherman Act because it possesses monopsony power that it is willfully maintaining through anticompetitive conduct. *Id.* ¶¶ 188–92. And, finally, Plaintiff alleges that United violated Section 2 of the Sherman Act because it has engaged in predatory or anticompetitive conduct in an attempt to acquire monopsony power. *Id.* ¶¶ 193–97.[6]

   A. **Plaintiff's Sherman Act Claims Against United and MultiPlan Fail Because Plaintiff Has Not Sufficiently Alleged Antitrust Injury**

In an antitrust case, a private plaintiff must have constitutional standing under Article III, as well as antitrust standing. *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n. 31 (1983). Antitrust standing is "a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement [the court] must dismiss it as a matter of law." *Gatt Commc'ns Inc. v. PMC Assocs. L.L.C.*, 711 F.3d 68, 75 (2d

---

[6] United also argues that Plaintiff's complaint should be dismissed or stayed under the *Colorado River* abstention doctrine and that Plaintiff's antitrust claims fail because the Empire Plan is not subject to New York's Surprise Bill Law. ECF No. 31-1 at 8–13. According to United, whether the Empire Plan is subject to New York's Surprise Bill Law or required to follow the Federal No Surprises Act is a threshold question on which the Court should abstain from ruling until the declaratory judgment action in New York Supreme Court regarding the same question is resolved. In supplemental letters submitted by the parties after the motions were briefed, the parties note that the New York Supreme Court has issued an opinion in the declaratory judgment action, which Plaintiff is appealing. ECF Nos. 48 & 49 (Supplemental Letters). However, because the Court finds that Plaintiff has not sufficiently pled antitrust injury regardless of whether the New York or Federal law controls the Empire Plan's reimbursements and because the parties have not briefed what, if any, preclusive effect they believe the New York Supreme Court's ruling has on this case, the Court does not need to reach the question of whether Plaintiff's claims fail because the Empire Plan is not subject to New York's Surprise Bill Law.

Cir. 2013). To establish antitrust standing with respect to both its Sherman Act Section 1 and Section 2 claims as a private plaintiff, LIA must do more than allege an injury causally related to unlawful conduct – it must allege plausible facts that it suffered "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also Bologna v. Allstate Ins. Co.*, 138 F. Supp. 2d 310, 319–20 (E.D.N.Y. 2001) (analyzing plaintiff's Sherman Act Sections 1 and 2 claims together and dismissing both for failure to state an antitrust injury). Therefore, an injury does not constitute an "antitrust injury" unless "it is attributable to an anti-competitive aspect of the practice under scrutiny." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). This requirement stems from the principle that the antitrust laws were "enacted for the protection of competition, not competitors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 319 (1962); *see also Gatt*, 711 F.3d at 75 ("Absent such boundaries, the potent private enforcement tool that is an action for treble damages could be invoked without service to—and potentially in disservice of—the purpose of the antitrust laws: to protect competition.").

Therefore, to survive a motion to dismiss, a "plaintiff must plead specific facts demonstrating that the defendants' conduct injured the competitive structure of the market." *S.O. Textiles Co. v. A & E Prod. Grp., a Div. of Carlisle Plastics, Inc.*, 18 F. Supp. 2d 232, 242–43 (E.D.N.Y. 1998). "The antitrust injury requirement obligates a plaintiff to demonstrate, as a threshold matter, that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice." *Bologna* 138 F. Supp. 2d at 319 (emphasis in original).

To determine whether a plaintiff has antitrust standing, courts in the Second Circuit analyze "(1) whether the plaintiff suffered an antitrust injury, and then (2) whether any . . .

factors . . . prevent the plaintiff from being an efficient enforcer of the antitrust laws." *Winstar Comms. LLC, v. Equity Office Properties, Inc.*, 170 F. App'x 740, 742 (2d Cir. 2006); *see also Gatt*, 711 F.3d at 76 ("[W]e require a private antitrust plaintiff plausibly to allege (a) that it suffered a special kind of antitrust injury, and (b) that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an efficient enforcer of the antitrust laws."). To analyze whether a plaintiff has plausibly alleged an antitrust injury, courts in this Circuit "employ a three-step process for determining whether a plaintiff has sufficiently alleged antitrust injury." *Gatt*, 711 F.3d at 76. First, a plaintiff alleging that it has been injured must "identify the practice complained of and the reasons such a practice is or might be anticompetitive. Next, [the court] identif[ies] the actual injury the plaintiff alleges[, which] requires [courts] to look at ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct. Finally, [the court] compare[s] the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges." *Id.*

