UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
LONG ISLAND ANESTHESIOLOGISTS PLLC,                 :
                                                    :
                        Plaintiff,                  :
                                                    :
            -against-                               :        Case No. 2:22-cv-04040-HG
                                                    :
UNITEDHEALTHCARE INSURANCE                          :
COMPANY OF NEW YORK INC., as Program                :
Administrator, THE EMPIRE PLAN                      :
MEDICAL/SURGICAL PROGRAM and                        :
MULTIPLAN INC.,                                     :
                                                    :
                        Defendants.                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


**MEMORANDUM OF LAW IN SUPPRT OF PLAINTIFF'S
MOTION FOR LEAVE TO SERVE AN AMENDED COMPLAINT**

Roy W. Breitenbach, Esq.
Harris Beach, PLLC
333 Earle Ovington Blvd, Suite 901
Uniondale, NY 11553
(516) 880-8484

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

    I.    THE PAC SUFFICIENTLY ALLEGES ANTITRUST INJURY ........................... 4

        A.  The PAC Alleges Facts Plausibly Establishing Harm To Competition ....................... 4

        B.  The PAC Plausibly Alleges The Lowering Of Health Plan  Reimbursement Rates Through A Horizontal Arrangement ........................................................................... 8

    II.    THE PAC SUFFICIENTLY ALLEGES A PLAUSIBLE CONSPIRACY BETWEEN UNITED AND MPI .......................................................................... 11

    III.    LIA SUFFICIENTLY ALLEGES ANTI-COMPETITIVE CONDUCT THAT VIOLATES THE RULE OF REASON ............................................................... 17

    IV.    LIA HAS PLEAD PLAUSIBLE SECTION 2 MONOPSONY CLAIMS ........... 20

CONCLUSION ............................................................................................................................. 22

# TABLE OF AUTHORITIES

**Cases**            **Page(s)**

*Anderson News, LLC v. American Media, Inc.*,
680 F.3d 162 (2d Cir. 2012) ........................................................................ 10, 12, 16

*Angelico v. Lehigh Valley Hosp., Inc.*,
184 F.3d 268 (3d Cir. 1999) .................................................................................. 6, 7

*Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*,
917 F.2d 1413 (6th Cir. 1990) ................................................................................. 21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................... 3

*Balaklaw v. Lovell*,
14 F.3d 793 (2d Cir. 1994) ........................................................................................ 4

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................. 12, 3

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*,
996 F.2d 537 (2d Cir. 1993) ................................................................................... 17

*Compass, Inc. v. Real Estate Bd. of N.Y.*,
2022 U.S. Dist. LEXIS 60871 ................................................................................. 12

*Computer Assocs. Int'l v. Simple*,
2006 U.S. Dist. LEXIS 116876 ................................................................................. 3

*Daniel v. Am. Bd. of Emergency Med.*,
988 F. Supp. 112 (W.D.N.Y. 1996) .......................................................................... 3

*Davitashvili v. Grubhub Inc.*,
2022 U.S. Dist. LEXIS 58974 (S.D.N.Y. Mar. 30, 2022) ...................................... 19

*In re Delta Dental, Antitrust Litig.*,
484 F. Supp. 3d 627 (N.D. Ill. 2020) ........................................................................ 8

*Dluhos v. Floating & Abandoned Vessel*,
162 F.3d 63 (2d Cir. 1998) ........................................................................................ 2

*Eastman Kodak Co. v. Image Tech. Servs.*,
504 U.S. 451 (1992) ................................................................................................. 20

*Fineman v. Armstrong World Indus.*,
980 F.2d 171 (3d Cir. 1992) .................................................................................... 17

*Foman v. Davis*,
371 U.S. 178 (1962) ................................................................................................... 2

*FTC v. Indiana Fed. of Dentists*,
476 U.S. 447 (1986) ............................................................................................................. 18

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*,
386 F.3d 485 (2d Cir. 2004) ............................................................................................. 18

*George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*,
554 F.2d 551 (2d Cir. 1997) ............................................................................................... 3

*Kelco Disposal, Inc. v. Browning-Ferris Indus.*,
845 F.2d 404 (2d Cir. 1988) ...................................................................................... 20, 21

*La. Wholesale Drug Co. v. Shire LLC*,
929 F. Supp. 2d 256 (S.D.N.Y. 2013) ............................................................................... 3

*N.Y. Medscan LLC v. N.Y. Univ. Sch. of Med.*,
430 F. Supp. 2d 140 ...................................................................................................... 6, 7

*New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*,
54 F. Supp. 3d 1189 (D.N.M. 2014) ........................................................................... 11, 8

*Newcal Industries, Inc. v. Ikon Office Solution*,
513 F.3d 1038 (9th Cir. 2008) ......................................................................................... 19

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
524 F. Supp. 2d 1031 (N.D. Ill. 2007) ............................................................................. 8

*Presque Isle Colon & Rectal Surgery v. Highmark Health*,
391 F. Supp. 3d 485 (W.D. Pa. 2019) ............................................................... 11, 20, 8, 9

*Primetime 24 Joint Venture v. NBC*,
219 F.3d 92 (2d Cir. 2000) ......................................................................................... 12, 17

*Rebel Oil Co. v. Atlantic Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) ........................................................................................... 21

*Reddy v. Puma*,
2006 U.S. Dist. LEXIS 67848 ............................................................................................ 6

*Retrophin, Inc. v. Questcor Pharm.*,
41 F. Supp. 3d 906 (C.D. Cal. 2014) ............................................................................... 21

