UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                              :

LONG ISLAND ANESTHESIOLOGISTS PLLC,  :
                              :

            Plaintiff,    :

                              :  **AMENDED COMPLAINT**

  -against-                 :

                              :  **JURY TRIAL DEMANDED**

UNITEDHEALTHCARE INSURANCE     :
COMPANY OF NEW YORK INC., as Program  :
Administrator, THE EMPIRE PLAN    :  Case No. 2:22-cv-04040-HG
MEDICAL/SURGICAL PROGRAM and    :
MULTIPLAN INC.,               :
                              :

           Defendants.  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

     Plaintiff, Long Island Anesthesiologists PLLC ("LIA") by its attorneys, Harris Beach PLLC, alleges for its Amended Complaint against the Defendants, UnitedHealthcare Insurance Company of New York Inc., as Program Administrator, The Empire Plan Medical/Surgical Program ("United") and MultiPlan Inc. ("MPI"), as follows:

## INTRODUCTION

    1.    High-quality and easily accessible anesthesia services are vitally important for the health and well-being of the New York metropolitan area's 18 million residents. These services enable patients to undergo lifesaving and life-changing medical procedures safely and comfortably and manage their pain. Without anesthesia services, much modern medicine would be impossible. LIA is a high-quality anesthesia provider located in southwestern Suffolk County.

    2.    United – described by the New York Attorney General several years ago as a "behemoth" health insurer and plan provider – has significant market power in the New York metropolitan area. In addition to being a major commercial insurer and health plan provider, it

1

is also the administrator of the Empire Plan, which is the health plan for over 1 million public-sector employees.

3.    United, as administrator of the Empire Plan, has significant market power. Anesthesiologists cannot choose their patients and cannot turn away patients because of their health coverage or other issues. Given the number of public employees in the New York metropolitan area, anesthesia providers are largely at the mercy of United. For LIA, and many other area anesthesia practices, approximately 40% of their revenue comes from the Empire Plan.

4.    The Empire Plan historically reimbursed anesthesia providers at usual, customary, and reasonable rates. This changed in January 2022 when, at United's behest, it decreased reimbursement rates by more than 80%. United then enlisted MPI to assist it in a scheme to pressure and prevent anesthesia providers into accepting these rates while requiring onerous and burdensome documentation.

5.    Thus, during a time of significant economic upheaval and inflation, vitally essential anesthesia providers are suffering an unsustainable and unending 80+% reimbursement cut. This will certainly decrease the availability of high-quality anesthesia services in the New York metropolitan area; many providers will be forced out of business entirely, and others will be forced to significantly curtail their services and recruitment and retention of well-trained clinicians.

6.    But these savings are not being passed on to United's customers or Empire Plan enrollees. Far from it, United regularly seeks and imposes rate increases, even though it generates net earnings each year in the tens of billions.

7.    Rather, United is reducing reimbursement rates by 80+% -- and pressuring anesthesia providers into accepting these rates – *to force these providers out of business.* As we explain below, eliminating LIA and other similarly situated anesthesia providers benefits United because it directly provides physician services – including anesthesia services – to patients throughout the United States, including in the New York metropolitan area. Thus, eliminating LIA and its fellow anesthesia practices is good for United's business; it removes competitors and harms competition in the market to United's advantage.

8.    For these reasons, this Court must step in and immediately put an end to United's illegal, improper, and anticompetitive conduct.

## **PARTIES**

9.    Plaintiff, Long Island Anesthesiologists PLLC ("LIA"), is a New York professional limited liability company.

10.    LIA's principal place of business is located at 1000 Montauk Highway, West Islip, New York.11795.

11.    Defendant UnitedHealthcare Insurance Company of New York ("United") is licensed by the New York State Department of Financial Services to provide accident and health insurance in New York under New York Insurance Law § 1113(a).

12.    Upon information and belief, United's principal place of business is located at 185 Asylum Street, Hartford, Connecticut 06103.

13.    United is the Program Administrator of The Empire Plan Medical/Surgical Program.

14.    Defendant MultiPlan, Inc. ("MPI") is a New York domestic business corporation.

15.    Upon information and belief, MPI's principal place of business is located at 115 Fifth Avenue, 7th Floor, New York, New York 10003.

## JURISDICTION AND VENUE

16.    This Court has subject-matter jurisdiction over the Sherman Act claims in this lawsuit under 28 U.S.C. § 133, which provides original jurisdiction in this Court over "a claim or right arising under" the laws of the United States.

17.    This Court has subject-matter jurisdiction over the New York state law claims in this lawsuit under 28 U.S.C. § 1367(a), which provides supplemental jurisdiction in this Court over "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

18.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the acts complained of have occurred within this District.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

## LIA

19.    LIA is a private anesthesiology practice located in West Islip, New York. It is owned by the anesthesiologists who provide services for the practice.

20.    LIA's principal line of business is to provide the anesthesia services at Good Samaritan Hospital Medical Center in West Islip, New York. LIA has been providing these services since shortly after Good Samaritan opened in 1959.

21.    LIA has no ownership interest in Good Samaritan; and Good Samaritan has no ownership in LIA. Good Samaritan is a not-for-profit hospital that is part of the Catholic Health system on Long Island.

22.    During this time, Good Samaritan has grown from a 175-bed general hospital to a 537-bed tertiary care, Level II trauma center and teaching facility serving the diverse populations of central and south Long Island.

23.    Good Samaritan has some of New York's highest volume emergency services, cardiac surgery services, a busy and active labor and delivery area, ambulatory and major surgery units including robotic surgery capabilities, adult and pediatric endoscopy suites, general and intensive care pediatric and neonatology units, advanced interventional cardiology, electrophysiology, and vascular suites, and dedicated surgical and medical intensive care units. LIA's anesthesiologists care for patients in all these areas.

24.    In addition to its diverse practice at Good Samaritan, LIA additionally provides anesthesia services at physician offices and surgery centers around New York and Long Island.

25.    Currently, LIA employs full-time anesthesiologists, trained at the nation's top academic medical centers.    Almost all are board-certified by the American Board of Anesthesiology.

26.    Many of these anesthesiologists have areas of focus or training in major anesthesiology subspecialties such as pediatrics, obstetrics, cardiothoracic anesthesia, neuroanesthesia, critical care, regional anesthesia for orthopedics, and pain management.

27.    At all locations, LIA cares for patients with the same exacting standards. Its patients can be assured of care by highly qualified physicians with experience and expertise in complex perioperative management, from the pre-anesthesia assessment, through the delivery of anesthesia, to the alleviation of pain, and, when necessary, care for critical illness. LIA is committed to its patients having the best outcomes possible, and the best anesthetic experience available. LIA highly values the privilege of patient care amidst Long Island's unique and diverse patient population.

28.    Unlike most medical specialties, anesthesiologists are unable to choose their patients or to turn away prospective patients. Anesthesiologists provide services to all patients

undergoing surgical or certain medical procedures at the facilities in which they work regardless of the patient's ability to pay or health coverage status.

29.     This is certainly the case with LIA. Its agreements with Good Samaritan for example obligate it to provide anesthesia and related services to all patients, without exception, and without regard to the patient's ability to pay or health coverage status.

30.     Accordingly, anesthesia practices in general – and LIA in particular – are at the mercy of health plans and other third-party payers of health care. Anesthesia practices such as LIA cannot choose what health plans to deal with or avoid treating patients of health plans that have low reimbursement rates or are otherwise difficult to deal with.

31.     Accordingly, LIA must deal with all health plans and other third-party payers of health care.

**Anesthesia Reimbursement**

32.     There are two types of relationships that medical practices have with health plans. The first is an "in-network" or "participating provider" relationship. The second is an "out-of-network" or "non-participating provider" relationship.

33.     In an in-network relationship, the health plan accepts the practice's clinicians as credentialed participating providers, and the parties enter into a participating provider agreement.

34.     The parties' participating provider agreement in an in-network relationship governs the amount that the health plan will reimburse the provider for covered services, how claims are submitted, how claims are paid, how disputes are resolved, and such issues as prior approval and pre-certification.

35.    The advantages that a medical practice derives from an in-network relationship are (a) being listed in the health plans' material as a participating provider (and thereby increasing referrals of health plan members); and (b) receiving reimbursement directly from the carrier.

36.    The other relationship that health plans have with medical practices is an out-of-network relationship. In that type of relationship, there is no contractual agreement between the health plan and the practice. Instead, whether, and to what extent, an out-of-network provider is reimbursed for services that out-of-network providers render to the health plan's members and beneficiaries is dictated by the terms of the health plan documents. Out-of-network providers have no say or control in the terms of these plan documents.

37.    Historically, in-network reimbursement rates were lower than out-of-network reimbursement rates. This is because health plans contended that the lower rates were appropriate given the increased referrals the practices would obtain from being listed in health plan directories and other materials. Health plans also contended that the lower rates were appropriate because network participating providers were receiving payment directly from the health plans, which was quicker and easier than what occurs with out-of-network providers.

38.    LIA, like most anesthesia practices in the New York metropolitan area, typically derives no benefit from being listed in participating provider directories, and accordingly has traditionally chosen to remain out of network with health plans.

**United's Size**

39.    United is a subsidiary of UnitedHealth Group Incorporated (UHG), which is a multi-national managed healthcare and insurance company based in Minnetonka, Minnesota.

40.     As of the 2022, UHG was the world's eighth largest company by revenue, and the second largest health care company by revenue (only CVS Health is larger). It was the largest insurance company in the United States by net premiums.

41.     UHG's 2021 revenues were $287.597 billion, a 12% increase over 2021. Its 2021 net earnings were $17.285 billion.

42.     In 2022, UHG's revenues were $324.162 billion, yet another 12% increase from the prior year. UHG also increased its operating margin.

43.     In 2023, UHG's revenues were $371.6 billion, representing a 15% year-over-year income.

44.     As the New York Attorney General stated in 2022, UHG is a "behemoth in the healthcare industry." It has purchased over 35 healthcare companies in the last decade.

45.     UHG operates, among other things, the largest health insurance company in the United States; a large network of physician groups, outpatient surgical centers, and other healthcare providers, including over 90,000 physicians across 2,200 locations; a pharmacy benefits manager that handles over a billion prescriptions every year; and a healthcare technology business that facilitates the transmission, analysis, and review of health insurance claims.

46.     UHG has been subject to significant antitrust and related scrutiny in the last several years because of its size and anticompetitive conduct. *See, e.g.*, *United States v. UnitedHealth Group Incorporated*, 22 Civ. 00481 (D.D.C. filed Feb. 24, 2022); *U.S. Anesthesia Partners v. UnitedHealthcare Insurance Company*, 2021CV31061 (Colo. Dist. Ct. Denver Cty. filed Mar. 31, 2021); *U.S. Anesthesia Partners v. UnitedHealthcare Insurance Company*, DC-2021-04103 (Tex. Dist. Ct. Dallas Cty. filed Mar. 31, 2021); *Fremont Emergency Services*

*(Mandavia) v. UnitedHealth Group*, A-19-792978-B  (Nev. 8th Dist. Ct. verdict Dec. 6, 2021)

($62.65 million jury award against UnitedHealthcare).