      Here, conducting the requisite analysis necessarily leads to the conclusion that Plaintiff has not sufficiently pled an antitrust injury. According to LIA, it has been injured because "United, through its role as administrator of the Empire Plan, is abusing its monopsony power to drive down the out-of-network reimbursement rate for medical [sic] necessary anesthesia services and thereby cause [sic] significant anticompetitive effects and resulting antitrust injury in the market for the delivery of anesthesia services in the New York metropolitan area." ECF No. 42 at 9. LIA further alleges that MultiPlan assists United in its efforts by providing "substantial assistance to United to enable it to significantly reduce reimbursement rates to below competitive [levels]." *Id.* at 3–4. Plaintiff also attempts to assert injury by averring that because the Empire Plan reimbursements make up a significant portion of anesthesia practices' business

in the New York metropolitan area, the lower reimbursement rates will decrease the availability of high-quality anesthesia services in the New York metropolitan area, force some providers out of business, force other providers to curtail their services, and hamper the ability of out-of-network practices to recruit and retain new talent. ECF No. 1 ¶¶ 5, 78, 135–37. Plaintiff alleges that the effect of United and MultiPlan's anticompetitive behavior is to drive down the market rate for out-of-network providers to increase the share of business handled by anesthesiologists employed by OptumCare and to force providers like Plaintiff to go in-network. *Id.* ¶¶ 7, 46–55, 142–44.

### i. Plaintiff Does Not Allege Facts Sufficient to Support a Finding that Competition as a Whole in the Relevant Market was Harmed

With respect to the relationship between the anticompetitive effect of the practice at issue and the actual injury Plaintiff alleges, even if the Court accepts that United has decision-making power over the rate at which the Empire Plan reimburses out-of-network providers, *see id.* ¶¶ 7, 46–55, 142–44, the Court finds that Plaintiff has not alleged an injury that the antitrust laws were intended to protect. Plaintiff has not done so because it has not alleged "an *actual* adverse effect on competition as a whole in the relevant market" but has merely alleged that "it has been harmed as an individual competitor[,which will not suffice]." *Bologna*, 138 F. Supp. 2d at 319 (emphasis in original).

As an initial matter, Plaintiff fails to state facts sufficient to support a finding that the consumers in the relevant market–patients–have been harmed by United and MultiPlan's actions. *See, e.g.*, *Balaklaw v. Lovell*, 14 F.3d 793, 798 (2d Cir. 1994) (finding that the market had remained unaltered when "[f]ron the consumers' point of view, nothing about the market has changed"). The complaint does not credibly allege that patients have had to or necessarily will have to pay more for anesthesia services as a result of the decreased reimbursement rates.

9

Instead Plaintiff relies on the argument that eventually decreased reimbursement rates will drive competitors to OptumCare out of business or force them to go in-network with the Empire Plan, which will eventually allow United to drive up costs.  ECF No. 1 ¶¶ 5, 135–46

However, Plaintiff has failed to allege that the lower reimbursement rates have had an actual or likely adverse effect on competition among insurers in the insurance market.  Plaintiff does not assert that OptumCare or in-network providers are recouping more lucrative reimbursements under the Empire Plan for their services[7] or that anesthesiologists are choosing to go in-network with respect to the Empire Plan or joining OptumCare rather than remaining independent, facts that might support a finding that competition in the market for delivery of anesthesia services was being harmed.  *See, e.g.*, *Michael E. Jones, M.D., P.C. v. United Health Grp., Inc.*, No. 19-cv-7972, 2021 WL 4443142, at *5 (S.D.N.Y. Sep. 28, 2021) ("Plaintiff has not alleged that medical providers have joined Defendants' network because of the purported discrimination against out-of-network providers or that Defendants' share of the health insurance market has increased since . . . the year the supposed discrimination began" therefore "there are no allegations . . . that competition in the insurance market . . . has been affected by Defendants' actions vis-à-vis Plaintiff's claim for reimbursement."); *Korshin v. Benedictine Hosp.*, 34 F. Supp. 2d 133, 138 (N.D.N.Y. 1999) (finding that plaintiff had not established antitrust standing because he had "not alleged any change in the price of anesthesiology services, a decrease in quality or efficiency of care, or that the consumers of anesthesiology services, be they patients, referring physicians, or third-party payers, have less of a market choice . . . as a result of defendants' actions").

---

[7] In fact, Plaintiff acknowledges that if it were to choose to go "in-network," its reimbursement rate would likely be the same or less than it is now.  ECF No. 42 at 15.