*Shak v. JPMorgan Chase & Co.*,
156 F. Supp. 3d 462 (S.D.N.Y. 2016) ............................................................................. 21

*Starr v. Sony BMG Music Ent.*,
592 F.3d 314 (2d Cir. 2010) ..................................................................................... 12, 16, 17

*Telsat v. Entm't & Sports Programming Network*,
753 F. Supp. 109 (S.D.N.Y. 1990) ................................................................................. 20

*In re Tether & Bitfinex Crypto Asset Litig.*,
576 F. Supp. 3d 55 (S.D.N.Y. 2021) ............................................................................... 20

*Todd v. Exxon Corp.*,
 275 F.3d 191 (2d Cir. 2001) ................................................................................ 18, 19, 20

*United States v. Microsoft Corp.*,
 253 F.3d 34 (D.C. Cir. 2001) ...................................................................................... 21

*United States v. Topco Assocs.*,
 Inc., 405 U.S. 596 (1972) ........................................................................................ 9-10

*Us v. FTC*,
 221 F.3d 928 (7th Cir. 2000) ................................................................................. 20-21

*West Penn Allegheny Health Sys. v. UPMC*,
 627 F.3d 85 (3d Cir. 2010) ....................................................................................... 8, 9

**Statutes**

Mich., 20-CV-12916-TGB-APP ..................................................................................... 8, 9

§ 1 ........................................................................................................................ 2, 12, 17

§ 2 ............................................................................................................................... 2, 20

**Rules**

Fed. R. Civ. P. 12 ............................................................................................................... 2

Fed. R. Civ. P. 15 ............................................................................................................. 22

## PRELIMINARY STATEMENT

This lawsuit concerns access to high-quality anesthesia services for the 18 million residents of the NY metropolitan area. Defendant United is one of the largest healthcare payers in the NY metropolitan area and is the administrator of the Empire Plan, the health plan for over 1.2 million public-sector employees. United, with the assistance of Defendant MPI, has used its market power to force out-of-network anesthesia practices in the NY metropolitan area to accept dramatically lowered Empire Plan reimbursement rates for their medically necessary services. These cuts have totaled more than 80% starting January 2022.

Defendants' actions have had, and will continue to have, significantly adverse economic effects on the hospital-based out-of-network anesthesia providers in the NY metropolitan area, including the Plaintiff, LIA.  Anesthesiologists cannot pick and choose their patients and cannot turn away patients because of their health coverage or other issues. Given the number of public employees in the NY metropolitan area, anesthesia providers are largely at the mercy of United. For LIA, and many other area anesthesia practices, approximately 40% of their revenue comes from the Empire Plan

Thus, during a time of significant economic upheaval and inflation, vitally essential anesthesia providers are suffering an unsustainable and unending 80+% reimbursement cut. This has decreased, and will continue to decrease, the availability of high-quality anesthesia services in the New York metropolitan area; many providers will be forced out of business entirely, and others will be forced to significantly curtail their services and recruitment and retention of well-trained clinicians.

Given the above, LIA commenced this lawsuit in July 2022 asserting claims against United and MPI for violations of Sherman Act § 1, the New York Donnelly Act, and unjust enrichment. It also asserts claims against United for monopsony and attempted monopsony in violation of Sherman Act § 2.

Last November, this Court granted Defendants' Fed. R. Civ. P. 12(b)(6) motion to dismiss. Specifically, the Court found that LIA failed to sufficiently allege: (1) antitrust injury, requiring dismissal of the Sherman Act claims; and § 1 claim. This Court did, however, grant us the opportunity to seek leave to file an amended complaint. LIA seeks leave to file the accompanying PAC by this motion.

This Court should grant LIA the requested leave. As we explain in Point I, the PAC contains sufficient factual allegations plausibly establishing that Defendants' actions harmed competition as a whole in a relevant market, as opposed to just harm to LIA, and thereby meets the antitrust injury requirement. As we explain in Point II, the PAC alleges facts plausibly establishing an actionable antitrust conspiracy between United and MPI that violates Sherman Act § 1. Point III and IV summarize the reasons why LIA has sufficiently alleged the remaining elements to make out claims under Sherman Act §§ 1 and 2.

## ARGUMENT

Rule 15(a) provides that "leave to amend a pleading shall be freely given when justice so requires.". Per the Supreme Court, Rule 15's prescription to freely grant amendments to pleadings is a "mandate" that is to be "heeded." *See Foman v. Davi*s, 371 U.S. 178, 182 (1962); *see also Dluhos v. Floating & Abandoned Vessel*, 162 F.3d 63, 69 (2d Cir. 1998).

Here, there has been no undue delay or dilatory tactics because LIA makes this motion in immediate response to the dismissal of its original complaint pursuant to a Court order prescribing

the time within which LIA can bring this motion. (ECF 50, 51, 52.) This is LIA's first attempt to cure deficiencies in its pleadings. LIA's proposed amendments will not prejudice Defendants in any respect. The PAC does not assert new claims against Defendants, but merely elaborates on LIA's already-asserted causes of action in line with the request of the Court's decision.

LIA's proposed amendments are not futile. "It is well-established that courts typically apply a 12(b)(6) standard to the 'futility' analysis." *Computer Assocs. Int'l v. Simple*, 2006 U.S. Dist. LEXIS 116876, *13 (E.D.N.Y. Sept. 30, 2006). When evaluating a claim under the Rule 12(b)(6) standard, a complaint need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility is demonstrated "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the conduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The task of a court … is to 'assess the feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *La. Wholesale Drug Co. v. Shire LLC*, 929 F. Supp. 2d 256, 259-60 (S.D.N.Y. 2013).