47.    UHG divides its business into two main "platforms": Optum and UnitedHealthcare.

**Optum Care Competes with LIA**

48.    Optum describes itself as purportedly serving "the broad health care marketplace, including payers, care providers, employers, governments, life sciences companies and consumers, through its Optum Health, Optum Insight and Optum Rx businesses. These businesses improve overall health system performance by optimizing care quality and delivery, reducing costs, and improving consumer and provider experience, leveraging distinctive capabilities in data and analytics, pharmacy care services, health care operations, population health and health care delivery."

49.    One of Optum Health's businesses is OptumCare, which acquires physician and other health care practices throughout the United States, and then directly manages them.

50.    In 2021, Optum Health generated approximately $54 billion in revenue.

51.    In 2022, Optum Health's reported revenue was $71.1 billion.

52.    In 2023, Optum Health revenue increased 33.9% from 2022.

53.    Currently, OptumCare is largest employer of physicians in the United States, with more than 90,000 physicians, including anesthesiologists and anesthesia practices, at 2,200 neighborhood clinics across the country. In 2022, it provided health care services to 102 million patients.

54.     In the New York area, OptumCare manages ProHealth, a large multi-specialty practice with over 300 locations throughout the metropolitan area. It employs or is affiliated with over 1,000 physicians and other health care providers.

55.     Founded on Long Island, ProHealth has practitioners and clinics in virtually every Long Island community. There are six practices alone in West Islip, where LIA is located. ProHealth offers anesthesia services on Long Island, upon information and belief employing at least 22 anesthesiologists.

56.     OptumCare also manages CareMount Medical, which currently serves patients throughout New York City, Westchester, Putnam, Dutchess, Columbia, and Ulster Counties.

57.     CareMount owns and operates seven urgent care locations, clinical laboratories and radiology services, as well as endoscopy suites and infusion suites. It is affiliated with Massachusetts General Hospital and Northwell Health. Upon information and belief, it currently employs 31 anesthesiologists.

58.     OptumCare also manages Riverside Medical Group, a large multi-specialty provider that services patients throughout New Jersey and southern Connecticut.

59.     In February 2023, OptumCare purchased Middletown, New York-based Crystal Run Healthcare, a multispecialty physician group with over 400 providers across 30 locations.

60.     All totaled, OptumCare has more than 2,100 providers in the New York metropolitan area, including over 50 anesthesiologists. It serves more than 1.6 million patients.

61.     OptumCare also owns Sound Physicians, a large physician practice group in the Midwest and Southwest that is a substantial and growing anesthesia provider.

**United's Market Presence**

62.     United offers a full-range of health benefits and insurance plans through four segments: (a) UnitedHealthcare Employer & Individual, which serves employers ranging from sole proprietorships to large, multi-site and national employers, public sector employers and individual consumers; (b) UnitedHealthcare Medicare & Retirement delivers health and well-being benefits for Medicare beneficiaries and retirees; (c) UnitedHealthcare Community & State manages health care benefit programs on behalf of state Medicaid and community programs and their participants; and (d) UnitedHealthcare Global provides health and dental benefits and hospital and clinical services to employer groups and individuals in South America, and through other diversified global health services.

63.     In terms of size, United's provider networks include over 1.7 million physicians and other health care professionals, and more than 6,400 hospitals and other facilities throughout the United States.

64.     As of December 31, 2022, UnitedHealthcare Employer & Individual provides access to medical services for 26.7 million people on behalf of its customers and alliance partners, including employer customers, serving people across all 50 states, the District of Columbia and most U.S. territories. Products are offered through affiliates licensed as insurance companies, health maintenance organizations (HMOs), or third-party administrators (TPAs). Large employer groups typically use self-funded arrangements where UnitedHealthcare Employer & Individual earns a service fee. Smaller employer groups and individuals are more likely to purchase risk-based products because they are less willing or unable to bear a greater potential liability for health care expenditures.

65.    In 2021, United's national accounts and large group employer commercial health insurance plans had about 23 million members and generated an estimated $31 billion in revenue.

66.    UnitedHealthcare Medicare & Retirement provides health benefit services to individuals aged 50 and older in all 50 states, the District of Columbia and most U.S. territories. It served 7.1 million people through its Medicare Advantage products as of December 31, 2022. It also currently serves 4.4 million seniors nationwide through various Medicare Supplement products in association with AARP.

67.    UnitedHealthcare Community & State provides services to state programs caring for the poor, the medically underserved and those without the benefit of employer-funded health care coverage, typically in exchange for a monthly premium per member from the state program. As of December 31, 2022, UnitedHealthcare Community & State participated in programs in 32 states and the District of Columbia and served 8.2 million people: including nearly 1.5 million people through Medicaid expansion programs in 19 states under the Patient Protection and Affordable Care Act (ACA).

68.    United has a significant share of the market in the New York area. For example, an analysis by the American Medical Association determined that United had the largest market share of health care insurers (all products) as of January 1, 2020, in the New York-Newark-Jersey City, NY-NJ-PA Metropolitan Statistical Area, at 26%. For point-of-service products, UnitedHealthcare's share soared to 66%.

69.    As of January 1, 2022, United's market share of the New York-Newark-Jersey City, NY-NJ-PA Metropolitan Statistical Area combined (all products) market, as reported by the American Medical Association, was 26%.

70. Likewise, another study of the market share of private (non-governmental) enrollment plans in the New York City market (defined as Suffolk, Nassau, Queens, Kings, Richmond, New York, Bronx, Westchester, Putnam, and Rockland Counties) as of the third quarter of 2022 reported that United's share was 33.8%. Its closest competition was Elevance at 20.2% and Cigna at 20.2%

**The Empire Plan**

71. In the New York market, United is not just a commercial insurer. Its United subsidiary also acts as the administrator of the Medical/Surgical Program of the Empire Plan, which is part of the New York State Health Insurance Program (NYSHIP). This Program provides health coverage for public employees in New York.

72. Initially, NYSHIP provided health coverage for state and local government employees in New York by purchasing health insurance contracts from heavily state regulated, not-for-profit medical indemnity companies (Civil Service Law § 162[1]).

73. In 2010, however, the State Legislature granted the Department of Civil Service the authority to do what private sector employers were able to do: "provide health benefits directly to plan participants" using the State's own funds (Civil Service Law § 162[1][a]).

74. Based on this statutory authority, NYSHIP's Empire Plan pays for covered hospital services, physicians' bills, prescription drugs, and other covered medical expenses of eligible public employees and their dependents. The Empire Plan has contracted with United to administer its Medical/Surgical Program.

75. Many New York state residents are covered by the Empire Plan. This is because the Plan covers not only New York state employees and their residents, but also employees and

dependents of state-related entities, municipalities (county, town, city, and village), school districts, and special purpose government districts.

76.    Currently, NYSHIP protects over 1.2 million State and local government employees, retirees, and their families. It is one of the largest employer-sponsored group health insurance programs in the United States. Approximately 800 local government employers currently offer NYSHIP's Empire Plan to their employees.

77.    Historically, the Empire Plan granted its enrollees the freedom to not only receive coverage from participating, in-network physicians, but also from non-participating, out-of-network physicians, such as the Plaintiff physician practices here. This was designed to ensure that New York's public employees had broad access to the finest physicians in the state, regardless of whether those physicians were in network with the Empire Plan or out of network.

78.    This "freedom of choice" to obtain covered care from any physician, including out-of-network physicians, was long a major feature of the Empire Plan and a significant benefit for public employees.

**United's Involvement In Empire Plan**

79.    As alleged above, United is the administrator of the Empire Plan, which is self-funded by the state and local government entities in New York.

80.    Although New York state and local government entities fund the Empire Plan and select the administrator, most day-to-day decisions regarding the operation of the Plan and the provision of benefits are the responsibility of United.

81.    United, for example, makes coverage and benefits determinations for the Plan's written terms and uses plan assets to pay benefits for covered healthcare expenses.

82.     As New York State Comptroller – the State's fiscal watchdog – has explained, as the Empire Plan administrator, United is "responsible for establishing a network of participating providers, establishing reimbursement rates, processing and paying claims from both participating and non-participating providers, and ensuring compliance with the requirements of the Empire Plan. Under the Empire Plan, [United] is reimbursed by Civil Service for the claims they process and pay. Additionally, Civil Service pays [United] an administrative fee." Thomas P. DiNapoli, *Preventing Inappropriate and Excessive Costs in the New York State Health Insurance Program* (N.Y. State Comptroller Audit 2016-D-1 (May 2018)) at 4-5.

83.     The exact financial terms of the administrative services arrangement between the Empire Plan and United is a closely guarded price of competitively sensitive and proprietary information shielded even from disclosure through the New York Freedom of Information Law.

84.     Nevertheless, upon information and belief, the administrative services fee that United receives for administering the Empire Plan is calculated the same way as it is for most self-funded health plans that United administers: The Plan's administrative fee is calculated as a set amount per Plan member, per month.

85.     One of most crucial functions that United provides to the Empire Plan as its administrator is the determination and payment of reimbursement rates for medically necessary services that health care providers render to Plan enrollees.

86.     As the State Comptroller explains, "Civil Service contracts with United to administer the medical/surgical portion of the Empire Plan. . . . United contracts with in-network health care providers who agree to accept payments at rates established by United to furnish medical services to Empire Plan members. United remits payment directly to in-network providers based on claims submitted for services provided . . . Empire Plan members may also

choose to receive services from out-of-network providers. . . . United bases its payments of out-of-network provider claims on the reasonable and customary (R&C) for the service. . . ." *Id.*

87.    For out-of-network providers such as LIA, United has significant leeway under the Empire Plan to determine the appropriateness of the billed codes and charges, calculate the applicable reasonable and customary reimbursement rate using benchmarking databases and other tools, and decide whether and to what extent to negotiate discounts or seek other reductions in reimbursement from the providers.

88.    Since United is in the business of administering, adjudicating, and negotiating health care benefits of a daily basis for thousands of self-funded plans throughout the United States and beyond, New York state officials – who are *not* in this business – rely on the substantial expertise United when making reimbursement determinations, particularly with respect to out-of-network providers.

89.    Upon information and belief, keeping out-of-network reimbursement rates as low as possible brings substantial financial benefits to United.

90.    Specifically, for many years, the fixed per member, per month administrative fees were all that United earned for its claims-administration services to self-funded plans. Recently, however United realized that it could bring in substantially more revenue by charging self-funded plans an additional "savings fee" each time it secured a "discount" on an out-of-network provider's billed charges.

91.    Starting in or around 2016, United began encouraging the plans to which it provided administrative services to move to a "shared savings initiative," which featured these "savings fees." Under the "shared savings" program, United calculates the "savings fee" it

charges to plans as a percentage – often as high as 35% — of the difference between the provider's billed charge and the reimbursement rate determined by United.