And the complaint contains no facts to support a finding that the competitive structure of the market for the delivery of anesthesia services in the New York metropolitan area has been affected by the decision of a single health insurance plan to reimburse out-of-network providers at lower rates to such an extent that providers are closing, thus decreasing the choices available to patients. *S.O. Textiles Co.*, 18 F. Supp. 2d at 242–43. Although the Court accepts as true LIA's assertion that "in the years leading up to 2022, Empire Plan represented approximately 40% of LI Anesthesia's revenues," the Court cannot credit LIA's assertion that "[u]pon information and belief," the Empire Plan represented "similar shares of revenues for other anesthesia groups in the New York metropolitan area." ECF No. 1 ¶¶ 78–79. "A litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory. Those magic words will only make otherwise unsupported claims plausible when the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018). Information about the percentage of other anesthesia providers' revenue that the Empire Plan represents is not information peculiarly within the possession and control of United. And, without any additional factual basis to support Plaintiff's allegation about other anesthesia practices, the Court cannot credit Plaintiff's conclusion that an insurance plan that covers only 1.2 million of the more than 19.5 million inhabitants of the New York metropolitan area[8] (roughly 6%) makes up more than 40% of revenues across the entire market for the delivery of anesthesia services. Accordingly, Plaintiff has not demonstrated that the lowered reimbursement rates under the Empire Plan are likely to drive out competition in the provider market.

---

[8]   *See* Census Reporter Data on New York-Newark-Jersey City, NY-NJ-PA Metro Area, available at https://perma.cc/XBQ4-K3GL (last visited November [X], 2023).

### ii. Lowering Reimbursement Rates to a Physician Practice is Generally Insufficient to Establish Antitrust Injury

The parties agree that a health plan lowering reimbursement rates paid to a physician practice is generally insufficient to establish antitrust injury. *See* ECF No. 42 (LIA's Opposition) at 13; ECF No. 45 (United's Reply) at 3; *see also Westchester Radiological Associates P.C. v. Empire Blue Cross & Blue Shield, Inc.*, 707 F. Supp. 708, 717 (S.D.N.Y. 1989) ("The law does not prevent a buyer with market power from negotiating a good price, or from specifying what it will buy."); *Kartell v. Blue Cross Blue Shield of Mass., Inc.*, 749 F.2d 922, 925, 929 (1st Cir. 1984) (holding that "[a]ntitrust law rarely stops the buyer of a service from trying to determine the price or characteristics of the product that will be sold" and that "a legitimate buyer is entitled to use its market power to keep prices down"). However, LIA argues that antitrust injury can be established when a defendant's reduced reimbursements are accompanied by "something more," such as a conspiracy or differential treatment provided to different market participants based on their relationship with the defendant. ECF No. 42 at 13–15.

According to Plaintiff, the "something more" alleged here is that United engaged in a "horizontal conspiracy" with MultiPlan to competitively hobble LIA's practice to benefit OptumCare. *Id.* at 15. However, as discussed in Section I.B., *infra*, Plaintiff has not put forth sufficient facts to state a claim that United and MultiPlan were engaged in a conspiracy let alone a "horizontal" conspiracy, which requires an "agreement[] between two or more competitors." *Texaco Inc. v. Dagher*, 547 U.S. 1, 2 (2006). Additionally, because the complaint does not allege that United and MultiPlan are horizontal competitors (rather, the facts as alleged in the complaint support a conclusion that they are not horizontal competitors), Plaintiff's efforts to cite a "horizontal conspiracy" as the "something more" required to establish antitrust injury must necessarily fail. *See In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481, 2014 WL

12

4277510, at *32 (S.D.N.Y. Aug. 29, 2014) ("Plaintiffs claim to have alleged a horizontal conspiracy in restraint of trade, but they do not allege that [the defendants] are horizontal competitors. In the absence of the latter, the former cannot be correct.").

In the absence of proof of a conspiracy or "something more," Plaintiff's arguments are insufficient to establish that it suffered an antitrust injury. *West Penn Allegheny Health System, Inc. v. UPMC*, 627 F.3d 85, 103 (3d Cir. 2010) (stating that if defendant had been acting alone, Plaintiff "would have little basis for challenging the reimbursement rates" because "[a] firm that has substantial power on the buy side of the market (*i.e.*, monopsony power) is generally free to bargain aggressively when negotiating the prices it will pay for goods and services."). Accordingly, Plaintiff's three Sherman Act claims against United and single Sherman Act claim against MultiPlan must be dismissed.