This dismissal standard is the same for antitrust cases, which carry no heightened pleading standard. See *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 555 (2d Cir. 1997). Indeed, the mandate to allow repleading is "even more stringent when evaluating antitrust claims, where the proof often is in the hands of the alleged conspirators, and dismissals prior to giving the plaintiff ample opportunity for merit-based discovery should be granted sparingly." *Daniel v. Am. Bd. of Emergency Med.*, 988 F. Supp. 112, 122 (W.D.N.Y. 1996).

# I.   THE PAC SUFFICIENTLY ALLEGES ANTITRUST INJURY

To state claims under the Sherman Act, LIA must show that Defendants' anti-competitive conduct caused "antitrust injury," defined as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' act unlawful." *Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir. 1994).  This requires LIA to show that Defendants' conduct has had an actual adverse effect on competition as a whole in the relevant market as opposed to just LIA being harmed as an individual competitor. *Id.*

LIA's theory is that United, as administrator of the Empire Plan, with MPI's assistance, is abusing its monopsony power to drive down out-of-network anesthesia reimbursement rates thereby causing significant anticompetitive effects and resulting antitrust injury in the NY metropolitan area anesthesia market.

## A.  The PAC Alleges Facts Plausibly Establishing Harm To Competition

This Court dismissed LIA's Sherman Act claims on antitrust injury grounds because of a failure to allege facts sufficient to support a finding that the consumers in the relevant market – patients – have been harmed by the actions of United and MultiPlan. (Order at 11.) Specifically required are plausible allegation about negative competitive impact that the actions of United and MultiPlan are having on other anesthesia providers in the relevant market, so as to demonstrate and render it plausible that the lowered reimbursement rates at issue are likely to drive out competition in the provider market.  (*Id.*)

The PAC cures this issue by setting forth the experiences of LIA and two other market anesthesia providers concerning the impact of the lowered Empire Plan reimbursement rates caused by the actions of United and MPI. (PAC ¶¶104-105, 122-123.)  These anesthesia providers all had similar, dramatic, and negative impacts. As of January 2022, Empire Plan represented a

substantial share of their business, including as high as 44% for LIAP and 40% for LIA. (PAC ¶¶101, 104.)   Immediately after January 1, 2022, their reimbursements declined precipitously, up to 80%. (PAC¶¶121-123.)   For one of these practices, this decline represented a revenue loss of $20 million. (PAC ¶209.)

This severe reimbursement loss is causing cause unabsorbable loss to the practices, which is exacerbated by the severe shortage of quality anesthesia providers in the Long Island area and skyrocketing expenses due to inflation and the uncertain economic climate. (PAC ¶207.) Operating and procedure rooms have been shuttered. (PAC ¶213.)   Schedules and wait times have been lengthened. (PAC ¶¶213, 218, 276.)    Service lines have been shut. (PAC ¶¶212, 213.) Clinician layoffs have occurred. (PAC ¶212.)  Hiring and recruiting efforts have been curtailed or suspended. (PAC ¶215.) Equipment and technology acquisitions have been halted. (PAC ¶¶ 215, 276.) Ultimately, if left unremedied, it is plausible that this severe financial distress will result in their closure or significant curtailment. (PAC ¶¶208, 215, 216, 277.)   No business can sustain such an immediate and pervasive financial loss, particularly at a time of economic uncertainty and rising costs.

The practices referred to in PAC collectively service seven large Long Island hospitals, and a significant number of ambulatory surgery centers and other facilities. (PAC ¶¶20, 103.) Based upon this sample size, and the consistency of severe financial and operational impacts, it is plausible to assume that these are market-wide impacts.

Indeed, these practices' experiences are corroborated by other market participants. For example, John F. DiCapua, M.D., the Chief Executive Officer of Long Island-headquartered North American Partners In Anesthesia stated in *MDnewslongisland.com* regarding the post-NSA reimbursement reductions: "In a profession already facing a shortage of clinicians, long work

hours and burnout, reducing reimbursement perpetuates this shortage by encouraging even more early retirements. This attrition only increases healthcare labor costs, as medical centers facing heavy competition often feel the need to offer higher salaries to attract and retain the remaining pool of anesthesia providers. Higher labor costs have also resulted in a record number of practice closures in this specialty, Dr. Di Capua explains, affecting access to care in many regions, including lower income and rural communities. 'We are at a point that I thought I would never see in my career,' Dr. Di Capua says. 'Hospitals may not have enough anesthesia providers to support their patient population.'" (PAC ¶220.)