92.    Upon information and belief, the Empire Plan – like most self-funded plans that have administrative services arrangements with United – participates in United's "shared savings" program.

93.    Even if the Empire Plan does not participate in United's "shared savings" program, United derives other benefits from lowering out-of-network reimbursement rates as much as possible.

94.    Specifically, because the benchmarking databases used by United to calculate customary and reasonable reimbursement for out-of-network services rely, in large part, on the aggregated amount of historical paid claims, lowered reimbursement rates for care provided to Empire Plan members – one of the largest plans in the country with over 1.2 million members – significantly depresses the benchmark databases' reimbursement rates, thereby generating savings in connection with United's "shared saving" program and fully insured businesses.

**Empire Plan Reimbursement**

95.    Historically, the Empire Plan reimbursed out-of-network physicians for providing covered medical services to Plan enrollees at amounts approximating the usual, customary, and reasonable (UCR) rate for the medical services in the geographic area where the services are provided.

96.    The UCR rate used by the Empire Plan for out-of-network reimbursement was determined using the benchmarking databases maintained by FAIR Health, established in October 2009 as part of the settlement of an investigation by the Attorney General into conflicts

of interest involving UnitedHealthcare[1] involving the adjudication of claims. FAIR Health was formed to create an independent, trusted and transparent source of data to support claims adjudication and to meet the healthcare cost and utilization information needs of all participants in the healthcare community (https://www.fairhealth.org/mission-origin).

97.      While Empire Plan's standard out-of-network reimbursement rates were based on the FAIR Health-determined UCR, covered services provided by out-of-network radiologists, anesthesiologists – such as LIA –or pathologists at an in-network hospital were reimbursed in full by the Empire Plan. The certificate provides: "If [enrollee] receive[s] anesthesia, radiology or pathology services in connection with covered inpatient or outpatient Hospital services at an Empire Plan Network Hospital and The Empire Plan provides [enrollee's] Primary Coverage, covered charges billed separately by the anesthesiologist, radiologist or pathologist will be paid in full by the Medical/ Surgical Program."

98.      As a result of these provisions, LIA, as well as other anesthesia groups in the New York metropolitan area, were able to obtain reasonable reimbursement for providing high-quality, medically necessary anesthesia services to Empire Plan enrollees.

99.      Given that this reimbursement was based, in large part, on UCR rates established through Fair Health, the rates at which Empire Plan reimbursed LIA, and other anesthesia groups, in the New York metropolitan area for providing medically necessary anesthesia services to Empire Plan enrollees were market rates.

100.    It was vitally important that the Empire Plan reimbursed LIA and other anesthesia groups in the New York metropolitan area at these rates because, given the number of Empire

---

[1] To settle allegations of misconduct with regard to its operation of the Ingenix benchmarking database, UnitedHealthcare contributed $50 million to the creation of FAIR Health Attorney General Cuomo Announces Historic Nationwide Reform Of Consumer Reimbursement System For Out-Of-Network Health Care Charges | New York State Attorney General (ny.gov)).

Plan enrollees, Empire Plan reimbursement represented a significant amount of these groups' revenues.

101.    For example, in the years leading up to 2022, Empire Plan represented approximately 40% of LIA's revenues.

102.    LIA's clientele is representative of the clientele that are patients at other local private anesthesia practices.

103.    Specifically, Long Island Anesthesia Physicians, LLP provides anesthesia services at John T. Mather Memorial Hospital, in Port Jefferson; Long Island Community Hospital in Patchogue; Mercy Medical Center, in Rockville Centre; St. Charles Hospital and Rehabilitation Center in Port Jefferson; and St. Joseph Hospital in Bethpage. It also provides anesthesia services at Port Jefferson Surgery Center; Progressive Surgery Center of Long Island; Precision Care Surgery Center; and The Center for Advanced Spine & Joint Surgery.

104.    The Chief Operating Officer of Long Island Anesthesia Physicians testified in an affidavit submitted in New York state court in 2022 that, in 2021, 44% of that practice's revenues were attributable to services performed on Empire Plan members.

105.    Likewise, the President of New York Cardiovascular Anesthesiologists, which provides anesthesia services to St. Francis Hospital in Roslyn, testified in an affidavit submitted in New York state court in 2022 that, in 2021, 19% of his practice's revenues were attributable to services performed on Empire Plan members.

106.    Empire Plan's reimbursement levels also significantly benefited its enrollees. They had broad access to the finest out-of-network specialty physicians in the country. They were protected against the large balance bills and surprise bills that many other patients faced when they did not have the protections that the Empire Plan enrollees had.

**New York Surprise Bill Law**

107.  Empire Plan enrollees and anesthesia practices such as LIA were further benefitted in March 2015 when the New York Surprise Bill Law (Financial Services Law §§ 601-08) became effective. Through Civil Service Law § 162, the Surprise Bill Law also applied to the Empire Plan (Civil Service Law § 162[1][b][iv]).

108.  Until January 2022, the Empire Plan was treated as subject to the Surprise Bill Law by all stakeholders, including the Empire Plan itself, the Department of Financial Services, state independent dispute resolution agencies, and out-of-network providers.

109.  Under the Surprise Bill Law, out-of-network providers, such as LIA, were prohibited from billing patients if the bill would meet the Law's definition of a "Surprise Bill" or was a bill for "Emergency Services" (Financial Services Law § 606[a]).

110.  The Empire Plan and other health plans subject to the Surprise Bill Law were required under the Law to reimburse the out-of-network physicians at a "reasonable amount" for their covered medical services (Financial Services Law §§ 607[a][3] [surprise bills], 605[a][1] [emergency services bills]).

111.  Then, if a dispute existed between the health plan and the out-of-network physician as to what is "reasonable reimbursement" for the covered medical services at issues, either party may submit the dispute to the independent dispute resolution (IDR) process established by the Surprise Bill Law (Financial Services Law §§ 607[a][4] [surprise bills], 605[a][2] [emergency services bills]).

112.  A qualified independent dispute resolution (IDR) entity then reviewed the disputed bills code-by-code and selects either the out-of-network physician's fee or the health

plan's payment amount as the "reasonable fee for the services rendered" (Financial Services Law §§ 607[a][6] [surprise bills], 605[a][4] [emergency services bills]).

113.    In making its determination as to the reasonable fee for the services rendered, the Surprise Bill Law required the IDR entity to consider all relevant factors, including "the usual and customary cost of the service" (Financial Services Law § 604[f]).

114.    The Department of Financial Service's regulations regarding enforcement of the Surprise Bill Law defined "usual and customary cost," as set forth in Financial Services Law § 604(f), as "the 80th percentile of all charges for the particular health care service performed by a provider in the same or similar specialty and provided in the same geographical area as reported in a benchmarking database maintained by a nonprofit organization specified by the superintendent, which is not affiliated with a health care plan" (23 NYCRR §400.2[w]).

115.    Based on this regulation, the IDR entities used the FAIR Health database when selecting the reasonable fee on a code-by-code basis for the services rendered during the Surprise Bill Law dispute resolution process.

116.    Accordingly, at least for those circumstances constituting a surprise bill or an emergency services bill, out-of-network physicians, such as LIA, had a remedy if Empire Plan failed to reimburse it near the UCR for covered medical services.

**LIA Remains Out-of-Network**

117.    Indeed, these protections, and Empire Plan's reimbursement level, formed the basis of LIA's refusal to enter in-network participating provider agreements with United that included the Empire Plan business.

118.    Accordingly, when, in or around 2012, United started pressuring Good Samaritan Hospital to require LIA to become an in-network participating provider, LIA agreed with

United to become an in-network participating provider for its commercial health plan products, but expressly excluded the Empire Plan from the participating provider agreement. This preserved the favorable Empire Plan out-of-network reimbursement rates for LIA. The in-network reimbursement rates imposed by United were significantly below these out-of-network reimbursement rates.

119.   Most other similarly situated anesthesia groups in the New York metropolitan area were similarly able to avoid entering an in-network participating provider agreement that included the Empire Plan, to preserve the favorable out-of-network Empire Plan reimbursement rates for them as well.

**United's Dramatic Reduction in Reimbursement**

120.   All this has changed since January 1, 2022, when LIA – and other out-of-network physicians – began being reimbursed by United for providing medically necessary anesthesia services to Empire Plan enrollees at amounts dramatically less than provided for in the Plan.

121.   For example, LIA's reimbursement was in most cases **more than 80% less** than what they were reimbursed for the services in December 2021.

122.   This dramatic decrease is verified by New York Cardiovascular Anesthesiologist's President, who testified that in April 2023 that NYCA's reimbursement decreased 73% in January 2022.

123.   Likewise, Long Island Anesthesia Physicians' Chief Operating Officer also testified in April 2023 that his practice's Empire Plan reimbursement decreased more than 80% effective January 2022.

124.   United's explanation for this dramatic lowering of reimbursement is that it was "determined" that the Empire Plan no longer be subject to New York insurance laws or be subject to regulation by the Department of Financial Services.

125.   Rather, at United's insistence, the Empire Plan has "decided" that it will be treated like a non-governmental self-funded employee health plan, which are not subject to New York insurance laws or regulation by State's Department of Financial Services. The New York Surprise Bill Law does not apply to non-governmental self-funded employee health plans; the out-of-network reimbursement procedures for those plans are governed by the federal No Surprises Act.

126.   Consequently, the Empire Plan is taking the position that it is no longer obligated to reimburse out-of-network physicians, including the Plaintiff physician practices, at the FAIR Health-determined UCR rates set forth in its plan certificates.

127.   In ordinary circumstances, when a New York regulated health plan fails to reimburse an out-of-network physician at the proper rate, the physician can file a complaint with the Department of Finance Services, and, if a surprise or emergency services bill is involved, submit the dispute to New York IDR.

128.   However, both avenues of redress would be unavailable if the Empire Plan is not subject to New York insurance law (including the Surprise Bill Law) or Department of Financial Services regulation.

129.   And, indeed, since January, United has responded to complaints made to the Department of Financial Services by out-of-network physician practices by contending that the Empire Plan is no longer subject to regulation by that agency. Likewise, since January, United has responded to New York IDR proceedings initiated by out-of-network physician practices by

contending that because it is no longer subject to New York insurance laws, its reimbursements are no longer reviewable in New York IDR.

130.    Empire Plan, at United's insistence, has also taken the extraordinary step of communicating with the federal Centers for Medicare and Medicare Services (CMS) to persuade CMS to find – wrongly – that the Empire Plan is not legally subject to the New York Surprise Bill Law and, therefore, the No Surprises Act applies to its out-of-network reimbursement procedures.

131.    United is also contending – wrongly – that all hospital-based anesthesia cases fall under the No Surprises Act and accordingly, intentionally reimbursing for ambulatory and day admission surgeries at artificially low rates.