### B. Plaintiff's Sherman Act Claim Against MultiPlan Must Also be Dismissed Because Plaintiff Does Not State a Plausible Claim Against MultiPlan

Even if Plaintiff's Sherman Act Section 1 claim against MultiPlan had sufficiently alleged an antitrust injury, the claim would be dismissed because Plaintiff's complaint does not plead "factual content that allows the court to draw the reasonable inference" that MultiPlan is "liable for the misconduct alleged." *Twombly*, 550 U.S. at 570. "To present a plausible claim, the pleading must contain something more than a statement of facts that merely creates a suspicion of a legally cognizable right of action." *Jorgensen v. Cnty. of Suffolk*, 558 F. Supp. 3d 51, 60 (E.D.N.Y. 2021).

LIA's complaint contains limited references to MultiPlan. LIA asserts that MultiPlan is helping United use its market power to force anesthesia providers to accept lower reimbursement rates by engaging in written and phone communications with providers in which MultiPlan engages in "bogus negotiations," asserts "unrealistic deadlines," and "bur[ies anesthesia]

13

practices in mountains of correspondence" related to reimbursement rates. ECF No. 1 ¶¶ 4, 140, 174–77. LIA also alleges that MultiPlan is a market participant as a payor for, or purchaser of anesthesia services "to the extent that it assists plans in terms of calculating reimbursement levels and facilitating reimbursement." *Id.* ¶ 167. These facts are not sufficient to state a claim that MultiPlan engaged in an antitrust conspiracy.

To survive dismissal of its Sherman Act Section 1 claim against MultiPlan, LIA must allege "a combination or some form of concerted action between at least two legally distinct economic entities" that constitutes "an unreasonable restraint of trade." *Primetime 24 Joint Venture v. NBC*, 219 F.3d 92, 103 (2d Cir. 2000). "Proof of unilateral action does not suffice," rather, the facts alleged "must reveal a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012). This requires allegations of "direct or circumstantial evidence that reasonably tends to prove that [Defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* at 184. A complaint claiming conspiracy "must provide some factual context suggesting that the parties reached an agreement, not facts that would be merely consistent with an agreement." *Id.*

Beyond a bare assertion that MultiPlan is working with United to force lower reimbursement rates,[9] the complaint contains no allegations to support a finding that MultiPlan and United had a "conscious commitment to a common scheme." *Caithness Long Island II, LLC v. PSEG Long Island LLC*, No. 18-cv-4555, 2019 WL 6043940, at *4 (E.D.N.Y. Sept. 30, 2019). The complaint, for example, does not assert that MultiPlan knew the reimbursement rates it sought were lower than the rates that United had previously offered, that MultiPlan believed the

---

[9] ECF No. 1 ¶¶ 4, 134–35, 141, 175–77.

14

rates were below competitive levels, that MultiPlan had any role in helping United or the Empire Plan determine appropriate reimbursement rates, or that MultiPlan intended to help United drive out competition. The only plausible finding suggested by the facts alleged in the complaint is that MultiPlan contracted with United to handle direct communication with providers as part of the federal IDR process with respect to claims for reimbursement related to treatment provided to patients insured by the Empire Plan. LIA does not allege any facts suggesting that United and MultiPlan conspired or agreed to work together to restrain trade unlawfully. *Anderson News*, 680 F.3d at 183–84. Accordingly, Plaintiff's Sherman Act Section 1 claim against MultiPlan must be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[10]

In its opposition brief, LIA asserts new allegations against MultiPlan, referencing MultiPlan's Annual Report and content from its website, and raises additional assertions about the relationship between MultiPlan and United, including that MultiPlan "receives a percentage of the 'savings' it generates through the reduction of reimbursement rates." ECF No. 42 at 18–20. However, it is well-settled that a complaint may not be amended by the brief in opposition to a motion to dismiss. *See, e.g.*, *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (finding that a party may not amend its pleadings through statements made in motion papers).

---

[10] Because "[a]llegations merely consistent with unilateral action are insufficient" to make out a violation of Section 1 of the Sherman Act, if Plaintiff fails to state a claim for a Section 1 violation against MultiPlan, its Section 1 claim against United, MultiPlan's alleged co-conspirator, must necessarily fail. *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 366 (S.D.N.Y. 2016) (dismissing plaintiffs' claims under Section 1 of the Shearman Act because plaintiff "failed to plausibly alleged unlawful concerted action or an anticompetitive agreement").