The harm to competition required for antitrust injury may be pled through allegations that a defendant's anticompetitive behavior had adverse effects on the price, *quality, or output* of the relevant good or service. *See Reddy v. Puma*, 2006 U.S. Dist. LEXIS 67848, *10-12 (S.D.N.Y. Sept. 19, 2006); *N.Y. Medscan LLC v. N.Y. Univ. Sch. of Med.*, 430 F. Supp. 2d 140, 148-49 (S.D.N.Y. 2006.  In the medical context, courts have repeatedly found allegations regarding the reduced availability and number of providers and a decline in quality of patient care to be sufficient to state an antitrust injury. *See, e.g., Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 276 (3d Cir. 1999) (deterioration of quality or reduction of output is sufficient to show antitrust injury); *Reddy*, 2006 U.S. Dist. LEXIS 67848, at *12-13; *N.Y. Medscan*, 430 F. Supp.2d at 148 ("[T]he courts have repeatedly held that a decline in quality is among the injuries that the antitrust laws were designed to prevent."). As noted in *N.Y. Medscan*, in the context of critical healthcare, "the quality of care is likely to be at least as important to patients as the price." *Id.*

Here, there are ample facts alleged to render plausible market-wide adverse effects of the quality or output of the anesthesia services. Indeed, from the perspective of the consumer-patient, the actions of United and MPI has required the closure of operating and procedure rooms for lack

of available anesthesiologists, the lengthening of OR schedules and wait times, the curtailment anesthesia-related services, the layoff of highly trained and qualified anesthesia staff, the suspension of efforts to recruit, hire, and retain highly trained and high quality anesthesiologists, and the halting of new equipment and technology acquisitions. (PAC ¶¶208, 212-213, 215-216, 218, 276-277.) If left unabated, the current severe financial crises caused by the actions of United and MPI will cause many of the anesthesia practices in the market to close their doors, further exacerbating output and quality reductions. For these reasons, LIA has more than sufficiently alleged plausible harm to competition in the relevant anesthesia market caused by reduced output and quality. *See Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d at 276; *Reddy*, 2006 U.S. Dist. LEXIS 67848, at *12-13; *N.Y. Medscan*, 430 F. Supp.2d at 148.

Finally, although not required to show antitrust injury here (because of sufficiently alleged facts plausibly showing reduction in quality and output), there are sufficient facts rendering it plausible that the actions of United and MPI will also lead to market-wide price increases. As the PAC alleges, United, aided by MPI, is using its significant market power to drive down out-of-network anesthesia reimbursement rates in the New York metropolitan area knowing full well that the impact of lower reimbursement rates will be to drive out anesthesia providers. (PAC ¶223.) In the long run, this will significantly benefit United because United, through its OptumCare subsidiary, provides anesthesia services in market and is looking to expend its delivery of all healthcare services, including anesthesia services, in the New York metropolitan area. (PAC ¶¶224, 225.)

Once United and MPI succeed in driving competing anesthesia practices from the market, OptumCare will be the proverbial "only game in town," able thereby to demand supra-competitive prices from United's health plan competitors and other third-party health care payers. This will,

in turn, enable United to maintain supra-competitive premium pricing in local health plan and insurer markets. It will finally give United a supra-competitive advantage when negotiating with customers and hospital advisers because of its ability, through OptumCare, to control access to and the supply of anesthesia services in the market.[1]

### B. The PAC Plausibly Alleges The Lowering Of Health Plan Reimbursement Rates Through A Horizontal Arrangement

As further support for its conclusion that LIA has failed to sufficiently allege antitrust injury, the Court stated that the "parties agree that a health plan lowering reimbursement rates paid to a physician practice is generally insufficient to establish antitrust injury." (Order at 12.)

This, however, does not mean that a health care practice can never establish antitrust injury through the lowering of reimbursement rates. Indeed, courts have likewise followed the economic principle that the exercise of monopsony power through the lowering of health plan reimbursement rates can cause actionable antitrust injury. *See, e.g.*, *West Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 103-04 (3d Cir. 2010)); *In re Delta Dental, Antitrust Litig.*, 484 F. Supp. 3d 627, 642 (N.D. Ill. 2020); *Presque Isle Colon & Rectal Surgery v. Highmark Health*, 391 F. Supp. 3d 485, 500 (W.D. Pa. 2019); *New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 54 F. Supp. 3d 1189, 1205 (D.N.M. 2014); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 524 F. Supp. 2d 1031, 1040 (N.D. Ill. 2007); *Anesthesia Assocs. of Ann Arbor, PLLC v. Blue Cross Blue Shield of Mich.*, 20-CV-12916-TGB-APP, at 31 (E.D. Mich. Sept. 28, 2022).

---

[1] In its decision, this Court noted the existence of a lawsuit in the New York Supreme Court under which LIA, along with other health care providers and interested persons challenged the position taken by United and New York State that the Empire Plan is not subject to the New York Surprise Bill Law. As the parties informed the Court during the pendency of the motion to dismiss (ECF 48 &49), the State Supreme Court found that the Empire Plan is not subject to the New York Surprise Bill Law, and this determination is on appeal to the Appellate Division. This Court pointedly stated in its decision that it was expressly not ruling regarding the preclusive effect, if any, that the State Court decision would have on this lawsuit. As we have explained in prior submissions to the Court (ECF 49, 42), we do not believe that the issues raised or the determination made in the State Court case have any bearing on the merits of LIA's antitrust claims here, much less any preclusive effect.

What is required to establish antitrust injury is something more than a health plan lowering reimbursement rates to a physician practice. In *Anesthesia Associates*, that "something more" was that the ability to lower reimbursement rates was obtained through a horizontal conspiracy to allocate markets. *Id.* In *West Penn Allegheny*, the "something more" was that the defendant health plan lowered the plaintiff physician practice's reimbursement rates "to hobble" plaintiff for the benefit of a competing medical group that had taken efforts to insulate defendant from competition from other health plans. 627 F.3d at 103-04. In *Presque Isle Colon*, the "something more" was allegations that the defendant health plan lowered the plaintiff physician practice's reimbursement rates, subjected them to unnecessary audits, and engaged in steering activities all designed to disadvantage plaintiff and benefit competing physician practices owned by defendant health plan. 391 F. Supp. 3d at 499-500.