**No Surprises Act**

132.    In December 2020, the United States Congress enacted the No Surprises Act, which was signed into law as part of the Consolidated Appropriations Act of 2021 (Public Law 116-260; Division BB § 109) on December 27, 2020. It took effect on January 1, 2022.

133.    No Surprises Act § 103 amends 42 U.S.C. §§ 300gg *et seq*. to establish an IDR process for non-emergency services performed by non-participating physicians at in-network hospitals, hospital outpatient departments, critical access hospitals, and ambulatory surgical centers and out-of-network emergency services in the emergency department of a hospital or independent freestanding emergency department.

134.    The No Surprises Act provides that the federal IDR process will apply and may be used by physicians and health plans to determine the out-of-network rate for emergency services in the emergency department of a hospital or independent freestanding emergency department and non-emergency items and services furnished by non-participating providers

during a visit to a participating health care facility when a "specified state law" does not apply (42 U.S.C. § 300gg-111).

135.   Under 42 U.S.C. § 300gg-111(a)(3)(I), a "specified state law" is a state law that provides for a method of determining the total amount payable in the case of an insured receiving an item or service from a non-participating provider at a participating facility or emergency services in the emergency department of a hospital or independent freestanding emergency department (42 U.S.C. § 300gg-111[a][3][I]).

136.   For a state law to determine the amount upon which cost-sharing is based and the out-of-network rate, the state law must apply to [a] the plan, issuer, or coverage involved; [b] the non-participating provider or non-participating emergency facility involved; and [c] the item or service involved. (42 U.S.C. § 300gg-111).

137.   When a state has a specified state law, that state law and state IDR process, rather than the federal IDR process, will apply and the amount upon which cost-sharing is based and the out-of-network rate for emergency and non-emergency services subject to surprise billing protections are calculated based on such specified state law (*id.*).

138.   The No Surprises Act specifically deferred to state law, when there was one, precisely because its drafters recognized that states have differing, and unique health care systems and applicable state laws might therefore be more effective than a one-size-fits-all federal law. This is particularly apt here, given that New York since 2015 has had one of the most complex, robust, and sophisticated surprise bill laws in the country.

139.   Accordingly, in New York, the provisions of the Surprise Billing Law constitutes a "specified state law" under the No Surprises Act, because, for health plans and circumstances governed by it, the Surprise Bill Law has a method for determining the total amount payable—

the health plan pays what it determines to be a reasonable amount, and then either the health plan or the out-of-network physician can submit the matter to IDR, which will determine the reasonable payment amount using the Financial Services Law §§ 600-08.

140.   Thus, even after the No Surprises Act took effect January 2022, for health plans and circumstances covered by the Surprise Bill Law, that Law, and not the federal No Surprises Act, governs the reimbursement of out-of-network physicians.

141.   Indeed, the Department of Financial Services recognized this when it issued Circular Letter No. 10, in December 2021. In this Letter, the Department of Financial Services stated: "New York has an IDR process that applies to out-of-network emergency services, including inpatient services that follow an emergency room visit, in hospital facilities, and surprise bills in participating hospitals or ambulatory surgical centers and for services referred by a participating physician. The IDR process requires issuers, physicians, hospitals and ambulatory surgical centers, and providers to whom the patient was referred by their participating physician, to ensure that the insured incurs no greater out-of-pocket costs for emergency services and surprise bills than the insured would have incurred with an in-network provider. **Since New York has a specified state law, the New York IDR process will continue to apply to out-of-network emergency services and surprise bills**"

142.   Moreover, through the Circular Letter, the Department of Financial Services broadened the coverage of the Surprise Bill Law to cover more scenarios, rather than have those scenarios default to the No Surprises Act.

143.   Following this provision, virtually all health plans subject to New York regulation recognized that the New York IDR process continues to apply to out-of-network emergency services and surprise bills since the No Surprises Act became effective January 1, 2022.

144.   The New York IDR process is preferable for out-of-network physicians over the federal IDR process, because the New York process is independent and fair, focusing on the FAIR Health-determined UCR rate, while the federal IDR process focuses on the Qualifying Payment Amount (QPA), which is biased as solely determined by the health plan, and is based on its median in-network rates for the same service in a similar geographic area (42 U.S.C. § 300gg-111[a][3][E]), 111[c][5][C][i][I]).

145.   In virtually all circumstances, the QPA is significantly less than the FAIR Health-determined UCR amount. Indeed, use of and reliance on the QPA has been roundly criticized in the health care industry (Don't skew surprise-billing regulations in health plans' favor | American Medical Association (ama-assn.org) [accessed Mar. 13, 2022]).  One federal court has even invalidated parts of the No Surprises Act regulations for being improperly too reliant on the QPA (Memorandum Opinion and Order [Dkt Entry 113], *Texas Med. Ass'n v. United States Dep't of Health & Human Servs.*, 6:21-cv-00425-JDK [ED Tex Feb. 23, 2022]).

146.   United's efforts did not end with taking the position that the Empire Plan was no longer governed by New York law.

**United's and MPI's Scheme to Deprive Anesthesia Providers of Reimbursement**

147.   After Empire Plan refused to participate in New York IDR for disputed reimbursement claims, LIA and other anesthesia groups believed they had no choice but to invoke the federal IDR process under the No Surprise Act.

148.   Puzzlingly, Empire Plan's response to the invocation of the federal IDR process was to contend to the IDR entity that, somehow, it was exempt from the federal IDR process as well.

149.    Accordingly, LIA and other anesthesia groups received responses from the federal IDR entities that "[t]he non-initiating party has provided reason as to why this dispute does not apply for the IDR process. CMS will take a more detailed look into this dispute to determine eligibility. I am unable to provide a time frame at the moment but will keep you updated on the status. It was communicated to us that once a dispute is on hold the timeline is also on hold and therefore there will be no penalty if any deadlines are missed."

150.    There is no statute, regulation, guidance, or case that would make the Empire Plan exempt from both the NY state and federal IDR processes for the same claims during the same period.

151.    Unfortunately, the correspondence from the federal IDR entities was not the end of the saga. Several days after receiving the correspondence, LIA started receiving written communications from MPI, identifying itself as working with United.

152.    The communications purport to respond to LIA's "Open Negotiation Notice," and state that the claims have "been identified as a No Surprises Bill under the No Surprises Act. We are offering the Qualifying Payment Amount to resolve this for payment in response to your Open Negotiation Notice. . .. Please note the following[:] upon expiration of the 30-business-day open negotiation period required by the No Surprises Act. If you choose to submit the Federal IDR Process, you must submit a Notice of IDR Initiation through the Federal IDR Portal. . . ."

153.    The first set of these notices demand a response in less than 24 hours' time. Thus, it appears from these communications, that United, through MPI, was now acknowledging that the federal IDR process applied. When LIA and other anesthesia group representatives called

MPI to negotiate the payment amounts, MPI representatives flatly refused, stating that they were only authorized to offer the QPA amount.

154.   Thereafter, LIA and other anesthesia practices started receiving more notices from MPI as United's representative. These notices demanded a response within 45 minutes of receipt, and ominously warned LIA that the "No Surprises Act states you must provide justification for your offer on the Open Negotiation Notice request. Some common reasons could be patient severity and acuity, provider level of training, facility teaching status or market share. Our offer is based on the information we currently have available. Failure to provide the requested information will result in your Open Negotiation Notice request being closed without a good faith engagement."

155.   Once again, contrary to MPI's representations, there is no statute, regulations, or guidance that obligates LIA to provide it with detailed information regarding its reimbursement claims within 45 minutes of demand.

156.   To make such demands in connection with scores of reimbursement disputes is the height of bad faith, particularly given the threat that non-compliance will result in the closure of the Open Negotiation period and the implied loss of the right to pursue the disputes.

157.   The whole position is particularly disingenuous given that MPI already has said that it has no intent to negotiate further. It is hard to conceive of a scenario other than that this entire process is a cynical attempt to prevent LIA from pursuing any type of IDR on these claims.

158.   Other anesthesia groups on Long Island similarly situated to LIA received similar correspondence from United and MPI.

159.   Not only does this correspondence serve to effectively deny LIA and other similarly situated anesthesia providers the ability to contest these abysmally and predatorily low reimbursement rates, but it is flooding each provider with such a large volume of correspondence demanding responses in ever shortening periods of time – as short of 15 minutes – as to make it impossible to keep up with the flood of correspondence and still keep up with the ability to routinely bill and collect for other anesthesia services.

160.   Given all the circumstances, the only logical conclusion that can be drawn is that this campaign of excessive correspondence with exceedingly short deadlines is designed to force anesthesia providers from abandoning their challenges to Empire Plan's low reimbursement.

161.   And this is exactly what has happened. Many practices receiving this torrent of correspondence from MPI and United have made the decision not to challenge Empire Plan's low reimbursement rates simply because they lack the bandwidth or resources to keep up with the MPI and United correspondence while at the same time performing routine billing and collection tasks.

**MPI's Illegal and Improper Motives**

162.   Although on its face MPI appears to be nothing more than a United vendor engaging in isolated communications with out-of-network providers on its behalf, nothing can be further from the truth.

163.   First, MPI is a horizontal competitor of United because both MPI and United own and operate Preferred Provider Organization (PPO) networks.

164.   As the Kaiser Family Foundation explained in 2022, PPOs are the most common type of employer provided healthcare plan in the United States. They contract with health care

providers to establish agreed-upon payment rates for the providers' services. Subscribers to PPO plans can access any network healthcare provider at a reduced rate. Subscribers almost always must pay more if they choose an out-of-network provider.

165.   MPI acknowledges that it operates the "oldest and largest independent [PPO] network" in the United States. Collectively, its PPO networks have over 1.3 million healthcare providers under contract, encompassing approximately "920,000 practitioners, 4,800 acute care hospitals and 87,000 ancillary facilities."

166.   Private and public-sector employers, insurance companies, tribal entities, and union benefit plans are all subscribers to MPI's PPO networks. Additionally, MPI provides competing health insurance networks  access to its "complementary" PPO networks in exchange for a fee. Indeed, MPI makes money from all these PPO networks, by contracting with insurers and others to permit their plan beneficiary to use the medical providers who participate in the applicable MPI PPO network.

167.   All these PPO networks compete with other commercial health insurance payers to secure contracts with medical providers. Many large health payers, including United, operate their own PPO network. United, for example, offers UnitedHealthcare Options PPO plans. These PPO plans rely on PPO networks that directly compete with MPI's PPO networks to obtain provider contracts.

168.   MPI's 2023 Annual Report admits that its PPO networks compete against United and other commercial health insurance networks: "We also compete with PPO networks owned by our large Payor customers[.]"