And, because the Court finds that Plaintiff's Sherman Act claims against United and MultiPlan must be dismissed for failure to plead antitrust injury, and that Plaintiff's Sherman Act Section 1 claims against United and MultiPlan must also be dismissed for failure to state a plausible claim as to MultiPlan, the Court does not need to reach the parties' remaining arguments regarding the sufficiency of Plaintiff's Sherman Act claims.

Accordingly, although the Court does not believe consideration of these facts would have altered its finding, the Court did not and could not consider these facts in reaching its conclusion.

## II. Plaintiff's Donnelly Act and Unjust Enrichment Claims

Plaintiff also claims that United and MultiPlan engaged in an antitrust conspiracy to restrain trade in violation of the Donnelly Act and that United and MultiPlan were unjustly enriched by receiving fees and retaining reimbursement through their alleged scheme of improperly reducing LIA's reimbursement rates. "District courts may use their discretion in deciding whether to exercise supplemental jurisdiction over state law claims after dismissing a plaintiff's only federal claims, so long as the federal claims were not dismissed for lack of subject matter jurisdiction." *Probiv v. PayCargo LLC*, No. 22-cv-2907, 2023 WL 159788, at *5 (E.D.N.Y. Jan. 11, 2023); 28 U.S.C. § 1367(c)(3) (A district court "may decline to exercise supplemental jurisdiction" over a "state law claim[]" if the district court "has dismissed all claims over which it has original jurisdiction"); *see also Cangemi v. United States*, 13 F.4th 115, 134 (2d Cir. 2021). Having dismissed all of Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's Donnelly Act and unjust enrichment claims.[11]

## III. Plaintiff May File a Motion Seeking Leave to Amend

In the final section of Plaintiff's brief, Plaintiff asks the Court to grant it leave to amend its complaint to cure any pleading deficiencies. ECF No. 42 at 34. The Second Circuit "strongly

---

[11] Although the Court declines to exercise supplemental jurisdiction over Plaintiff's Donnelly Act claims, the Court notes that the Donnelly Act "is modeled after the Sherman Act and should generally be construed in light of Federal precedent." *Biocad JSC v. F. Hoffman-La Roche*, 942 F.3d 88, 101 (2d Cir. 2019). Accordingly, "[t]he standard for a well-pleaded Donnelly Act claim is the same as a claim under Section 1 of the Sherman Act." *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 370 (S.D.N.Y. 2012). The Court has dismissed Plaintiff's Sherman Act claims against MultiPlan and United because they were not well-pled, *see supra* Section I. Accordingly, Plaintiff's Donnelly Act claims would also fail on the same grounds if the Court were to exercise supplemental jurisdiction over those claims.

favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6)." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107 (2d Cir. 2022); *see also Kopchik v. Town of East Fishkill*, 759 F. App'x 31, 38 (2d Cir. 2018) ("The opportunity to amend the complaint is appropriately presented *after* the district court rules on a motion to dismiss.").

The fact that Plaintiff's opposition brief provides no explanation about how it intends to amend its complaint is sufficient reason for the Court to deny leave to amend. *See Gregory v. ProNAi Therapeutics Inc.*, 757 F. App'x 35, 39 (2d Cir. 2018) (affirming denial of leave to amend where "plaintiffs sought leave to amend in a footnote at the end of their opposition to defendants' motion to dismiss" and "included no proposed amendments"). However, because Plaintiff has not previously sought to amend its complaint, Plaintiff may file a motion of no more than ten (10) pages seeking leave to file an amended complaint by December 12, 2023. Any such motion should include the proposed amended complaint as an exhibit as well as a redline comparing the proposed amended complaint to the current complaint. The brief should explain why leave to amend should be granted, including a discussion of how the proposed amended complaint cures the deficiencies identified herein and in Defendants' motions to dismiss. If Plaintiff chooses to file a motion and a proposed amended complaint, Defendants may file a joint opposition of no more than ten (10) pages on or before January 4, 2023. Unless otherwise requested by the Court, there will be no replies.

## CONCLUSION

For the reasons set forth above, the Court GRANTS Defendants' motions to dismiss. *See* ECF Nos. 30 & 31. Plaintiff may file a motion seeking leave to amend its complaint, as described above, on or before December 12, 2023, and Defendants may file a joint opposition

17

brief by January 4, 2023.  If Plaintiff does not seek leave to amend by December 12, 2023, judgment shall be entered, and the case closed.

    SO ORDERED.

 /s/ *Hector Gonzalez*
HECTOR GONZALEZ
United States District Judge

Dated:  Brooklyn, New York
        November 21, 2023