In its opposition to Defendants' motions to dismiss, LIA contended that the "something more" establishing antitrust injury was that United was able to exercise its monopsony power to lower reimbursement rates in part through a horizontal conspiracy with MPI. This Court, in its motion to dismiss decision, however, concluded that the initial complaint failed to sufficiently allege a plausible horizontal conspiracy between United and MPI. (Order at 12-13.)

The PAC cures this issue. As we explain below, in Point II, it contains extensive, detailed factual allegations regarding the relationship between United and MPI (and other horizontal competitors of United) that are more than sufficient to establish a plausible antitrust combination in restraint of trade of the Sherman Act.

Further, the PAC plausibly alleges facts indicating that the conspiracy between United and MPI is a *horizontal* conspiracy. A horizontal conspiracy is a conspiracy between competitors at the same level of the market structure. *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608

9

(1972); *see also Anderson News, LLC v. American Media, Inc.*, 680 F.3d 162, 182-83 (2d Cir. 2012).

Here, the PAC extensively alleges that United and MPI are direct competitors in the PPO network business. (PAC ¶¶163-169.) PPOs contract with health care providers to establish agreed-upon payment rates for the providers' services. (PAC ¶164.) Subscribers to PPO plans can access any network healthcare provider at a reduced rate. Subscribers almost always must pay more if they choose an out-of-network provider. (*Id*.)

MPI operates the "oldest and largest independent [PPO] network" in the United States. (PAC ¶165.) Its PPO networks have over 1.3 million healthcare providers under contract, encompassing approximately 920,000 practitioners, 4,800 acute care hospitals and 87,000 ancillary facilities. (*Id*.) These networks compete with other commercial health insurance payers to secure contracts with medical providers. (PAC ¶167)

Many large health payers, including United, operate their own PPO networks and plans. (PAC ¶167) United, for example, offers UnitedHealthcare Options PPO plans. (*Id*.) These plans rely on PPO networks that directly compete with MPI's PPO networks to obtain provider contracts. (*Id*.)

In its 2023 Annual Report, MPI admitted that its PPO networks compete against United and other commercial health insurance networks, stating "[w]e also compete with PPO networks owned by our large Payor customers[.]" (PAC ¶168.) Likewise, United has admitted that its PPO networks compete with MPI's networks. John Haben, United's former Vice President of Networks has testified that "MultiPlan has the largest network in the country. . . . They have a broad network. Broader than United." (PAC ¶169)

The competing PPO networks, however, are not the only horizontal aspects of the relationship between United and MPI. The repricing and negotiation services that MPI provided on behalf of United in connection with the lowering of Empire Plan reimbursement rates is an outgrowth of the longstanding arrangements that MPI has with United and United's top health plan competitors to lower out-of-network's reimbursement rates through the use of MPI repricing tools. (PAC ¶¶180-182.)

The success of these tools is dependent upon MPI having these repricing arrangements with all the large health plan competitors, who all use the tools in the same way thereby yielding virtually identical low out-of-network reimbursement rates and enabling the overall, uniform suppression of these reimbursement rates to below market and competitive levels. (PAC ¶¶192, 265, 269) Indeed, the most attractive feature – aggressively marketed by MPI – of the repricing arrangements to the health plans is that all their competitors are using the same arrangements, thereby ensuring uniformity. (PAC ¶174) Indeed, this appears to be the very reason why United used MultiPlan in connection with its efforts to reduce Empire Plan reimbursement. (PAC ¶¶185, 187-191)

Thus, the arrangement between United and MPI is, fundamentally, a horizontal arrangement because its very attractiveness and success is derived from its multi-competitor features. The horizontal nature of the relationship provides the "something more" required to render plausible antitrust injury flowing from the reduction in reimbursement rates for anesthesia providers.  *See, e.g.*, *Presque Isle*, 391 F. Supp. 3d at 500; *New Mexico Oncology*, 54 F. Supp. 3d at 1205.

## II.     THE PAC SUFFICIENTLY ALLEGES A PLAUSIBLE CONSPIRACY BETWEEN UNITED AND MPI

To survive dismissal, LIA must allege "a combination or some form of concerted action between at least two legally distinct economic entities" that "constituted an unreasonable restraint of trade either *per se* or under the rule of reason." *Primetime 24 Joint Venture v. NBC*, 219 F.3d 92, 103 (2d Cir. 2000). The facts alleged "must reveal a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012). This requires allegations of "direct or circumstantial evidence that reasonably tends to prove that [United] and [MPI] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* at 184; *see also Compass, Inc. v. Real Estate Bd. of N.Y.*, 2022 U.S. Dist. LEXIS 60871, *8 (S.D.N.Y. Mar. 31, 2022).

This is not a high burden at the motion-to-dismiss stage; LIA must "only allege 'enough factual matter (taken as true) to suggest that an agreement was made.'" *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 321 (2d Cir. 2010); *Compass*, 2022 U.S. Dist. LEXIS 60871 at *8 (S.D.N.Y. Mar. 31, 2022). The plaintiff need not pass a probability standard, only a plausibility one. *Anderson News*, 680 F.3d at 190. "[O]n a Rule 12(b)(6) motion[,] it is not the province of the court to dismiss the complaint on the basis of the court's choice among plausible alternatives." *Id.* "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts [establishing a conspiracy] is improbable, and that a recovery is very remote and unlikely." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

This Court held that, even if antitrust injury were sufficiently alleged, the Sherman Act § 1 claim still should be dismissed because the original complaint does not plead factual content that allows the court to draw the reasonable inference that MPI was liable for the conduct alleged. (Order at 13.) The Court went on to explain that "[b]eyond a bare assertion that MultiPlan is

working with United to force lower reimbursement rates, the complaint contains no allegations to support a finding that MultiPlan and United had a 'conscious commitment to a common scheme.'" (*Id.* at 14.)