41.   MPI has also recently admitted under oath that, like United, it is a health insurance payer. As Marjorie G. Wilde, Senior Counsel for MPI, explained in a declaration filed

in *Jonathan Hott, M.D. v. MPI, Inc.*, Case No. 1:21-cv-02421-LLS (S.D.N.Y. Aug. 15, 2022)

(Dkt. 38-2):

> MPI provides healthcare cost management services and operates a network-only preferred provider organization ("PPO") that does business nationwide by contracting, on the one hand, with healthcare providers, such as hospitals, physicians, physician groups and ancillary providers ("Network Agreements"). These contracted providers agree to give discount off of medical services rendered to the beneficiaries of clients of MPI. . . . On the other hand, MPI also contracts with its clients, which include health insurance carriers, health maintenance organizations, self-funded health plans, third party administrators, and other third-party payors that have members and beneficiaries who receive medical services from the provider network assembled by MPI.

*Id.* ¶¶ 3–4.

169.   United itself has recognized that MPI is a competing network. At a trial, John Haben, United's former Vice President of Networks testified that "MPI has the largest network in the country. . . . They have a broad network. Broader than United."

170.   MPI, however, is more than just a horizontal competitor. Rather, starting around 2006, it embarked on a strategy – self-described as "MultiPlan 2.0" – to sell "analytics" services to its health insurance competitors. MPI described these services as a "[d]ata-driven, customized healthcare cost management solution."  As we allege below, these "analytics" are nothing more than an agreed-upon methodology for health insurance payers to suppress payments to health care providers using the artifice of a "fair" and "reasonable" repricing scheme.

171.   Specifically, uses analytics tools it created or acquired, such as Pro Pricer, Viant, MARS, and Data iSight to "re-price" out-of-network health plan claims. In a typical example, after an out-of-network provider renders a covered health care service to a plan enrollee, the plan receives the provider's reimbursement claim and turns it over to MPI. Multi-Plan then uses its analytic tools to "reprice" the claim pursuant to MPI's agreement with the health plan. This

repricing process almost invariably leads to a reimbursement amount below the customary and reasonable amount. MPI then either directly or through the plan repriced claim on a take-it-or-leave-it basis.

172. MPI makes money on claims repricing by charging its health care payer customers a fee based on the difference between a healthcare providers' original claim and the amount the provider accepts following MPI's repricing of the claim. This fee is usually equal to 5-7% of the "savings," but can be as high as 9.75%. As a result, MPI is motivated to recommend the lowest reimbursement price possible, since it increases the fee that MPI charges to its competing insurance companies.

173. Importantly, in most cases, MPI's repriced amount is not just a payment recommendation to the health care payer; it is a determine of the payment amount. Typically, MPI's recommendation is accepted by the payer anywhere from 93% to 99.4% of the time.

174. These high acceptance rates are not because MPI's repriced amounts are fair or reasonable, but rather because almost all major health payers use MPI to reprice their out-of-network claim using the exact same analytic tools, thereby yielding virtually identical repricing amount, leaving the providers little alternative but to accept them.

175. Without the uniformity that the MPI repricing scheme provides, health payers would determine reimbursement rates independently based on their own individual analyses.

176. In such an environment, an individual payer would be constrained in its ability to impose dramatically decreased reimbursement rates upon out-of-network providers, for fear that providers and enrollees, when confronted by these reduced rates and the damage they do to the delivery of high quality care, would seek to avoid dealing with the low reimbursement payer.

177.    This, however, does not occur with the MPI repricing scheme. Because payers know that their competitors are using the same repricing tools that generate virtually identical amounts, they are free to dramatically reduce reimbursement knowing that their competitors will be doing the same.

178.    Indeed, MPI leaves little room for doubt that its motives are not fairness or reasonableness. Its marketing materials are clear that its products were "built to help [insurers and other] payers reduce the cost of . . . out-of-network" reimbursements to physician practices such as LIA.

179.    MPI further advertises that it generates over $15 billion in reimbursement rate reductions. It has variously alleged that it has reduced out-of-network reimbursement payments throughout the country by anywhere from 18% to 81%.

180.    MPI's clients for these services include not only United, but also Cigna, Elevance, Centene, and Humana. These are some of the largest health care companies in the world. As of 2022, United was 5 on the Forbes' list. Aetna (part of CVS Health) was 4, Cigna is 12, Anthem (now Elevance Health) was 20, Centene was 26, and Humana was 40 on the Forbes' list.

181.    In 2021, Sean Crandell, the Senior Vice President of Healthcare Economics at MPI, testified that "all of the top 10 insurers in the U.S." are MPI customers. By 2023, MPI acknowledged that "all of the top 15 insurers" in the nation have agreed to use MPI as their out-of-network claim repricer.

182.    All totaled over 700 managed care companies and 100,000 health plans/sponsors use MPI's services; these cover over 60 million beneficiaries throughout the United States.

183.    The relationship between MPI and the plans is quite deep and longstanding. According to MPI's Annual Report, it "continue[s] to experience high renewal rates and our top

ten customers based on full year 2021 revenues have been customers for an average of 25 years. Our customer relationships are further strengthened by high switching costs as MPI is electronically linked to customers in their time-sensitive claims processing functions, and we support highly flexible benefits offerings to an extensive group of customers who often feature a MPI logo on membership cards when networks are used." *Id.*

184.    The relationship between MPI and United is particularly close and deep. United is MPI largest customer, representing 30% of its revenue. As MPI stated in 2021, "Over the past three years, MPI's revenues from UHC have grown more than 30% to an all-time high. MPI and UHC have partnered on a series of strategic initiatives that we expect will further grow this business in 2022 and beyond. UHC is an extraordinary customer and partner of MPI. . . . We are excited to continue that partnership in the years to come. . . ."

185.    United's motives for using MPI become clear from their correspondence. In 2016, MPI's then Chief Revenue Officer, Dale White, authored an email to United executives informing them that 7 of United's top 10 competitors were using MPI's repricing services. White specifically stated "[i]mplementing these initiatives will go a long way to bring UnitedHealth back into alignment with its primary competitor group [Blues, Cigna, Aetna] on managing out-of-network costs."

186.    Dale White is currently MPI's Chief Executive Officer, although he will be transitioning into the role of Executive Chair effective March 1, 2024.

187.    Rebecca Paradise, United's Vice President of Out-of-Network Payment Strategy, after receiving White's email explained that a key factor in United's decision to use MPI's repricing services was that it was "widely used by our competitors."

188.    John Haben, another United executed, recommended to senior United management in 2017 that [t]oday, our major competitors have some sort of outlier cost management; they use Data iSight. United will be implementing July 1, 2017."

189.    Haben testified under oath that United moved from paying out-of-network claims at reasonable and customary rates, or rates determined by benchmarking databases, to using MPI's tools because reasonable and customary rates led to "uncontrolled" costs. Rather, United, like its competitors, shifted to a "shared saving" model using MPI's repricing tools.

190.    United made approximately $1.3 billion from its shared savings agreements to suppress out-of-network claims in 020. United has also stated in an internal presentation that it intended to cut its out-of-network reimbursements by $3 billion through 2023.

191.    So successful was MPI's repricing arrangement with United and the other health care payers, that MPI sought to extend its features to the No Surprises Act process when it became operational in January 2022.

192.    Accordingly, MPI's marketing materials announced a coordinated strategy to partner with United and other health plan clients to manage the entire No Surprises Act compliance process with the goal of significantly reducing the plans' reimbursement rates. https://www.MPI.us/no-surprises-act/ (accessed Nov. 11, 2022). Like the overall repricing product, MPI would share in the savings generated by United and the other health plans resulting from its negotiation efforts.

193.    As MPI explained in its 2021 Annual Report:

> The [NSA] require[s] extensive data collection and analysis to identify claims as surprise bills under the law's definition; calculate the new QPA benchmark introduced by the law and append it to the claim; create an initial payment amount for the claim, typically by using the QPA as the reference point; negotiate a settlement as needed; and take claims through an independent

dispute resolution process as needed. We leverage existing technology and expertise in data science, claim pricing and negotiation in offering these new services. They are used by all types of Payors that must comply with the NSA, and are priced either at a percentage of savings for the end-to-end service, or on a per-claim basis for individual components.

MPI Annual Report (SEC Form 10-K) at 13 (Feb. 25, 2022).

194.    Accordingly, MPI developed an "End to End Surprise Billing Service," stating that "[w]ith expertise in every step of the process, we can administer the entire NSA process on your behalf. Our easy-to-implement services can help you organization achieve compliance quickly."

195.    This Service has five key features, as explained by MPI:

- **Identify Surprise Bill**: "We examine billing codes, facility network status and episodes of care for your primary network(s) and ours."

- **Calculate and Append QPA**: "We calculate the Qualifying Payment Amount (QPA) and include it on the processed claim so that you can complete the adjudication."

- **Price Claim**: "We can reprice claims at QPA or an amount just below or above it. Alternatively, we can use another of our Analytics-Based services to determine a fair amount that providers are likely to accept."

- **Negotiate Settlement**: "Providers that reject the initial payment contact us to start the process. We leverage technology, data, and experienced staff to negotiate a settlement to accept."

- **Arbitrate**: "When settlement isn't reached, we'll own the IDR process from start to finish. In calculating a payment offer, we analyze data from millions of claims, actual facility costs, and more."

196.    MPI's 2022 Annual Report describes the Services as follows:

> *Surprise Billing Services.* Introduced in 2021, our surprise billing services help Payors comply, or help their employer/plan sponsor customers comply, with the federal No Surprises Act ("NSA"), which became effective on January 1, 2022. Interim final regulations issued on July 13, 2021 and October 7, 2021 ("IFRs") and then final regulations issued on August 26, 2022 (the "Final Rules"), have provided additional detail on how payors and providers must operate under the NSA. These IFRs and Final Rules implemented portions of the NSA and introduced changes to the reimbursement process of certain types of medical claims, increasing what was typically a one- to two-step reimbursement process to five steps. MultiPlan performs all five steps in an end-to-end service, or makes each step available as components to meet the specific needs of each Payor. The steps require extensive data collection and analysis to identify claims as surprise bills under the law's definition; calculate the new QPA introduced by the law and append it to the claim; create an initial payment amount for the claim, typically by using the QPA as the reference point; negotiate a settlement as needed; and take claims through an independent dispute resolution process as needed. In offering these new services, we leverage existing technology and expertise in data science, claim pricing, and negotiation. The services are used by all types of Payors that must comply with the NSA, and are priced either as a percentage of savings for the end-to-end service, or on a per-claim basis for individual components.

197.   It is the Price Claim, Negotiate Settlement, and Arbitrate features of the Service that incorporate significant aspects of MPI's pre-existing repricing services and are thereby used to extend and replicate the reimbursement reducing benefits of the repricing services to the NSA environment.

198.   MPI's efforts in connection with No Surprises Act compliance are part of its overall, decade-long strategy to work with "substantially all of the largest health plans," to reduce out-of-network reimbursement rates, "using data-driven negotiation and/or reference-based pricing methodologies."

199.   It is this extension of the MPI repricing strategy to the NSA environment that is at work in the events underlying this lawsuit.