The PAC cures this issue. Specifically, the pleading alleges that the mechanism by which United has implemented its anticompetitive scheme is through using its monopsony power to dramatically (80%+) lower Empire Plan reimbursement rates to out-of-network anesthesia providers, such as LIA. (PAC ¶¶200, 256-273.) Logically, its efforts have a far greater chance to succeed if pressure is applied to out-of-network anesthesia providers to accept these rates without challenge or complaint. (PAC ¶¶161, 264)

United uses MPI to apply this pressure. (PAC ¶258.) Under the No Surprises Act, there is an initial required 30-day negotiation period between the health plan and the provider for every out-of-network claim. (PAC ¶259.) United takes advantage of this negotiation period by having MPI make extremely low, and entirely unsupported, opening offers in every out-of-network claim, and then demanding that the practice respond, with data supporting its position, in  time periods as short as 45-minutes after receiving the offer. (PAC ¶260.) MPI threatens the practice that failure to timely respond will be treated as a bad faith refusal to negotiate, causing the practice to lose its ability to challenge the reimbursement rate.  (PAC ¶261.) Accordingly, practices such as LIA must scramble to provide meaningful responses to MPI in virtually impossible time frames. (PAC ¶262.)

Hospital-based anesthesia practices such as LIA typically treat many patients each day. Given the short time frames for responses and the volume of data involved, it becomes easy to see how MPI's actions can quickly overwhelm practices' ability to question or challenge Empire Plan reimbursement rates and simply accept them without complaint or challenge. (PAC ¶264) And, when LIA has made complaints to MPI representatives about this impossible situation, these

representatives have agreed with LIA's predicament, but that these are their instructions from United. They also have acknowledged that, regardless of the practice's response, they have no authority to offer any more reimbursement to the practice beyond the initial lowball offer. (PAC ¶153.)

MPI's actions are not simply isolated communications or recommendations. Rather, they grow out of longstanding arrangements between MPI and large health plan payers, including United, to use MPI repricing tools as an agreed-upon methodology to suppress out of network reimbursement.

As the PAC alleges, starting around 2006, MPI embarked on a strategy to sell analytic tools designed to reprice out-of-network claims for health plan payers. (PAC) This repricing process almost invariably leads to a reimbursement amount below the customary and reasonable amount. (PAC ¶170.) MPI then either directly or through the plan repriced claim on a take-it-or-leave-it basis. (PAC ¶171.) MPI charges its health care payer customers a fee based on the difference between the original and repriced claim amounts. (PAC ¶172.) This fee can approach 10%. (*Id*.) As a result, MPI is motivated to recommend the lowest reimbursement price possible, since it increases the fee that MPI charges to payers. (*Id*.) MPI leaves little room for doubt as to its motives, stating its repricing products were "built to help [insurers and other] payers reduce the cost of . . . out-of-network" reimbursements to physician practices, in some cases more than 80%. (PAC ¶¶178, 179.)

MPI's repricing customers include, as of 2023, all the top 15 health insurers, including not only United, but also Cigna, Elevance, Centene, and Humana. (PAC ¶180) All totaled, over 700 managed care companies and 100,000 health plan/sponsors use MPI's repricing services; these cover over 60 million beneficiaries (PAC ¶182)

In most cases, MPI's repriced amount is not just a recommendation, it is a determination accepted by the payer more than 90% of the time. (PAC ¶173.) This is not because MPI's repriced amounts are fair or reasonable, but rather because almost all major health payers use MPI to reprice their out-of-network claim using the exact same analytic tools, thereby yielding virtually identical repricing amount, leaving the providers little alternative but to accept them. (PAC ¶174.)

Without the uniformity that the MPI repricing scheme provides, health payers would determine reimbursement rates independently based on their own individual analyses. (PAC ¶175.) In such an environment, am individual payer would be constrained in its ability to impose dramatically decreased reimbursement rates upon out-of-network providers, for fear that providers and enrollees, when confronted by these reduced rates and the damage they do to the delivery of high quality care, would seek to avoid dealing with the low reimbursement payer. (PAC ¶176.) This, however, does not occur with the MPI repricing scheme. Because payers know that their competitors are using the same repricing tools that generate virtually identical amounts, they are free to dramatically reduce reimbursement knowing that their competitors will be doing the same. (PAC ¶177.)

Regarding United, MPI approached it in 2017 and opined that United's out-of-network reimbursements were too high and needed to be brought "back into alignment." (PAC ¶269.) MPI affirmed United that it had already agreed with other competing health payers to manage out-of-network costs and offered to enter into a similar agreement with United. (*Id*.) When considering whether to enter into the MPI agreement, a key factor for United was that its competitors also used MPI's pricing methodology to suppress out-of-network rates. (*Id*.) United and MPI thereafter discussed and agreed upon how little United would pay for out-of-network claims using the MPI repricing tools. (*Id*.)