**<u>Anti-Competitive Harm Caused Anesthesia Providers</u>**

200.   As a result of the actions of United and MPI, which continue to date, LIA and other anesthesia groups are in the untenable and unenviable position where their reimbursement for providing medically necessary anesthesia services have been dramatically cut – more than 80% –by United, with the assistance of MPI, and they have no viable avenue to redress these cuts.

201.   These actions of United and MPI have caused significant harm.

202.    The sudden, precipitous decrease in reimbursement – to less than 20% of what it was in December 2021 – is devastating to LIA.

203.    LIA is a hospital-based anesthesia provider and cannot simply choose not to accept certain patients referred to it. Accordingly, it cannot turn away patients with the Empire Plan.

204.    Given these circumstances and the fact that LIA is already out-of-network for the Empire Plan, LIA has little recourse in the facte of the lowered reimbursement rates.

205.    If LIA were to choose to go in-network—its only option—its reimbursement rate would likely be the same or less than it is now, according to testimony from Daniel Yanulavich, the Director of the Employee Benefits Division of the New York State Department of Civil Service (responsible for administration of the Empire Plan). *See* ECF Dkt. 41-3.

206.    LIA's practice is representative of other private practices in the market, and, upon information and belief, each are situated similarly.

207.    For example, Long Island Anesthesia Partner's Chief Operating Officer testified in late 2022 that the sudden, precipitous decrease in Empire Plan reimbursement — to less than 20% of what it was in December 2021 — constituted unabsorbable loss to the practice, especially given a severe shortage of quality anesthesia providers in the Long Island area, skyrocketing expenses due to inflation and the uncertain economic climate.

208.    The testimony went on to explain that, if low Empire Plan reimbursement levels continue unabated, the practice would, at the very least, be forced to significantly curtail its services and not allow its hospital clients to open all required operating rooms on any given day. It would be severely hampered in its ability to recruit and retain high quality recently trained physicians or acquire new technology and information systems. This is exacerbated by

demographic and societal factors such as the "Great Resignation," causing an already significant shortage of well-qualified clinicians.

209.   In 2021, 44% of LIAP's revenues were attributable to services performed on Empire Plan's members. Consequently, following the Empire Plan's actions, as of June 2022, only 11% of LIAP's revenues are attributable to services performed on Empire Plan's members resulting in a reduction of revenues of more than $20 million and reduction of practice profits by more than 80%.

210.   As of June 2022, LIAP has seen its average reimbursement per case decline from $6,083.00 to $873.00 in a matter of days for the same services provided to members of the Empire Plan.

211.   LIAP's Chief Operating officer explains that, shortly and assuredly, the low Empire Plan' reimbursement rates would disrupt longstanding relationships that its participating facilities and providers have with the practice. Its clinicians intimately know the participating facilities' and providers' requirements to deal with unique medical conditions and how best to treat them. This will be hampered, if not lost, negatively impacting the health and wellbeing of New York's public employees and their dependents during these stressful times.

212.   The COO further testified that, due to the low Empire Plan rates, LIAP has lost more than 10% of its physician staff due to financial distress, resigned from a new ambulatory surgery center due to an inability to continue to make the investment required to insure the facility's success after its initial first few years of start-up losses, terminated both of its general surgeons, commenced the divestiture of its interventional pain management operation impacting 70 employees and approached its clients for stipends which will now place even greater financial stress on not-for-profit hospitals which could lead to further reduction in much needed

hospital services. These dramatic changes were fundamentally, severely and permanently damaging to LIAP, its hospital clients, patients and employees and such damage will be irreversible.

213.    In addition, LIAP is the exclusive anesthesia provider to five hospitals located on Long Island. There are no alternative in-network providers at the hospitals nor the availability of alternative anesthesia resources by others to staff these hospitals. Due to the Empire Plan's actions, LIAP's ability to service these hospitals has been severely hampered, causing a shortage of anesthesia providers to take call at these hospitals. As a result, these hospitals have been forced to shutter operating or procedure rooms, or lengthen schedules or wait times, to account for these shortages. This directly and irreparably impacts patient care at hospitals.

214.    This consistent and continued lowered reimbursement led LIAP to announce that, as of February 1, 2024, it ended its 50+-year history of being an independent medical practice and joined NYU-Langone Health. This difficult decision was largely precipitated by the No Surprises Act impacting out-of-network reimbursement from NYSHIP making it nearly impossible to continue to practice independently.

215.    Likewise, New York Cardiovascular Anesthesiologist's President has testified that NYCA relies on fair reimbursement to continue its mission to provide high quality, innovative care to its patients. The sudden, precipitous decrease in Empire Plan reimbursement — a 73% decrease compared to December 2021 — also constituted unabsorbable loss to its practice.

216.    He further explained that, if the low Empire Plan reimbursement rates continue, the practice will, at the very least, be forced to significantly curtail its services, preventing it from opening all required operating rooms. Since January 2022, the practice also has been

severely hampered in our ability to recruit and retain high quality recently trained physicians or acquire new technology and information systems.

217. The President concludes that, unless Empire Plan reimbursement rates are restored, there will be a loss of continuity of medical care, significant delays in the provision of care due to the lack of or restricted access to out-of-network physicians, potential exposures to surprise and balance bills, and significant increases in adverse health outcomes, including serious illness and the potential loss of life.

218. In 2021, 19% of NYCA's revenues were attributable to services performed on Empire Plan's members. Consequently, following the Empire Plan's unlawful actions, as of July 2022, 10% of .NYCA's revenues are attributable to services performed on Empire Plan's members. Essentially overnight NYCA has lost over 12% of overall revenue. Due to this situation, NYCA has been forced to suspend all new hires, lay off staff and eliminate sites of service.

219. In addition, NYCA is a contractual anesthesia provider to hospitals located on Long Island. There are no alternative in-network providers at the hospitals it services. The low Empire Plan reimbursement rates have hampered NYCA's ability to service these hospitals, which has caused a shortage of anesthesia providers to take call at these hospitals. As a result, these hospitals too have been forced to delay operating and procedure rooms, lengthen schedules and patient wait times to account for these shortages. This directly and irreparably impacts patient care at hospitals.

220. LIA, NYCA, and LIAP collectively service seven large Long Island hospitals, and a significant number of ambulatory surgery centers and other facilities. Their demonstrated

difficulties at the hands of United and the lowered Empire Plan reimbursement rates demonstrate a large, market-wide impact.

221. Further, these practices' experiences are corroborated by other market participants, including John F. DiCapua, M.D., the Chief Executive Officer of Long Island-headquartered North American Partners In Anesthesia stated in *MDnewslongisland.com* regarding the post-NSA reimbursement reductions: "In a profession already facing a shortage of clinicians, long work hours and burnout, reducing reimbursement perpetuates this shortage by encouraging even more early retirements. This attrition only increases healthcare labor costs, as medical centers facing heavy competition often feel the need to offer higher salaries to attract and retain the remaining pool of anesthesia providers. Higher labor costs have also resulted in a record number of practice closures in this specialty, Dr. Di Capua explains, affecting access to care in many regions, including lower income and rural communities. 'We are at a point that I thought I would never see in my career,' Dr. Di Capua says. 'Hospitals may not have enough anesthesia providers to support their patient population.'"

222. Taken as a whole, the consequences that Empire Plan enrollees will suffer at the hands of Defendants include the loss of continuity of medical care, significant delays in the provision of care due to the lack of or restricted access to out-of-network physicians, potential exposures to surprise and balance bills, and significant increases in adverse health outcomes, including serious illness and the potential loss of life.

**Defendants' Anti-Competitive Motives**

223. Defendants' conduct is particularly egregious given that its intent in undertaking this conduct is simply anticompetitive harm and restraint of trade.

43

224.   Put simply, United, aided by MPI, is using its significant market power to drive down out-of-network anesthesia reimbursement rates in the New York metropolitan area knowing full well that the impact of lower reimbursement rates will be to drive out anesthesia providers such as LIA.

225.   Driving anesthesia providers such as LIA from the market will significantly benefit United because, as alleged above, United, through its OptumCare subsidiary, provides anesthesia services in market and is looking to expend its delivery of all healthcare services, including anesthesia services, in the New York metropolitan area.

226.   Thus, the elimination of independent anesthesia providers, such as LIA, from the market, will significantly benefit United at the expense of LIA and other similarly situated anesthesia providers.

227.   Given United's size and market share, the dramatic lowering of its reimbursement rate for anesthesia services is causing, and will continue to cause, a sizable number of anesthesia practices to leave the relevant market by either going out of business entirely or being forced to sell their practices to hospitals or multispecialty groups. Those that survive have will be seriously hampered in their ability to compete.

228.   This will result in decreased output and quality of anesthesia services.

229.    The dramatic lowering of reimbursement rates will also have a direct negative economic effect on patients, because those patients with high deductible plans or plans with large cost-sharing requirements for out-of-network services may have to pay significantly more out-of-pocket to receive medically necessary services.

230.   Because of all the foregoing, Defendants' actions have greatly and irreparably harmed competition in general and LIA in particular.

231.   There is no reasonable, pro-competitive justification for Defendants' actions, much less one that outweighs these anti-competitive effects.

232.   Indeed, while United is decreasing the amount it pays for anesthesia services in the relevant market, it is not passing on these savings to patients or the purchasers of health care coverage.

233.   Not only will Defendants' actions harm LIA, but they will also harm other anesthesia providers and, indeed, the whole market.

234.   Indeed, premiums have increased. For 2022, United sought an increase in premiums for the small group market in the amount of 17.5%; it obtained an increase of 6.3%. For 2023, United seeks an increase of 19.1%. It received a 6.0% increase.

**Defendants Under Antitrust and Other Investigative Scrutiny**

235.   United's conduct recently has led to the opening of an antitrust inquiry by the Department of Justice into its operations.

236.   Specifically, the *Wall Street Journal* reported on February 27, 2024 that the "Justice Department has launched an antitrust investigation into UnitedHealth, owner of the biggest U.S. health insurer, a leading manager of drug benefits and a sprawling network of doctor groups. The investigators have in recent weeks been interviewing healthcare-industry representatives in sectors where UnitedHealth competes, including doctor groups, according to people with knowledge of the meetings."[2]

237.   The article goes on to explain that "[d]uring their interviews, investigators have asked about issues including certain relationships between the company's UnitedHealthcare insurance unit and its Optum health-services arm, which owns physician groups, among other

---

[2] https://www.wsj.com/health/healthcare/u-s-launches-antitrust-investigation-of-healthcare-giant-unitedhealth-ff5a00d2?st=o9j2rb3xua0897y&reflink=article_email_share (accessed May 28, 2024).

assets. Investigators have asked about the possible effects of the company's doctor-group acquisitions on rivals and consumers, the people said."

238.    Explaining United's vast size, the *Wall Street Journal* wrote "UnitedHealth, based in Minnetonka, Minn., had $372 billion in revenue last year. Its insurance unit covers about 53 million people, across a range of plans including employer, Medicaid and Medicare coverage. After years of acquisitions, Optum includes about 90,000 physicians, as well as surgery centers, an array of health data and technology units, and one of the largest pharmacy-benefit managers."