Thereafter, MPI extended its repricing arrangement's features to the No Surprises Act processes when it became operational in January 2022. (PAC ¶270.) It incorporated significant features of its pre-existing repricing services to extend and replicate the reimbursement reducing benefits of the repricing services to the No Surprises Act environment. (*Id.*) It is through United's use of this service that MPI engaged in negotiating pressure tactics upon market anesthesia providers to aid United in significantly reducing Empire Plan out-of-network reimbursement rates. (*Id.*)

Taken as a whole, these factual allegations are more than sufficient to allege a plausible antitrust conspiracy. *See Starr*, 592 F.3d at 321; *Compass*, 2022 U.S. Dist. LEXIS 60871 at *8; *see also Anderson News*, 680 F.3d at 190. United entered the arrangement not just because MPI would assist it in repricing claims and thereby potentially lower out-of-network reimbursement. It entered the arrangement because *it knew* that MPI was entering into similar arrangements with its major competitors. (PAC ¶271.) Therefore, its ability to dramatically reduce out-of-network reimbursement rates would be assured because providers would have no choice but to accept these lower rates. And, since its competitors were using the same repricing methodology, it would be insulated from losing business to them when it dramatically lowered reimbursement rates. This is nothing more than a price coordination scheme among competitors. *See, e.g.*, *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002 (C.D. Calif. 2011).

Likewise, MPI, when entering the arrangement with United, knew that it was facilitating a price coordination scheme among competitors. Indeed, MPI's entire marketing program was how its repricing methodology was used by all the major health payers. (PAC ¶272.) MPI also knew that its uniform repricing methodology was accepted more than 93% of the time by providers. (*Id.*) Because of the extensive reimbursement data from all major market competitors, it is also plausible

that United was dramatically reducing reimbursement levels to market anesthesia providers below competitive levels and would thereby reduce output and quality. *See*, *e.g.*, *Starr*, 592 F.3d at 325; *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 214 (3d Cir. 1992).

Finally, Defendants' contention that no conspiracy is sufficiently alleged because United merely provided recommendations to the Empire Plan misstates the nature of United's role regarding the Empire Plan. As the PAC explains, United, far from simply recommending action to the Empire Plan, has substantial control over the Empire Plan by setting and determining reimbursement rates, selecting in-network providers, processing and adjudicating claims, paying claims, and negotiating dispute resolutions. (PAC ¶273.) It earns more money the more savings it generates. (*Id.*) Given this level of authority, coupled with the significant competitive interest that United has in lowering the reimbursement rates for hospital anesthesia providers to below competitive levels, renders United's actionable involvement in this conspiracy plausible.

For all these reasons, LIA has met its obligation in the Complaint to allege "a combination or some form of concerted action between at least two legally distinct economic entities. . ." *Primetime 24 Joint Venture*, 219 F.3d at 103 (2d Cir. 2000).

## III. LIA SUFFICIENTLY ALLEGES ANTI-COMPETITIVE CONDUCT THAT VIOLATES THE RULE OF REASON

In addition to alleging the existence of concerted action, a Sherman Act § 1 plaintiff also must allege that this concerted action "constituted an unreasonable restraint of trade either per se or under the rule of reason." *Primetime 24 Joint Venture*, 219 F.3d at 103.

Since LIA is pursuing this case based on a rule of reason theory, it "bears the initial burden of showing that the challenged action has had an actual adverse effect on competition as a whole in the relevant market . . . ." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 543 (2d Cir. 1993). While sometimes this requires an inquiry into the defendant's market

power to determine whether the challenged conduct could have a substantial adverse impact on competition, "proof of actual detrimental effects, such as a reduction of output," can obviate the need for an inquiry into market power, which is but "a surrogate for detrimental effect." *FTC v. Indiana Fed. of Dentists*, 476 U.S. 447, 460 (1986); *see also Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 509 (2d Cir. 2004)

Here, the PAC alleges actual adverse effects on competition in the relevant product market regarding the delivery of the medically necessary anesthesia services to patients. (PAC ¶276.) There are three categories of participants in the market. First, there are Hospital-based anesthesia practices, such as LIA, that provide the medically necessary anesthesia services to patients. (PAC ¶203.) Second, there are the patients who need the anesthesia services and are therefore the market's consumers. (PAC ¶102.) And third, there are the payers, such as United, who reimburse the practices for the medically necessary anesthesia services provided to their enrollees. (PAC ¶62.)

First, the delivery of anesthesia services is clearly a relevant product market. Only anesthesiologists have the necessary skills and training to provide these services; other physicians do not have the expertise to competently provide these services and therefore cannot be considered reasonable substitutes. (PAC ¶¶238-240.) Patients cannot look to other physicians to provide them anesthesia services, and other physicians cannot enter the market to provide these services without significant time and expense. (*Id.*) These factors indicate – at least at the pleading stage – that anesthesia services are a properly defined relevant market. *See, e.g., Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001).

As the PAC also alleges, there is virtually no substitutability or cross-elasticity of demand in this market. (PAC ¶240.) Hospital-based anesthesia providers have no choice as to who the

consumers of their services; they must provide anesthesia services to all patients needed anesthesia services in the hospital or facility where they work. (PAC ¶28.) For the same reason, anesthesia providers also have no say in selecting the payers for their services. (PAC ¶30.) They cannot avoid a low paying payer or re-focus their practice on higher paying payers. They must accept and treat all patients regardless of the level of payment. (PAC ¶¶29, 20.) Patients, too, have little choice over who their anesthesia providers are for a given surgery; hospitals typically have a single anesthesia provider, which selects the most appropriate anesthesiologist for a given surgery.