239.    At least part of the investigation is focused on New York. The *Journal* article explains that the "new Justice Department inquiry, reported earlier by the Examiner News, a news organization based in New York's Hudson Valley, is partly examining Optum's acquisitions of doctor groups and how the ownership of physician and health-plan units affects competition, according to the people with knowledge of the matter. Investigators have asked whether UnitedHealthcare favored Optum-owned groups in its contracting practices, potentially squeezing rival physicians out of certain types of attractive payment arrangements. Investigators have also explored whether Optum's ownership of healthcare providers could present challenges to health insurers that are rivals to UnitedHealthcare."

240.    This is not the only investigative scrutiny that Defendants have been subjected to in the recent past.

241.    Specifically, the *New York Times* published a series of investigative articles on April 7, 2024, about MPI and its relationships with the major managed care plans, including United.[3]

---

[3] https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills.html (accessed May 28, 2024).

242.  The *Times* reported that "[l]arge health insurers are working with a little-known data company to boost their profits, often at the expense of patients and doctors." This data company, MPI, "has helped drive down payments to medical providers and drive up patients' bills, while earning billions of dollars in fees for itself and insurers."

243.  The *Times* went on to explain that, when patients receive care from providers outside their insurance plans' networks, large commercial insurers (including United) send the bills MPI to recommend a payment amount. But MPI and the insurers are strongly incentivized to keep the payments low because their fees increase when the reimbursements decrease. Specifically, their revenues are based on the difference between the original bill and the amount the insurer actually pays, so these giant corporate entities have every reason to pay far less than they should. Remarkably, the fees paid to commercial insurers and MPI are often far higher than the reimbursement for the health care itself. Given these perverse incentives, it is not surprising that these returns help pad the sky-high profits of large corporate conglomerates like United. Tellingly, United alone reportedly reaps $1 billion in annual fees from employers for its work with MPI.

## SUMMARY OF ANTITRUST ALLEGATIONS

### Relevant Product Market

244.  The relevant product market at issue here is the provision of medically necessary anesthesia services to patients.

245.  Anesthesia services comprises the use of various injected and inhaled medications to produce a loss of sensation in patients, making it possible to carry out procedures that would otherwise cause intolerable pain or be technically unfeasible.

246.    Safe anesthesia requires in-depth knowledge of various invasive and non-invasive organ support techniques that are used to control patients' vital functions while under the effects of anesthetic drugs; these include advanced airway management, invasive and non-invasive hemodynamic monitors, and diagnostic techniques like ultrasonography and echocardiography. Anesthesiologists are expected to have expert knowledge of human physiology, medical physics, and pharmacology, as well as a broad general knowledge of all areas of medicine and surgery in all ages of patients, with a particular focus on those aspects which may impact on a surgical procedure.

247.    In recent decades, the role of anesthesiologists has broadened to focus not just on administering anesthetics during the surgical procedure itself, but also beforehand to identify high-risk patients and optimize their fitness, during the procedure to maintain situational awareness of the surgery itself to improve safety, as well as afterwards to promote and enhance recovery.

248.    Anesthesiologists are also responsible for ensuring adequate pain relief for patients in the immediate postoperative period. The field comprises individualized strategies for all forms of analgesia, including pain management during childbirth, neuro-modulatory technological methods such as transcutaneous electrical nerve stimulation or implanted spinal cord stimulators, regional anesthesia and nerve blocks, and specialized pharmacological regimens.

249.    Only appropriately educated, trained, and experienced anesthesiologists have the necessary skills and training to provide these services.

250.    Other physicians or clinicians do not have the expertise to competently provide these services and therefore cannot be considered reasonable substitutes.

251.    The relevant product market at issue here is the New York metropolitan area.

**Relevant Geographic Market**

252.    Given the chronic and urgent nature of most medical problems requiring procedures performed under anesthesia, patients need to seek this treatment close to where they live and work.

253.    Generally, most patients are willing to travel, under the best of circumstances, only about 30 minutes for health care services.[4]

254.    Accordingly, the relevant geographic market for anesthesia services in this lawsuit is no larger than the New York metropolitan area, including New York City, Nassau, Suffolk, and Westchester Counties.

**United's Market Power**

255.    LIA participates in this market as a "seller" of anesthesia services. Other anesthesia providers – including OptumCare practices – also participate in this market as sellers.

256.    Accordingly, LIA and other similarly situated anesthesia providers are horizontal competitors of United in this market.

257.    The patients of LIA, as well as the patients of the other anesthesia providers in the relevant market participate in the relevant market as consumers of anesthesia services.

258.    In addition to competing in the market as a seller of anesthesia service, United -- through administering the Empire Plan and other health plans as well as directly providing health plans itself – also participates in the relevant market as a payer or "purchaser" of anesthesia services to the extent plan enrollees seek anesthesia services in the relevant market.

---

[4] https://altarum.org/sites/default/files/uploaded-publication-files/Altarum_Travel-and-Wait-Times-for-Health-Care-Services_Feb-22.pdf.

259. MPI, to the extent that it assists plans in terms of calculating reimbursement levels and facilitating reimbursement, also constitutes a market participant as a payer or purchaser of anesthesia services.

260. For these reasons, the provision of anesthesia services in the New York metropolitan area is the proper antitrust market in connection with this lawsuit.

261. United has market power in this market. As alleged above, Defendants' actions have had, and will continue to have, an actual adverse effect on competition in terms of decreased output and quality in the market for anesthesia services in the New York metropolitan area.

262. Additionally, as alleged above, United has a significant share of the market in the New York area. Depending on the health plan product involved, United's market share is as high as 66%. Its share of commercial insurers in the New York City market (defined as Suffolk, Nassau, Queens, Kings, Richmond, New York, Bronx, Westchester, Putnam, and Rockland Counties) as of the third quarter of 2019 was 50%.

263. And, in the New York market, United also acts as the administrator of the Empire Plan, which is part of the New York State Health Insurance Program (NYSHIP). This Program provides health coverage for over 1.2 million public employees in New York.

264. In the New York metropolitan area, the Empire Plan represents a significant, if not dominant, payer of reimbursement for anesthesia services.

265. As alleged above, for LIA and, upon information and belief, for similarly situated anesthesia practices, approximately 40% of revenues is received from the Empire Plan.

**Defendants' Anti-Competitive Scheme**

266.    As alleged above, Defendants' anti-competitive conduct here has included significantly reducing reimbursement to out-of-network anesthesia providers such as LIA to more than 80% below previous market levels.

267.    Logically, its efforts have a far greater chance to succeed if pressure is applied out out-of-network anesthesia providers to accept these rates without challenge or complaint.

268.    United uses MPI to apply this pressure.

269.    Under the No Surprises Act, there is a 30-day negotiation period between the health plan and the provider for every out-of-network claim.

270.    United takes advantage of this negotiation period by having MPI make extremely low, and entirely unsupported, opening offers in every out-of-network claim, and then demanding that the practice respond, with data supporting its position, in periods as short as 45 minutes after receiving the offer.

271.    MPI thereafter threatens the practice that failure to timely respond will be treated as bad faith refusal to negotiation, causing the practice to lose its ability to challenge the reimbursement rate.

272.    Practices such as LIA must scramble to provide meaningful responses in virtually impossible timeframes.

273.    These steering efforts, including bogus negotiations, applying unrealistic deadlines, and burying practices in mountains of correspondence, are intended to force anesthesia practices to accept these low rates.

274.    These actions have been undertaken as part of a contract, combination, or conspiracy between United and MPI so that LIA will accept low Empire Plan rates without challenge or complaint.

275.    Indeed, MPI's actions are not simply isolated communications or recommendations. Rather, they grow out of longstanding arrangements between MPI and large health plan payers, including United, to use MPI repricing tools as an agreed-upon methodology to suppress out of network reimbursement.

276.    As alleged above, starting around 2006, MPI embarked on a strategy to sell analytic tools designed to reprice out-of-network claims for health plan payers. This repricing process almost invariably leads to a reimbursement amount below the customary and reasonable amount. MPI then either directly or through the plan repriced claim on a take-it-or-leave-it basis. (MPI charges its health care payer customers a fee based on the difference between the original and repriced claim amounts. As a result, MPI is motivated to recommend the lowest reimbursement price possible, since it increases the fee that MPI charges to payers.

277.    MPI's repricing customers include, as of 2023, all the top 15 health insurers, including not only United, but also Cigna, Elevance, Centene, and Humana. Over 700 managed care companies and 100,000 health plan/sponsors use MPI's repricing services; these cover over 60 million beneficiaries    In most cases, MPI's repriced amount is not just a recommendation, it is a determination accepted by the payer more than 90% of the time. This is not because MPI's repriced amounts are fair or reasonable, but rather because almost all major health payers use MPI to reprice their out-of-network claim using the exact same analytic tools, thereby yielding virtually identical repricing amount, leaving the providers little alternative but to accept them.(PAC)

278.   Without the uniformity that the MPI repricing scheme provides, health payers would determine reimbursement rates independently based on their own individual analyses. In such an environment, am individual payer would be constrained in its ability to impose dramatically decreased reimbursement rates upon out-of-network providers, for fear that providers and enrollees, when confronted by these reduced rates and the damage they do to the delivery of high quality care, would seek to avoid dealing with the low reimbursement payer. This, however, does not occur with the MPI repricing scheme. Because payers know that their competitors are using the same repricing tools that generate virtually identical amounts, they are free to dramatically reduce reimbursement knowing that their competitors will be doing the same.

279.   Regarding United, MPI approached it in 2017 and opined that United's out-of-network reimbursements were too high and needed to be brought "back into alignment." MPI affirmed United that it had already agreed with other competing health payers  to manage out-of-network costs and offered to enter into a similar agreement with United. When considering whether to enter into the MPI agreement, a key factor for United was that its competitors also used MPI's pricing methodology to suppress out-of-network rates. United and MPI thereafter discussed and agreed upon how little United would pay for out-of-network claims using the MPI repricing tools.

280.   Thereafter, MPI extended its repricing arrangement's features to the No Surprises Act processes when it became operational in January 2022. It incorporated noteworthy features of its pre-existing repricing services to extend and replicate the reimbursement reducing benefits of the repricing services to the No Surprises Act environment. It is through United's use of this

service that MPI engaged in negotiating pressure tactics upon market anesthesia providers to aid United in significantly reducing Empire Plan out-of-network reimbursement rates.

281.   Taken as a whole, these factual allegations establish an antitrust conspiracy. United entered into the arrangement not just because MPI would assist it in repricing claims and thereby potentially lower out-of-network reimbursement. It entered the arrangement because *it knew* that MPI was entering into similar arrangements with its major competitors. Therefore, its ability to dramatically reduce out-of-network reimbursement rates would be assured because providers would have no choice but to accept these lower rates. And, since its competitors were using the same repricing methodology, it would be insulated from losing business to them when it dramatically lowered reimbursement rates.