Second, the PAC adequately alleges a relevant geographic market: the New York metropolitan area. This is because, given the chronic and urgent nature of most conditions requiring anesthesia, patients need to seek treatment close to where they live and work. Most patients are willing to travel only about 30 minutes for health care services. (PAC ¶¶242, 243) Accordingly, the relevant geographic market for neurosurgery services in this lawsuit is no larger than the New York metropolitan area, including New York City, Nassau, Suffolk, and Westchester Counties. *See, e.g., Davitashvili v. Grubhub Inc.*, 2022 U.S. Dist. LEXIS 58974, at *15 (S.D.N.Y. Mar. 30, 2022).

These allegations are sufficient to state a relevant antitrust market at the pleading stage. *See Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008). And since the validity of the relevant market is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial."); *Todd*, 275 F.3d at 200; *Oltz*, 861 F.2d at 1446.

As discussed above, to survive this motion to dismiss, LIA is not required to demonstrate that Defendants possess market power in the relevant antitrust market, so long as LIA alleges facts plausibly indicating the existence of an actual adverse effect on competition in that market, such

as through decreased quality or output. As explained above in Point I, the PAC sets forth detailed facts plausibly indicating that Defendants' actions are causing adverse economic effects, such as decreased quality or output, in the market for the delivery of anesthesia services in the New York metropolitan area. (PAC ¶276.) These allegations are sufficient to meet LIA's obligation at this motion-to-dismiss stage to allege facts plausibly indicating the existence of an actual adverse effect on competition in that market. *See Presque Isle*, 391 F. Supp. 3d at 500; *see also Todd*, 275 F.3d at 213-14.

## IV. LIA HAS PLEAD PLAUSIBLE SECTION 2 MONOPSONY CLAIMS

In this lawsuit, LIA alleges claims under Sherman Act § 2. To state a claim for actual monopsony, LIA must allege: (1) the possession of monopsony power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *See In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55, 94 (S.D.N.Y. 2021); *Telsat v. Entm't & Sports Programming Network*, 753 F. Supp. 109, 112 (S.D.N.Y. 1990). For attempted monopsony, LIA must allege (1) anticompetitive or exclusionary conduct; (2) specific intent to monopolize; and (3) a 'dangerous probability' that the attempt will succeed. *See Kelco Disposal, Inc. v. Browning-Ferris Indus.*, 845 F.2d 404, 407 (2d Cir. 1988).

The PAC sufficiently alleges facts that plausibly satisfy these requirements. Specifically, the market in which LIA's alleges that United has monopsony power is the market for the delivery of anesthesia services in the New York metropolitan area. As discussed above, LIA has sufficiently pled this market at the motion-to-dismiss stage.

Monopsony power can be sufficiently alleged through direct evidence of the actual exercise of control over prices or the actual exclusion of competition from the relevant market. *See Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 477-78 (1992); *Toys "R" Us v. FTC*,

221 F.3d 928, 937 (7th Cir. 2000); *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 482 (S.D.N.Y. 2016). Monopsony power can also be sufficiently alleged through evidence of a dominant share of the relevant market, and high barriers to entry. *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001); *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *Retrophin, Inc. v. Questcor Pharm.*, 41 F. Supp. 3d 906, 916 (C.D. Cal. 2014). If there is no evidence of a dominant share, a substantial share of the market will be sufficient to allege an attempted monopsony claim. *See Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1443 (6th Cir. 1990) (58%); *Kelco Disposal v. Browning-Ferris Indus.*, 845 F.2d 404, 409 (2d Cir. 1988) (55%), *aff'd on other grounds*, 492 U.S. 257 (1989).

Here, as discussed above, LIA has alleged facts plausibly indicating that United has substantial control over prices and is using this control to cause adverse economic effects, such as decreased quality or output, in the market for the delivery of anesthesia services in the New York metropolitan area. Moreover, the Empire Plan (administered by United) accounts for approximately 40% of the revenues of LIA and other similarly situated out-of-network anesthesia providers in the relevant market. (PAC ¶101.) On top of this, United also participates in the market as a health insurer and administrator of employer self-funded plans. United's share of the commercial health insurance market in the New York metropolitan area was 50%. (PAC ¶252.) When this is added to its Empire Plan share, a picture emerges of significant, if not dominant, market power. *Microsoft Corp.*, 253 F.3d at 51; *Rebel Oil.*, 51 F.3d at 1434 *Arthur S. Langenderfer*, 917 F.2d at 1443; *Kelco*, 845 F.2d at 409.

As discussed above, this market power is further enhanced because the anesthesia providers in the relevant market have little control over the payers with whom they must deal. Accordingly,

the anesthesia providers do not have the ability to seek alternative patients or payers when confronted with a significantly lowered reimbursement rate from a payer.

For all these reasons, LIA has sufficiently the existence of monopsony power on the part of United.

<b><u>CONCLUSION</u></b>

For the foregoing reasons, LIA respectfully requests that this Court grant it leave under Fed. R. Civ. P. 15 to file the PAC.

Dated: February 2, 2024
       Uniondale, New York

HARRIS BEACH, PLLC.
*Attorneys for Plaintiff*

By       _____
          Roy W. Breitenbach
          Daniel S. Hallak

The Omni
333 Earle Ovington Boulevard
Uniondale, New York 11553
(516) 880-8378