282.   Likewise, MPI, when entering into the arrangement with United, knew that it was facilitating a price coordination scheme among competitors. Indeed, MPI's entire marketing program was how its repricing methodology was sued by all the major health payers. MPI also knew that its uniform repricing methodology was accepted more than 93% of the time by providers.

283.   Because of the extensive reimbursement data from all major market competitors, it is also plausible that MPI was fully aware that United was dramatically reducing reimbursement levels to market anesthesia providers below competitive levels and would thereby reduce output and quality.

284.   Finally, United, far from simply recommending action to the Empire Plan, has substantial control over the Empire Plan by setting and determining reimbursement rates, selecting in-network providers, processing and adjudicating claims, paying claims, and negotiating dispute resolutions. It earns more money the more savings it generates.) Given this

level of authority, coupled with the significant competitive interest that United has in lowering the reimbursement rates for hospital anesthesia providers to below competitive levels, renders United's actionable involvement in this conspiracy plausible.

**Antitrust Injury to Patients in the Relevant Market**

285.  The harm to competition required for antitrust injury is established by demonstrating that a defendant's anticompetitive behavior had adverse effects on the price, *quality, or output* of the relevant good or service.

286.  Here, there are ample facts alleged to render plausible market-wide adverse effects of the quality or output of the anesthesia services.

287.  Indeed, from the perspective of the consumer-patient, the actions of United and MPI has required the closure of operating and procedure rooms for lack of available anesthesiologists, the lengthening of OR schedules and wait times, the curtailment anesthesia-related services, the layoff of highly trained and qualified anesthesia staff, the suspension of efforts to recruit, hire, and retain highly trained and high quality anesthesiologists, and the halting of new equipment and technology acquisitions.

288.  If left unabated, the current severe financial crises caused by the actions of United and MPI will cause many of the anesthesia practices in the market to close their doors, further exacerbating output and quality reductions.

289.  For these reasons, the facts indicated plausible harm to competition in the relevant anesthesia market here caused by reduced output and quality.

290.  Additionally, the actions of United and MPI will also lead to market-wide price increases.

291.   United, aided by MPI, is using its significant market power to drive down out-of-network anesthesia reimbursement rates in the New York metropolitan area knowing full well that the impact of lower reimbursement rates will be to drive out anesthesia providers.

292.   Eventually, this will significantly benefit United because United, through its OptumCare subsidiary, provides anesthesia services in market and is looking to expend its delivery of all healthcare services, including anesthesia services, in the New York metropolitan area.

293.   Once United and MPI succeed in driving competing anesthesia practices from the market, OptumCare will be the proverbial "only game in town," able thereby to demand supra-competitive prices from United's health plan competitors and other third-party health care payers. This will, in turn, enable United to maintain supra-competitive premium pricing in local health plan and insurer markets.

294.   It will finally give United a supra-competitive advantage when negotiating with customers and hospital advisers because of its ability, through OptumCare, to control access to and the supply of anesthesia services in the market.

295.   Thus, Defendants' actions are causing adverse economic effects, such as decreased quality or output, in the market for the delivery of anesthesia services in the New York metropolitan area.

296.   Moreover, there is no reasonable, pro-competitive justification for Defendants' actions, much less one that outweighs these anti-competitive effects. Indeed, while United is decreasing the amount it pays for anesthesia services in the relevant market, it is not passing on these savings to patients or the purchasers of health care coverage.

297.   For these reasons, judicial intervention is vitally needed.

## FIRST CAUSE OF ACTION

298.    LIA repeats and re-alleges each of the above paragraphs as though fully set forth herein.

299.    At all times relevant to this Complaint, under the circumstances listed above, Defendants have entered contracts, combinations, or conspiracies in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

300.    These contracts, combinations, or conspiracies have caused substantial anticompetitive effects, including the exclusion of competition by LIA and other anesthesia providers, ultimately leading to lower quality and output of anesthesia services available to patients.

301.    These contracts, combinations, or conspiracies have no legitimate business justification or offsetting procompetitive benefit. They achieve no legitimate efficiency benefit to counterbalance the anticompetitive effects that they cause.

302.    Because of the foregoing, LIA has been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

303.    LIA repeats and re-alleges each of the above paragraphs as though fully set forth herein.

304.    United possesses monopsony power in the market for the reimbursement of anesthesia services in the New York metropolitan area.

305.    United is willfully maintaining that monopsony power through anticompetitive conduct including, but not limited to, dramatically decreasing the reimbursement rate for

anesthesia services in the relevant market to below-market and below-cost levels to drive anesthesia providers from the market.

306.    United is leveraging that monopsony power to gain an anticompetitive advantage in the market for the provision of anesthesia services in the New York metropolitan area.

307.    Because of the foregoing, LIA has been damaged in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

308.    LIA repeats and re-alleges each of the above paragraphs as though fully set forth herein.

309.    United has engaged in predatory or anticompetitive conduct including, but not limited to, dramatically decreasing the reimbursement rate for anesthesia services in the relevant market to below-market and below-cost levels to drive anesthesia providers from the market.

310.    United undertook this conduct with the specific intent to monopsonize.

311.    United has a dangerous probability of achieving monopsony power.

312.    Because of the foregoing, LIA has been damaged in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION

313.    LIA repeats and re-alleges each of the above paragraphs as though fully set forth herein.

314.    Defendants possess and exercise market power in the relevant product and geographic markets identified in this Complaint.

315.   At all times relevant to this Complaint, Defendants, have entered contracts, combinations, or conspiracies in unreasonable restraint of trade in violation of the Donnelly Act, General Business Law §§ 340, *et seq*.

316.   These contracts, combinations, or conspiracies have caused substantial anticompetitive effects, including the exclusion of competition by LIA and other providers of anesthesia services, ultimately leading to lower quality anesthesia services available to patients.

317.   These contracts, combinations, or conspiracies have no legitimate business justification or offsetting procompetitive benefit. They achieve no legitimate efficiency benefit to counterbalance the anticompetitive effects that they cause.

318.   Because of the foregoing, LIA has been damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

319.   LIA repeats and re-alleges each of the above paragraphs as though fully set forth herein.

320.   LIA was entitled to be paid at a reasonable rate by United for the medically necessary, covered health care services listed above to the United health plan enrollees at issue.

321.   United improperly and without justification failed to timely and properly pay LIA for the medically necessary and covered services it provided, as enumerated above.

322.   United benefitted from the services rendered by LIA because LIA discharged the obligations that Empire owed the health plan enrollees. But for the services rendered by LIA, United would have a duty under the relevant health plans to provide benefits to their members for the medically necessary anesthesia services they require.

323.   As a result of the non-payment of the medically necessary services s performed by the Practice, United also retained funds designated and reserved for the payment of claims pursuant to the health plan documents. Indeed, all health and other benefit plans conduct an actuarial analysis to determine the proper funding of the plan based upon the members and the anticipated claims. In other words, health plans determine the cost of paying valid claims and set aside the funds necessary for such payment.

324.   Pursuant to the relevant health plan documents, United had an obligation to pay for medically necessary services, such as those provided to the enrollees at issue here. By not paying for medically necessary claims, Empire retained an improper benefit.

325.   This is so even though United may have been acting as an administrator for a self-funded health plan. In that role, United is responsible for processing claims at the level of benefits determined by the plan and for performing other administrative functions. Empire provides these administrative services pursuant to a contract with the plan sponsors in exchange for which it receives a fee.

326.   United's customary administrative services agreements for self-funded insurance plans provide for administrative fees, *inter alia*, based upon a percentage of the payment reductions obtained by United.

327.   For all these reasons, United was unjustly enriched by not paying LIA at a reasonable rate, or in some cases at all.

328.   This enrichment was at LIA's expense.

329.   Given the facts and circumstances, United must return this unjust benefit to LIA.

330.   By reason of the foregoing, LIA has been damaged in an amount to be determined at trial.

331. By reason of the foregoing, Defendants have engaged in reckless and morally reprehensible conduct, therefore entitling LIA to recover punitive damages.

## DEMAND FOR RELIEF

**WHEREFORE**, the Plaintiff, Long Island Anesthesiologists, PLLC, respectfully requests the following relief:

(a)     On the first cause of action, a declaration that Defendants' conduct constitutes violations of Sherman Act § 1, 15 U.S.C. § 1; a permanent injunction preventing Defendants and their agents and employees from continuing their unlawful actions set forth herein, including engaging in retaliatory and punitive negotiations with Plaintiff; an award of damages in an amount to be determined at trial, to be trebled according to law, to compensate LIA for the damages it incurred from Defendants' violations of law; an award of prejudgment interest; and an award of reasonable attorneys' fees and the costs of suit incurred.

(b)     On the second cause of action, a declaration that United's conduct constitutes violations of Sherman Act § 2, 15 U.S.C. § 2; a permanent injunction preventing United and its agents and employees from continuing their unlawful actions set forth herein, including engaging in retaliatory and punitive negotiations with Plaintiff; an award of damages, in an amount to be determined at trial, to be trebled according to law, to compensate LIA for the damages it incurred from United's violations of law; an award of prejudgment interest; and an award of reasonable attorneys' fees and the costs of suit incurred.

(c)     On the third cause of action, a declaration that United's conduct constitutes violations of Sherman Act § 2, 15 U.S.C. § 2; a permanent injunction preventing United and its agents and employees from continuing their unlawful actions set forth herein, including engaging in retaliatory and punitive negotiations with Plaintiff; an award of damages, in an amount to be determined at trial, to be trebled according to law, to compensate LIA for the damages it incurred from United's violations of law; an award of prejudgment interest; and an award of reasonable attorneys' fees and the costs of suit incurred.

(d)     On the fourth cause of action, an award of damages in an amount to be determined at trial.

(e)     On the fifth cause of action, an award of compensatory and punitive damages in an amount to be determined at trial.

(f)    Such other and further relief this Court deems just and proper including the costs, disbursements, attorney's fees, and other allowances of this action.

Dated: May 28, 2024
Uniondale, New York

HARRIS BEACH, PLLC.
*Attorneys for Plaintiff*

By _____

Roy W. Breitenbach

333 Earle Ovington Boulevard
Uniondale, New York 11553
(516) 880-8378

TO:    ALL COUNSEL OF RECORD

## <u>JURY TRIAL DEMAND</u>

Plaintiff, Long Island Anesthesiologists, P.C. by its attorneys, Harris Beach PLLC, hereby demands a jury trial under Fed. R. Civ. P. 38(b) on all claims so triable.

Dated: Uniondale, New York
      May 28, 2024

              HARRIS BEACH, PLLC
              *Attorneys for Plaintiff*

              By: _____
                    Roy W. Breitenbach

              The Omni
              333 Earle Ovington Boulevard
              Suite 901
              Uniondale, New York 11553
              (516) 880-8484

TO: ALL COUNSEL OF RECORD