UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

LONG ISLAND ANESTHESIOLOGISTS
PLLC,

                      Plaintiff,

          v.

UNITED HEALTHCARE INSURANCE
COMPANY OF NEW YORK INC., *as
Program Administrator for the Empire Plan
Medical/Surgical Program*, and MULTIPLAN
INC.,

                      Defendants.

**MEMORANDUM & ORDER**
22-CV-04040 (HG)

**HECTOR GONZALEZ**, United States District Judge:

      I previously dismissed the complaint in this action because Plaintiff Long Island

Anesthesiologists PLLC's ("LIA") had failed to allege an antitrust injury and could therefore not

sustain its Sherman Act Section 1 or Section 2, 15 U.S.C. §§ 1–2 ("Section 1" and "Section 2"),

claims against Defendants United Healthcare Insurance Company of New York Inc. ("United")

and MultiPlan Inc. ("MultiPlan"). *See Long Island Anesthesiologists PLLC v. United Healthcare

Ins. Co.*, No. 22-cv-4040, 2023 WL 8096909, at *3–6 (E.D.N.Y. Nov. 21, 2023) ("*LIA I*"). I also

found that Plaintiff had failed to allege the existence of a Section 1 conspiracy because LIA

failed to "allege any facts suggesting that United and MultiPlan conspired or agreed to work

together to restrain trade unlawfully." *Id.* at *6–7. Having dismissed Plaintiff's federal claims, I

also declined to exercise supplemental jurisdiction over Plaintiff's restraint of trade claim under

New York's Donnelly Act, N.Y. Gen. Bus. Law §§ 340 *et seq.* ("Donnelly Act"), and its claim

for unjust enrichment. *Id.* at *8.

Plaintiff moved for leave to file an amended complaint on February 2, 2024, *see* ECF No. 54, and I granted the motion, *see* May 15, 2024, Text Order.  Plaintiff filed its Amended Complaint ("AC") on May 28, 2024.  ECF No. 58.  The AC asserts the same five claims as before.  First, it alleges that United and MultiPlan have engaged in an antitrust conspiracy to restrain trade in violation of Section 1.  AC ¶¶ 298–302.  Next, LIA asserts that United possesses monopsony[1] power in the relevant market, that it is willfully maintaining that power through anticompetitive conduct, and that it is leveraging that power to gain an anticompetitive advantage in the relevant market, in violation of Section 2.  *Id.* ¶¶ 303–07.  Third, LIA asserts that United has engaged in predatory or anticompetitive conduct in an attempt to acquire monopsony power and that it has a dangerous probability of achieving monopsony power, also in violation of Section 2.  *Id.* ¶¶ 308–12.  Fourth, LIA asserts that United and MultiPlan have engaged in an antitrust conspiracy to restrain trade in violation of the Donnelly Act.  *Id.* ¶¶ 313–18.  Finally, LIA asserts that United was unjustly enriched by not reimbursing LIA at a reasonable rate.  *Id.* ¶¶ 319–31.

Unfortunately for Plaintiff, the AC suffers from many of the same deficiencies as the original complaint.  Each Defendant, unsurprisingly, has moved to dismiss the AC.  *See* ECF No. 61-1 (United Mot.); ECF No. 62-1 (MultiPlan Mot.).  Plaintiff filed an opposition, *see* ECF No. 64 (Plaintiff's Opp'n), and Defendants filed their replies, *see* ECF No. 66 (MultiPlan Reply); ECF No. 67 (United Reply).  For the reasons set forth below, I again grant Defendants' motions to dismiss.  I assume basic familiarity with the factual and procedural background of this case and write only as necessary to resolve the instant motions.

---

[1]     A monopsony is a market dominated by a single buyer who controls the market.  *See Monopsony*, Black's Law Dictionary (12th ed. 2024).

## **FACTUAL BACKGROUND**

I draw the following facts from the AC.[2]  LIA is a private anesthesia services provider
located in Suffolk County, New York.  AC ¶¶ 1, 19.  LIA provides anesthesia services to patients
at Good Samaritan Hospital Medical Center in West Islip, New York, and at other physicians'
offices and surgery centers throughout the New York metropolitan area.  *Id*. ¶¶ 20, 24.  LIA, like
many anesthesiology practices in the New York metropolitan area, has an out-of-network
relationship with most health insurance providers.  *Id.* ¶¶ 36–38.  United is a health insurer and
health plan provider and a subsidiary of UnitedHealth Group Incorporated ("UHG"), a multi-
national managed healthcare and insurance company and the world's second largest healthcare
company by revenue.  *Id.* ¶¶ 2–3, 39–45.  Relevant to the instant action, United is also the
administrator of the Empire Plan, a health plan in which roughly 1.2 million public-sector
employees in the New York metropolitan area are enrolled.  *Id.* ¶¶ 2–3, 71–76, 94.
Approximately 40% of LIA's revenue comes from the Empire Plan and LIA alleges that the
Empire Plan makes up a similar share of revenue for other anesthesia groups in the New York
metropolitan area.  *Id.* ¶¶ 3, 104–05.

According to LIA, prior to January 2022, the Empire Plan reimbursed out-of-network
physicians at amounts approximating the "usual, customary, and reasonable" rate for medical
services in the geographic area in which the services were provided.  *Id.* ¶ 95.  This practice did
not change when, in March 2015, the Empire Plan began using the independent dispute

---

[2]    I am "required to treat [Plaintiff's] factual allegations as true, drawing all reasonable
inferences in favor of Plaintiff[] to the extent that the inferences are plausibly supported by
allegations of fact."  *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d Cir. 2021).
I therefore "recite the substance of the allegations as if they represented true facts, with the
understanding that these are not findings of the [C]ourt, as [I] have no way of knowing at this
stage what are the true facts."  *Id.*

3

resolution ("IDR") process established by the New York Surprise Bill Law ("Surprise Bill Law") to settle reimbursement disputes between health plans and out-of-network physicians. *Id.* ¶¶ 107–16. However, in January 2022, after the Federal No Surprises Act ("No Suprises Act") took effect, LIA alleges that the Empire Plan decreased the rates at which it reimbursed out-of-network providers by more than 80% after determining that it was not bound by the Surprise Bill Law. *Id.* ¶¶ 4, 120–29.

According to Plaintiff, MultiPlan coordinates a repricing scheme among health insurance payers to suppress payments to health care providers. *Id.* ¶ 170. MultiPlan allegedly uses analytic tools to adjust out-of-network claims, reducing reimbursement amounts to a value below what the provider originally requested. *Id.* ¶¶ 170–71. MultiPlan provides this service to all 15 of the largest health insurers in the United States. *Id.* ¶ 181. MultiPlan profits from repricing claims by charging health care payers, such as United, a fee based on the savings between a provider's original claim and the reduced amount accepted after repricing. *Id.* ¶ 172. According to LIA, because insurers know competitors are using the same repricing tools, they can reduce reimbursement rates without fear that providers and enrollees will go somewhere else. *Id.* ¶¶ 174–77.

Plaintiff alleges that after the Empire Plan determined that it was not covered by the Surprise Bill Law's IDR process, MultiPlan began to communicate with LIA and other anesthesiology providers, identifying itself as working with United, in an effort to pressure providers into accepting the lower reimbursement rates offered by MultiPlan. *Id.* ¶¶ 4, 154–59. In these communications, MultiPlan allegedly demanded rapid response times and requested onerous and detailed documentation from providers related to reimbursement claims. *Id.* ¶¶ 154–59. Plaintiff alleges that these communications are designed to force anesthesia

providers to abandon their challenges to the Empire Plan's newly decreased reimbursement rates and that the tactic has been effective because practices lack the resources to pursue challenges to the reimbursement amounts. *Id.* ¶¶ 159–61.

LIA alleges that United's decision to lower reimbursement rates for anesthesia services will decrease the availability of high-quality anesthesia services in the New York metropolitan area and hinder out-of-network practices' ability to recruit and retain new talent. *Id.* ¶¶ 5, 200–22. Due to United's size and market share, LIA claims that the lower rates will force many anesthesia practices out of the market by going out of business or being compelled to sell their practices. *Id.* ¶¶ 7, 224–28. Additionally, LIA alleges that patients with high-deductible plans or significant cost-sharing requirements for out-of-network services could face substantially higher costs for medically necessary services. *Id.* ¶ 229. LIA claims that United's actions aim to drive anesthesia providers out of business to benefit its "subsidiary," OptumCare, which employs physicians, including anesthesia providers. *Id.* ¶¶ 7, 225–27, 291–94. According to LIA, OptumCare is the largest employer of physicians in the United States and employs more than 50 anesthesiologists in the New York metropolitan area. *Id.* ¶¶ 53, 60.

## LEGAL STANDARD

"Rule 8(a)(2) provides that a complaint must include a short and plain statement of the claim showing that the pleader is entitled to relief." *Mohammad v. N.Y. State Higher Educ. Servs. Corp.*, 422 F. App'x 61, 62 (2d Cir. 2011).[3] A complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002). The Second Circuit has defined "fair notice" in this

---

[3]     Unless otherwise indicated, when quoting cases, all internal quotation marks, alteration marks, emphases, footnotes, and citations are omitted.

context as "that which will enable the adverse party to answer and prepare for trial . . . and identify the nature of the case." *Wynder v. McMahon*, 360 F.3d 73, 79 (2d Cir. 2004). A shotgun pleading that is neither clear nor concise goes against the fundamental principles of Rule 8. *See Digilytic Int'l FZE v. Alchemy Fin., Inc.*, No. 20-cv-4650, 2022 WL 912965, at *5 (S.D.N.Y. Mar. 29, 2022) ("Shotgun pleadings are those which incorporate by reference the previous paragraphs of allegations and merely recite the elements of each claim, leaving defendants and the court to parse out which facts apply to which claim."); *see also Litwak v. Tomko*, No. 16-cv-00446, 2018 WL 1378633, at *6 (M.D. Pa. Mar. 19, 2018) (finding that a complaint that "intermingles seemingly unrelated fact[s] and conclusory statements with claims based on a variety of legal theories" is "a shotgun pleading" that "does not comply with the mandates of Rule 8").

Additionally, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of [p]laintiff['s] claims for relief." *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 155 (E.D.N.Y. 2018). Although all allegations contained in a complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

### I.    Issue Preclusion

Defendants argue that Plaintiff's antitrust claims are precluded by the decision of the New York Supreme Court, Albany County, in *Joseph v. Corso*, No. 902227-22, 2023 WL

6

12011473 (N.Y. Sup. Ct. July 13, 2023), which addressed the applicability of the Surprise Bill Law to the Empire Plan.[4]  *See* ECF No. 61-1 at 14; ECF No. 62-1 at 13.  Specifically, Defendants point to the *Joseph* court's holdings that:  (1) "the Surprise Bill Law is not an applicable insurance law to the Empire Plan" and (2) "United cannot and does not . . . control the Empire Plan's coverage or reimbursement decisions."  2023 WL 12011476, at *2–3; *see also* ECF No. 61-1 at 14; ECF No. 62-1 at 13.  Plaintiff responds that the first *Joseph* holding is irrelevant "because the No Surprises Act merely created the opportunity upon which Defendants' unlawful scheme was able to be applied to the Empire Plan."  ECF No. 64 at 27.  Additionally, Plaintiff contends that the second holding from *Joseph* "related only to United's inability to control the Empire Plan's decision to follow the No Surprises Act."  *Id.* at 29.

I agree with Plaintiff that the *Joseph* decision has no bearing on this case—the gravamen of which is that Defendants engaged in anticompetitive conduct in violation of the Sherman Act. Because *Joseph* considered only whether United controlled the Empire Plan's decision to follow the No Surprises Act—and did not assess United's alleged use of its administrator role to manipulate reimbursement rates—this issue was not actually litigated in *Joseph*, and collateral estoppel does not bar Plaintiff's claims.  *See Heriveaux v. Lopez-Reyes*, No. 17-cv-9610, 2018 WL 3364391 (S.D.N.Y. July 10, 2018) ("[C]ollateral estoppel does not bar Plaintiff's claim because the . . . issue was not actually litigated or decided."), *aff'd*, 779 F. App'x 758 (2d Cir. 2019).

## II.    Plaintiff's Federal Claims

Plaintiff asserts three claims under the Sherman Act.  First, Plaintiff claims that United and MultiPlan engaged in an antitrust conspiracy to restrain trade in violation of Section 1.  AC

---

[4]    The Appellate Division recently affirmed the Supreme Court's *Joseph* decision.  *See Joseph v. Corso*, 221 N.Y.S.3d 279 (N.Y. App. Div. 2024).

¶¶ 298–302.  Next, Plaintiff alleges that United violated Section 2 because it possesses monopsony power that it is willfully maintaining through anticompetitive conduct.  *Id.* ¶¶ 303–07.  And, finally, Plaintiff alleges that United violated Section 2 because it has engaged in predatory or anticompetitive conduct in an attempt to acquire monopsony power.  *Id.* ¶¶ 308–12.

In attempting to remedy the deficiencies I identified in *LIA I*, Plaintiff abandons the "short and plain statement" required by Rule 8 in favor of a sprawling and unfocused pleading.  However, the issue with the prior Complaint was not its length.  The AC now spans 331 paragraphs but fails to include a single factual allegation that plausibly suggests United and MultiPlan conspired to restrain trade.  Instead, Plaintiff devotes extensive portions of the AC to irrelevant or tangential matters.  Eighteen paragraphs are devoted to detailing the size and revenues of UHG—an entity that is not even a party to this action.  *See* AC ¶¶ 39–47, 62–70.  Fourteen more describe OptumCare, another non-party, and its subsidiaries, most of which operate outside the alleged geographic market at issue here.  *See id.* ¶¶ 48–61.  Plaintiff also includes nine paragraphs summarizing media reports about UHG that bear no apparent connection to the claims at issue.  *See id.* ¶¶ 235–43.  Throughout, the AC intermixes sweeping allegations untethered to any identified cause of action—for example, claims that MultiPlan engages in a price coordination scheme involving "all the top 15 health insurers" in the country.  AC ¶¶ 276–83.  This kitchen-sink approach obscures rather than clarifies the basis for Plaintiff's claims and falls short of Rule 8's basic pleading requirements.  *See Javier v. Beck*, No. 13-cv-2926, 2014 WL 3058456, at *1 (S.D.N.Y. July 3, 2014) ("The Complaint is a sprawling 287-paragraph jumble that is far from the short and plain statement prescribed by Rule 8.").  This lack of clarity is not merely a pleading defect under Rule 8—it reflects a more fundamental failure to meet the plausibility standard required by Rule 12.  In particular, Plaintiff's allegations

8

fall short of establishing antitrust standing, which is a necessary threshold in any private antitrust action.

### A.    Antitrust Standing

As I explained in *LIA I*, 2023 WL 8096909 at *3–4, in an antitrust case, a private plaintiff must have constitutional standing under Article III as well as antitrust standing.  *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983).  Antitrust standing is "a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement [the court] must dismiss [the case] as a matter of law." *Gatt Commc'ns Inc. v. PMC Assocs. L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013).  To establish antitrust standing with respect to both its Section 1 and Section 2 claims as a private plaintiff, LIA must do more than allege an injury causally related to unlawful conduct—it must plausibly allege that it suffered "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [D]efendants' acts unlawful."  *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  Therefore, an injury does not constitute an "antitrust injury" unless "it is attributable to an anti-competitive aspect of the practice under scrutiny."  *See Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 334 (1990).

Courts in this Circuit "employ a three-step process for determining whether a plaintiff has sufficiently alleged antitrust injury."  *Gatt*, 711 F.3d at 76.  First, a plaintiff must "identify the practice complained of and the reasons such a practice is or might be anticompetitive."  *Id.*  Next, the court "identif[ies] the actual injury the plaintiff alleges[, which] requires [the court] to look at ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct."  *Id.*  Finally, the court must "compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges."  *Id.*

9

Here, I find that Plaintiff has again failed to plead an antitrust injury. According to Plaintiff, it has been injured because "United has engaged in predatory or anticompetitive conduct including, but not limited to, dramatically decreasing the reimbursement rate for anesthesia services in the relevant market to below-market and below-cost levels to drive anesthesia providers from the market." AC ¶ 309. Plaintiff also alleges that MultiPlan assists United in its efforts by "using data-driven negotiation and/or reference-based pricing methodologies" to "reduce out-of-network reimbursement rates." *Id.* ¶¶ 197–99. Plaintiff further avers that the dramatic reduction in reimbursement rates has resulted in "decreased output and quality in the market for anesthesia services in the New York metropolitan area." *Id.* ¶¶ 228, 261, 283, 286.

In *LIA I*, 2023 WL 8096909 at *5–6, I found that Plaintiff had not sufficiently alleged antitrust injury because: (1) Plaintiff did not sufficiently allege "an actual adverse effect on competition as a whole in the relevant market but ha[d] merely alleged that it ha[d] been harmed as an individual competitor" and (2) without a plausible allegation of conspiracy or "something more," a "health plan lowering reimbursement rates paid to a physician practice is generally insufficient to establish antitrust injury." As discussed further herein, while the AC attempts to address these issues identified in *LIA I* by adding allegations regarding other anesthesia service providers and communications between Defendants, those allegations, without more, are also not enough to establish antitrust standing. *See generally* AC ¶¶ 162–221.

     i.    <u>Plaintiff Still Does Not Allege Antitrust Injury Based on Lowered Reimbursement Rates</u>

In an attempt to show market-wide harm, Plaintiff now alleges that three other anesthesia providers were affected by reduced reimbursement rates—two of which appear to claim direct harm, and one of which describes broader, generalized harm to anesthesia providers. *Id.* ¶¶ 200–

21.  However, "[h]arm to competition is different than harm to a . . . group of competitors, which does not necessarily constitute harm to competition."  *In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 380 (S.D.N.Y. 2022).  And, more importantly, the harm Plaintiff alleges is not "the type the antitrust laws were intended to prevent."  *Brunswick*, 429 U.S. at 489.

In the AC, LIA points to the statements of Long Island Anesthesia Partner's ("LIAP") Chief Operating Officer, in which he notes that "if low Empire Plan reimbursement levels continue unabated [LIAP] would, at the very least, be forced to significantly curtail its services and not allow its hospital clients to open all required operating rooms on any given day."  AC ¶ 208.  The AC alleges that the reduced Empire Plan reimbursement rates forced LIAP to withdraw from a new ambulatory surgery center, terminate both of its general surgeons, and severely limit its ability to service the five hospitals on Long Island where it is the exclusive anesthesia provider.  *See id.* ¶¶ 212–13.  Plaintiff also provides the example of New York Cardiovascular Anesthesiologists ("NYCA"), whose President states that the low Empire Plan reimbursement rates will force NYCA to significantly curtail its services, "preventing it from opening all required operating rooms," causing "significant delays in the provision of care", and resulting in "significant increases in adverse health outcomes."  *Id.* ¶¶ 216–17.  Finally, the AC recounts statements of the Chief Executive Officer of North American Partners in Anesthesia, headquartered on Long Island, in which he alleges that the reduction of reimbursement rates has exacerbated a shortage of anesthesia practitioners to the point where "[h]ospitals may not have enough anesthesia providers to support their patient population."  *Id.* ¶ 221.

Plaintiff argues that these allegations are sufficient to allege antitrust injury because "courts have repeatedly found allegations regarding the reduced availability and number of providers and a decline in quality of patient care to be sufficient to state an antitrust injury."

11

ECF No. 64 at 10 (citing *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 276 (3d Cir. 1999); *Reddy v. Puma*, No. 06-cv-1283, 2006 WL 2711535, at *4–5 (S.D.N.Y. Sept. 19, 2006); *N.Y. Medscan LLC v. N.Y. Univ. Sch. of Med.*, 430 F. Supp. 2d 140, 148–49 (S.D.N.Y. 2006)). These cases, however, are easily distinguishable from the allegations here.  In all of them, the plaintiffs were *excluded* from the market.  *See Angleico*, 184 F.3d at 274 (concluding that "Angelico's alleged injury is of the type the antitrust laws were meant to redress" because he was "shut out of competition for anticompetitive reasons"); s*ee also Reddy*, 2006 WL 2711535, at *2 (finding antitrust injury where the harm was caused by "a pattern of exclusionary behavior," including discouraging physicians from referring patients to plaintiffs and instructing physicians "not to provide post-operative care" to plaintiffs' patients); *N.Y. Medscan*, 430 F. Supp. 2d at 144 (finding antitrust injury where the harm was due to "the termination of plaintiffs as a[n] . . . approved provider" of radiology treatments "so as to eliminate the only viable competition").  That is not the case here.

Plaintiff does not allege it has been excluded from the market.  Even with reduced reimbursement rates, Plaintiff can still provide out-of-network anesthesia services or negotiate in-network participation.  *See* AC ¶¶ 117–19, 203–05.  Indeed, according to Plaintiff, the reason it and "similarly situated anesthesia groups" have not entered an "in-network participating provider agreement" with the Empire Plan is to "preserve the favorable out-of-network Empire Plan reimbursement rates." *Id.* ¶ 117–19.  Instead of exclusion due to anticompetitive conduct, what Plaintiff actually complains of is the reduction of reimbursement rates, which has made its medical practice less profitable.  *Id.* ¶¶ 120–21, 200–02.  Plaintiff's alleged "market-wide impact" stems from "lowered Empire Plan reimbursement rates." *Id.* ¶ 220.  However, lowering reimbursement rates to out-of-network providers is neither inherently unlawful nor

anticompetitive under the antitrust laws. *See W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 103 (3d Cir. 2010) ("A firm that has substantial power on the buy side of the market (i.e., monopsony power) is generally free to bargain aggressively when negotiating the prices it will pay for goods and services."). Therefore, even "if [Plaintiff and similarly situated anesthesia providers] were injured, it was not by reason of anything forbidden in the antitrust laws." *Brunswick*, 429 U.S. at 488. Plaintiff's allegations reflect harm to a subset of providers—not to competition itself—and stem from reimbursement practices that, even if harmful to the bottom-line of Plaintiff and the other providers it references in the AC, do not constitute antitrust violations. *See Atl. Richfield*, 495 U.S. at 334 (finding that an injury "will not qualify as antitrust injury unless it is attributable to an anti-competitive aspect of the practice under scrutiny"). As such, Plaintiff has not alleged a cognizable antitrust injury.

      ii.     <u>Plaintiff Has Not Pled "Something More" in Addition to the Lowering of Reimbursement Rates</u>

Although the Second Circuit does not appear to have decided the issue, as discussed above and in *LIA I*, both LIA and United agree that establishing antitrust injury requires "something more" than lowering reimbursement rates paid to a physician practice. *See* ECF No. 61-1 at 20; ECF No. 64 at 11–12; *see also Westchester Radiological Assocs. P.C. v. Empire Blue Cross & Blue Shield, Inc.*, 707 F. Supp. 708, 717 (S.D.N.Y. 1989) ("The law does not prevent a buyer with market power from negotiating a good price, or from specifying what it will buy."); *Kartell v. Blue Cross Blue Shield of Mass., Inc.*, 749 F.2d 922, 925, 929 (1st Cir. 1984) (Breyer, J.) ("A legitimate buyer is entitled to use its market power to keep prices down.").

Plaintiff provides three examples of situations in which courts have found the existence of "something more," in addition to lowered reimbursement rates, to support a plausible inference of antitrust injury. *See* ECF No. 64 at 12. In Plaintiff's first example, the court found

that plaintiff could overcome the "natural inference that as a buyer of anesthesiology services on behalf of patients, [d]efendant has incentives to procure the best quality at the lowest price" by plausibly alleging the existence of a "Blues Conspiracy" through "amended license agreements" between BlueCross BlueShield-Michigan and other "Blues" that geographically divided markets and prevented competition among the "Blues." *Anesthesia Assocs. of Ann Arbor, PLLC v. Blue Cross Blue Shield of Mich.*, No. 20-cv-12916, ECF No. 52 at 6–31 (E.D. Mich. Sept. 28, 2022) (denying in part and granting in part leave to amend). In Plaintiff's second example, the Third Circuit found that it was plausible that paying depressed reimbursement rates unreasonably restrained trade where the complaint also alleged that a health care provider paid plaintiff depressed reimbursement rates, "not as a result of independent decision making, but pursuant to a conspiracy with [defendant], under which [defendant] insulated [the health care provider] from competition in return for [the health care provider] taking steps to hobble [plaintiff]." *W. Penn*, 627 F.3d at 103–04. Finally, in Plaintiff's third example, the court found that allegations that defendant subjected plaintiff to a series of "unnecessary audits as a means to claw-back previously disbursed reimbursements," "inefficient procedure codes and requirements" that forced plaintiff "to schedule patients for two different procedures where one would suffice," and "steer[ing] patients away from independent physicians to its own facility," taken in concert with plaintiff's alleged reimbursement reductions, constituted a plausible pleading of antitrust injury. *Presque Isle Colon & Rectal Surgery v. Highmark Health*, 391 F. Supp. 3d 485, 499–500 (W.D. Pa. 2019). Plaintiff, however, has failed to allege similar facts here.

Plaintiff argues that "[t]here are three theories that the AC puts forward to allege 'something more'" akin to the examples it provides. ECF No. 64 at 12. Those theories are:

(1) "Defendants engaged in anticompetitive conduct by subjecting anesthesia providers to unreasonable timeframes[,] . . . refusing to negotiate in good faith on

reimbursement pricing, and flooding anesthesia providers with large volumes of correspondence"; (2) "Defendants engaged in a horizontal conspiracy to suppress reimbursement payments"; (3) Defendants have a "scheme to drive Plaintiff and other anesthesia providers out of business, cause them to sell their practices to hospitals, or force them in-network."

*Id.* at 12–13.  As to Plaintiff's first theory, Plaintiff's allegations that it was subject to "unreasonable timeframes" and "flood[ed]" with "large volumes of correspondence" are distinguishable from the interference with treatment decisions and patient steering in *Presque Isle*, 391 F. Supp. 3d at 499–500.  Furthermore, "[a] firm that has substantial power on the buy side of the market (*i.e.*, monopsony power) is generally free to *bargain aggressively* when negotiating prices it will pay for goods and services."  *W. Penn*, 627 F.3d at 103 (emphasis added).  Even assuming *arguendo* that MultiPlan's negotiation tactics are unethical or even unlawful, and may have caused significant financial losses to Plaintiff and its peers, "[s]uch harm . . . [is] not the type of injur[y] the antitrust laws were intended to prevent."  *See Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 218 F. Supp. 3d 389, 392 (E.D. Pa. 2016) (finding that plaintiffs failed to establish antitrust standing despite harm to plaintiffs' "operations, investments, and earnings" and allegations that defendant's "participation in the market [was] illegal under state and local regulations"), *aff'd*, 886 F.3d 332 (3d Cir. 2018).  Plaintiff may have been injured by a violation of insurance law, or maybe even by fraud, but it does not have an *antitrust* injury.

As to Plaintiff's second and third theories, they necessarily fail because, as discussed herein, *see infra* § II.C.i, Plaintiff has not plausibly alleged a conspiracy, horizontal or otherwise, between United and MultiPlan.  Therefore, "[t]here is nothing special here to take this case outside of the general rule" that a buyer is entitled to use its market power to reduce reimbursement rates.  *Kartell*, 749 F.2d at 929, 932.

15

In sum, Plaintiff's allegations—focused on reduced reimbursement rates and generalized harm to certain providers—fail to demonstrate harm to competition or the kind of exclusionary conduct necessary to establish antitrust injury.  Nor has Plaintiff plausibly alleged "something more" that would take this case outside the bounds of ordinary price negotiations.  Accordingly, Plaintiff has not pled a cognizable antitrust injury.

### B.    Relevant Market

Although Plaintiff has not adequately alleged an antitrust injury, I nonetheless address the sufficiency of Plaintiff's alleged relevant market, as this is a separate and independent basis for dismissing Plaintiff's Sherman Act claims.  "To survive a motion to dismiss, a Sherman Act claim must," in addition to plausibly alleging antitrust standing, "define a relevant market."  *In re Inclusive Access Course Materials Antitrust Litig.*, 544 F. Supp. 3d 420, 432 (S.D.N.Y. 2021) (citing *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016)).  "For antitrust purposes . . . [a] relevant product market consists of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered."  *Concord*, 817 F.3d at 52.  However, in the case of a monopsony, the market is reversed.  "[T]he market is not the market of competing sellers but of competing buyers.  This market is comprised of buyers who are seen by sellers as being reasonably good substitutes."  *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (Sotomayor, J.).

Plaintiff's alleged product market "reflects a failure to reverse all of the factors involved in light of the buyer-side nature of the alleged activity."  *Id.*  Here, Plaintiff alleges that the relevant product market is "the provision of medically necessary anesthesia services to patients."  AC ¶ 244.  United argues that Plaintiff's "alleged market is inconsistent with its antitrust theory" and I agree.  *See* ECF No. 61-1 at 24–25.  To support the interchangeability of the products in its alleged relevant market, Plaintiff alleges that only anesthesiologists with proper education,

16

training, and experience can provide these services, and other clinicians lack the expertise to be reasonable substitutes. *Id.* ¶¶ 249–50. However, that describes *Plaintiff's* own, seller side of the market; because Plaintiff is alleging a buyer-side conspiracy and monopsony power, "the proper focus is the commonality and interchangeability of the buyers, not the commonality or interchangeability of the sellers." *Todd*, 275 F.3d at 202. "While acknowledging that market definition is frequently a fact-intensive inquiry where courts are hesitant to grant a motion to dismiss," I nevertheless find Plaintiff's failure to describe the market of competing *buyers* of anesthesia services to be incongruent with its theory of antitrust injury. *Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 298 (S.D.N.Y. 2010). As such, Plaintiff has failed to adequately allege a relevant product market, and its Sherman Act claims fail for this reason as well. *See Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) ("[W]here the plaintiff . . .alleges a proposed relevant market that clearly does not encompass all interchangeable substitute [buyers] . . . the relevant market is legally insufficient and a motion to dismiss may be granted.").[5]

### C.    Plaintiff's Conspiracy and Monopsony Claims

Having determined that Plaintiff has insufficiently alleged both antitrust standing and a relevant market, I may dismiss both the Section 1 and 2 claims on either of those bases alone. *See, e.g.*, *Apotex, Inc. v. Acorda Therapeutics, Inc.*, No. 11-cv-8803, 2013 WL 12617608, at *3 (S.D.N.Y. Feb. 7, 2013) (finding that a "plaintiff seeking relief under Sections 1 and 2 . . . must establish, as a threshold matter," that it has suffered antitrust injury), *aff'd*, 823 F.3d 51 (2d Cir. 2016); *Fifth & Fifty-Fifth Residence Club Ass'n, Inc. v. Vistana Signature Experiences, Inc.*,

---

[5]     Because I find Plaintiff's alleged product market to be inadequate, I need not address its alleged geographic market as "[c]ourts have found that failure to adequately plead either of these markets is sufficient to justify dismissal." *TechReserves Inc. v. Delta Controls Inc.*, No. 13-cv-752, 2014 WL 1325914, at *4 (S.D.N.Y. Mar. 31, 2014).

No. 17-cv-1476, 2018 WL 11466157, at *12 (S.D.N.Y. Sept. 28, 2018) ("To state a claim under

either [S]ection [1] or [2,] . . . a plaintiff must plausibly allege a relevant market."). Even so,

assuming *arguendo* that Plaintiff had cleared those hurdles, its claims would still fail because it

fails to adequately allege an actionable conspiracy.

> i.   Plaintiff's Section 1 Conspiracy Claim Against United and
>      MultiPlan

First, I will consider Plaintiff's Section 1 conspiracy claim. To survive dismissal of its

Section 1 claim, Plaintiff must allege "a combination or some form of concerted action between

at least two legally distinct economic entities" that constitutes "an unreasonable restraint of

trade." *Primetime 24 Joint Venture v. NBC*, 219 F.3d 92, 103 (2d Cir. 2000). "Proof of

unilateral action does not suffice;" rather, the facts alleged "must reveal a unity of purpose or a

common design and understanding, or a meeting of minds in an unlawful arrangement."

*Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012). This requires

allegations of "direct or circumstantial evidence that reasonably tends to prove that [Defendants]

had a conscious commitment to a common scheme designed to achieve an unlawful objective."

*Id.* at 184. A complaint claiming conspiracy "must provide some factual context suggesting that

the parties reached an agreement, not facts that would be merely consistent with an agreement."

*Id.*

In *LIA I*, I found that Plaintiff had not plausibly alleged a conspiracy between United and

MultiPlan. *See* 2023 WL 8096909, at *6 ("Plaintiff has not put forth sufficient facts to state a

claim that United and MultiPlan were engaged in a conspiracy let alone a horizontal conspiracy,

which requires an agreement between two or more competitors."). Here, even with the

additional allegations in the AC, Plaintiff still fails to plausibly allege that Defendants entered

into an unlawful agreement. In its AC, Plaintiff now alleges that although MultiPlan "appears to

be nothing more than a United vendor," United and MultiPlan are actually horizontal competitors because they compete directly in the Preferred Provider Organization ("PPO") network business. AC ¶¶ 162–69.  According to Plaintiff, MultiPlan solicited United to employ MultiPlan's data-driven pricing methodology, a service already provided to many of United's competitor insurers, to suppress out-of-network reimbursement rates.  *Id.* ¶ 279.  Plaintiff alleges that in 2016, MultiPlan's Chief Revenue Officer wrote an email to United executives informing them that seven of United's top ten competitors were using MultiPlan's repricing services and that "implementing these initiatives will go a long way to bring UnitedHealth back into alignment with its primary competitor group . . . on managing out-of-network costs."  *Id.* ¶ 185.  United then allegedly agreed to employ MultiPlan for its repricing services.  *Id.* ¶ 279.  In January 2022, when the Empire Plan began following the No Surprises Act IDR process, United allegedly engaged MultiPlan to use its repricing service and negotiate reimbursement rates to "below competitive levels" for out-of-network claims on behalf of United and the Empire Plan.  *Id.* ¶¶ 280–85.

Even with the benefit of my prior decision in *LIA I*, the new allegations in the AC fall well short of adequately alleging an antitrust conspiracy.  First, Multiplan and United are not competitors in Plaintiff's alleged relevant antitrust market and therefore cannot have plausibly engaged in a "horizontal conspiracy."  *See* ECF No. 64 at 14–16.  "Horizontal conspiracies involve agreements among competitors at the same level of competition to restrain trade, such as agreements among manufacturers to fix prices for a given product and geographic market."  *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 179 (2d Cir. 2004).  Plaintiff contends that United and MultiPlan are horizontal competitors because they both own PPO networks and allegedly compete to contract with medical providers.  AC ¶¶ 163–67.  But Plaintiff defines the relevant

19

product market as the provision of medically necessary anesthesia services. *Id.* ¶ 244. There is no allegation—nor could there be—that United and MultiPlan compete in the provision of such services. Moreover, while Plaintiff asserts in a conclusory fashion that the two Defendants own PPOs and that their PPOs compete, the alleged conspiracy arises specifically from United's administration of the Empire Plan, in which United is alleged to have enlisted MultiPlan to reprice anesthesia claims. *See id.* ¶¶ 4, 163. Critically, neither United nor MultiPlan was acting as a PPO in this context: United was functioning as a claims administrator for the Empire Plan, and MultiPlan was merely acting as a vendor to United by providing repricing services at United's direction. *See id.* ¶¶ 79, 197–99 ("It is [the] extension of the [MultiPlan] repricing strategy to the [No Surprises Act] environment that is at work in the events underlying this lawsuit.").

Plaintiff does not allege that MultiPlan competed with United in this capacity or that it independently contracted with providers for Empire Plan claims. Instead, the AC itself describes a vertical relationship: MultiPlan is alleged to act as a vendor, providing repricing or billing support services to United. *See id.* ¶ 4 (United "enlisted [MultiPlan] to assist it in a scheme" to reduce reimbursement rates.); *see also id.* ¶ 184 (describing United as MultiPlan's "largest customer"). That both entities may operate PPOs elsewhere in the healthcare ecosystem does not convert this vertical service-provider relationship into a horizontal conspiracy. *See United States v. Aiyer*, 470 F. Supp. 3d 383, 403 (S.D.N.Y. 2020) ("A horizontal conspiracy exists when the coconspirators are competitors at the same level of the market structure rather than combinations of persons at different levels of the market structure . . . which are termed vertical restraints."), *aff'd*, 33 F.4th 97 (2d Cir. 2022). To hold otherwise would be to condemn seemingly every business relationship between large healthcare companies aimed at improving their respective

margins as potentially illegally anticompetitive.  Plaintiff's failure to allege that United and Multiplan were acting as competitors in the relevant context is fatal to its horizontal conspiracy theory.  *Ivoclar Vivadent, Inc. v. Ne. Dental & Med. Supplies, Inc.*, No. 04-cv-0262, 2006 WL 8455722, at *4 n.13 (W.D.N.Y. Aug. 30, 2006) ("A restraint is not horizontal because it has horizontal effects but rather because it is the product of a horizontal agreement, i.e., a restraint imposed by agreement between competitors.").  As explained in *In re Aluminum Warehousing Antitrust Litigation*, "[p]laintiffs claim to have alleged a horizontal conspiracy in restraint of trade, but they do not allege that [defendants] are horizontal competitors.  In the absence of the latter, the former cannot be correct."  No. 13-md-2481, 2014 WL 4277510, at *32 (S.D.N.Y. Aug 29, 2014).

Second, Plaintiff still fails to allege facts suggesting a "meeting of minds in an unlawful arrangement."  *Anderson News*, 680 F.3d at 183.  The AC asserts that United and MultiPlan conspired to suppress reimbursement rates to drive out anesthesia providers, allegedly to benefit United's "subsidiary" healthcare provider, OptumCare.  AC ¶¶ 291-94.  But as the Supreme Court made clear in *Twombly*, "a bare assertion of conspiracy will not suffice" to survive a motion to dismiss.  550 U.S. at 556.  First, Plaintiff's own allegations contradict the assertion that OptumCare is United's subsidiary.  According to Plaintiff, "UHG divides its businesses into two main platforms:  Optum and UnitedHealthcare."  AC ¶ 47.  UnitedHealthcare Insurance Company of New York—the named Defendant—is a subsidiary of UnitedHealthcare.  *Id.* ¶¶ 11, 71.  Optum, meanwhile, includes separate business segments, including Optum Health, which houses OptumCare.  *Id.* ¶¶ 48–49.  Plaintiff alleges that OptumCare operates physician practices, including several in the New York metropolitan area that employ anesthesiologists.  *See id.* ¶ 54–60.  Plaintiff repeatedly characterizes OptumCare as "United's subsidiary"—a designation

plainly inconsistent with the corporate structure alleged in the AC.  *See e.g., id.* ¶¶ 225, 292.

Based on that structure, United and OptumCare are at most sister companies, operating in

distinct business units under UHG's broader corporate umbrella.  *See Holland v. JPMorgan*

*Chase Bank, N.A.*, No. 19-cv-00233, 2019 WL 4054834 (S.D.N.Y. Aug. 28, 2019) (finding that

two sister companies "were entitled to the presumption of separateness afforded to related

corporations"); *see also Karupaiyan v. CVS Health Corp.*, No. 19-cv-8814, 2021 WL 4341132,

at *2 n.3 (S.D.N.Y. Sept. 23, 2021) ("Although CVS, Aetna, and AHM are all part of the same

corporate family, the character of these distinct entities is highly relevant to several of

[p]laintiff's claims.").

       This mischaracterization is not a trivial error; it undermines the plausibility of Plaintiff's

theory.  The AC lacks any allegation that United and OptumCare communicated, coordinated, or

otherwise shared a common objective.  Absent such factual support, the theory that United

conspired with MultiPlan to drive competitors out of the market for the benefit of a legally

distinct sister company is not just implausible—it is wholly speculative.  *Cf. In re Suboxone*

*(Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-md-2445, 2017 WL

4642285, at *6–7 (E.D. Pa. Oct. 17, 2017) (rejecting plaintiffs' "single economic entity" theory

between defendant and a sister company where the complaint did "not contain a single factual

allegation" from which the court could "reasonably infer that [defendant] exercised any control

or pervasive domination over" its sister company).  Again, it is worth backing up and

considering the breadth of this argument.  As LIA would have it, so long as an antitrust plaintiff

can identify some potential benefit to some member of an alleged co-conspirator's corporate

family connectable to the alleged agreement, he would plausibly allege an antitrust conspiracy.

But that mix-and-match approach, which would have the practical effect of punishing affiliated

businesses for competing in different markets, would prohibit on competition grounds virtually all commercial relationships between them, an impermissible result under *Twombly*. *See* 550 U.S. at 566 ("[I]f alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a [Section] 1 violation against almost any group of competing businesses would be a sure thing.").

Furthermore, Plaintiff's factual allegations do not support the conclusion that the agreement between United and Multiplan had an unlawful objective of reducing competition. Instead, they merely suggest that United engaged Multiplan to reduce out-of-network reimbursement rates. AC ¶¶ 185, 189. As has now been discussed at length, "[t]he existence of a lawful business relationship does not plausibly suggest a separate, unlawful agreement to restrain trade." *Honeywell Int'l Inc. v. Ecoer Inc.*, No. 24-cv-1464, 2024 WL 3521591, at *7 (S.D.N.Y. July 23, 2024). None of Plaintiff's factual allegations suggests that United and MultiPlan entered into an agreement to eliminate competition in the market for anesthesia services. To the contrary, Plaintiff's allegations suggest that it was in the Defendants' independent self-interests to lower reimbursement rates. *See* AC ¶ 172 ("[MultiPlan] makes money on claims repricing by charging its health care payer customers a fee based on the difference between a healthcare providers' original claim and the amount the provider accepts following [MultiPlan]'s repricing of the claim."); *see also id.* ¶¶ 89–90 ("keeping out-of-network reimbursement rates as low as possible brings substantial financial benefits to United" because it charges a "savings fee each time it secures a discount on out-of-network provider's billed charges"). Plaintiff's factual allegations do not "tend to exclude independent self-interested conduct as an explanation for [D]efendants' parallel behavior." *Twombly*, 550 U.S. at 552. Rather, the most straightforward explanation for the agreement between United and MultiPlan,

based on the facts alleged, is that it served their common financial interests. *See Caithness Long Island II, LLC v. PSEG Long Island LLC*, No. 18-cv-4555, 2019 WL 6043940, at *4 (E.D.N.Y. Sept. 30, 2019) ("[A]n antitrust plaintiff's complaint can be dismissed where there is an obvious alternative explanation to the facts underlying the alleged conspiracy among the defendants."). More fundamentally, by Plaintiff's own explanation, it would work against the alleged co-conspirators' own economic interests to agree to try to wipe out the provision of anesthesia services. Such conduct would not just reduce their ability to aggressively reduce reimbursements to out-of-network providers; it would eliminate it altogether. And even if United could eventually try to redirect some of the anesthesia services to its sister company, MultiPlan lacks any non-speculative reason to join in such a scheme. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 112 (2d Cir. 2018) (finding that "defendants had an unlikely motive to conspire" given that "the alleged conspiracy [was] economically implausible"). Accordingly, I find that Plaintiff's factual allegations concerning a Section 1 conspiracy are not "enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and grant Defendants' motion to dismiss the Section 1 claim for this additional reason.

ii.    Plaintiff's Monopsonization and Attempted Monopsonization Claims Against United

As discussed in the introduction to this section, because Plaintiff has not plausibly alleged antitrust injury or a relevant antitrust market, its Section 2 claims necessarily fail. *See supra* at 17–18. I nonetheless consider whether Plaintiff has adequately stated claims against United for monopsonization and attempted monopsonization under Section 2. "Monopsony power is market power on the buy side of the market. As such, a monopsony is to the buy side of the market what a monopoly is to the sell side and is sometimes colloquially called a buyer's monopoly." *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320

(2007).  I apply the same pleading standard to a Section 2 monopsony claim that I would use for a monopoly claim.  *See id.* at 322 ("The kinship between monopoly and monopsony suggests that similar legal standards should apply to claims of monopolization and to claims of monopsonization.").  "In order to state a claim for monopsonization under Section 2 of the Sherman Act, a plaintiff must [allege]:  (1) the possession of monopsony power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Sitts v. Dairy Farmers of Am., Inc.*, 417 F. Supp. 3d 433, 476 (D. Vt. 2019).  "With respect to this second element, the possession of [monopsony] power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct."  *Mazda v. Carfax, Inc.*, No. 13-cv-2680, 2016 WL 7231941, at *15 (S.D.N.Y. Dec. 9, 2016), *aff'd sub nom. Maxon Hyundai Mazda v. Carfax, Inc.*, 726 F. App'x 66 (2d Cir. 2018).  "To [state] a claim for attempted monopsonization, a plaintiff must [allege]:  (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopsonize and (3) a dangerous probability of achieving monopsony power."  *Sitts*, 417 F. Supp. 3d at 476.  "Both [monopsonization] and attempted [monopsonization] claims therefore have anticompetitive conduct as one of their elements."  *Mazda*, No. 13-cv-2680, 2016 WL 7231941 at *15.  Because it is essential to both claims, I address that element first.

Plaintiff alleges that United unilaterally "engaged in predatory or anticompetitive conduct."  *See* AC ¶¶ 304–06, 309–11.  "[S]ingle-firm activity is unlike concerted activity covered by [Section] 1, which inherently is fraught with anticompetitive risk."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993).  Indeed, Congress treats "concerted behavior more strictly than unilateral behavior."  *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010).  The

purpose of distinguishing between concerted and independent action is to avoid "judicial scrutiny of routine, internal business decisions" and "chilling vigorous competition through ordinary business operations." *See id.* The Second Circuit has described anticompetitive conduct as "conduct without a legitimate business purpose that make sense only because it eliminates competition." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014). "That definition is a narrow one, which works to ensure that exceptions to the general rule that 'businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing' are 'rare.'" *Twin Bridges Waste & Recycling, LLC v. Cnty. Waste & Recycling Serv., Inc.*, No. 21-cv-263, 2021 WL 4192606, at *7 (N.D.N.Y. Sept. 14, 2021) (quoting *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009)).

Therefore, I must determine whether Plaintiff's allegations plausibly meet this narrow standard for alleging anticompetitive conduct. Plaintiff claims that United maintains monopsony power and is leveraging it by suppressing reimbursement rates to eliminate competition, which would allow it to dominate the anesthesia services market through its OptumCare sister company. AC ¶¶ 291–95, 305–306. Although Plaintiff claims that United's suppression of reimbursement rates is exclusionary, AC ¶ 305, I find that, as alleged in the AC, United's actions are consistent with standard business incentives rather than anticompetitive conduct. *See In re Adderall*, 754 F.3d at 133 ("Anticompetitive conduct is conduct without a legitimate business purpose that makes sense only because it eliminates competition").

As alleged in the AC, "keeping out-of-network reimbursement rates as low as possible brings substantial financial benefits to United" because it charges a "savings fee each time it secures a discount on out-of-network provider's billed charges." AC ¶¶ 89–90. Absent factual allegations that United is engaged in "something more than business activity that occurs in the

normal competitive process," its conduct aligns with lawful competitive behavior rather than exclusionary conduct. *See In re Google*, 627 F. Supp. 3d at 379; *see also In re Adderall*, 754 F.3d at 135 (finding plaintiff had not alleged anticompetitive conduct where plaintiff did not allege a "course of dealing suggesting a willingness to forsake short-term profits to achieve an anticompetitive end"). Furthermore, again, "[a] firm that has substantial power on the buy side of the market (i.e., monopsony power) is generally free to bargain aggressively when negotiating the prices it will pay for goods and services." *W. Penn*, 627 F.3d at 103.

Plaintiff's Section 2 claims fail at the threshold because the AC does not plausibly allege that United's conduct lacked a "legitimate business purpose" or that it "makes sense only because it eliminates competition." *In re Adderall*, 754 F.3d at 133. Absent such allegations, Plaintiff has not established the essential element of anticompetitive conduct, and both Section 2 claims must be dismissed on that basis. *See Apotex Corp. v. Hospira Healthcare India Priv. Ltd.*, No. 18-cv-4903, 2020 WL 58247, at *5 (S.D.N.Y. Jan. 6, 2020) (dismissing Section 2 claims where plaintiff did not plausibly allege anticompetitive conduct).

Even assuming that Plaintiff had plausibly alleged anticompetitive conduct, the monopsony claim independently fails because Plaintiff does not plausibly allege that United possesses monopsony power in the relevant market. Plaintiff alleges that "United possesses monopsony power in the market for the reimbursement of anesthesia services in the New York metropolitan area," AC ¶ 304, but elsewhere defines the relevant product market as "the provision of medically necessary anesthesia services to patients," *see id.* ¶¶ 244–54. That inconsistency with market definition is fatal. *See Chapman*, 546 F.3d at 238.

Plaintiff's attempted monopsony claim is likewise deficient. Plaintiff merely recites the required elements—specific intent and a dangerous probability of achieving monopsony

power—without factual support. *See Spectrum Sports*, 506 U.S. at 456; *see also* AC ¶¶ 310–11 ("United undertook this conduct with the specific intent to monopsonize. United has a dangerous probability of achieving monopsony power."). While Plaintiff appears to allege that United seeks monopsony power by reducing reimbursement rates to below-cost levels to drive out anesthesia providers, AC ¶ 309, that theory is implausible: as discussed, driving providers from the market would reduce supply and potentially increase costs—an outcome contrary to United's interests as the Empire Plan's administrator. Moreover, Plaintiff offers no coherent explanation as to how this strategy would give United monopsony power over reimbursement.

To the extent Plaintiff suggests United is using monopsony power to create monopoly power for OptumCare, the allegations are equally deficient. The AC notes only that OptumCare employs "over 50 anesthesiologists," *id.* ¶ 60, without identifying the total number of providers in the market or OptumCare's share—basic facts needed to assess market power. *See Spectrum Sports*, 506 U.S. at 459 ("[D]emonstrating the dangerous probability of [monopsonization] in an attempt case also requires inquiry into the . . . defendant's economic power in that market.").

To summarize, Plaintiff's Section 2 claims rest on a speculative theory of market manipulation unsupported by concrete, plausible allegations of anticompetitive conduct, monopsony power over the relevant market, or a dangerous probability of market dominance. These deficiencies, both individually and collectively, require dismissal of Plaintiff's Section 2 monopsonization and attempted monopsonization claims.

### III.    Plaintiff's State Law Claims

Plaintiff also claims that United and MultiPlan engaged in an antitrust conspiracy to restrain trade in violation of the Donnelly Act and that United[6] was unjustly enriched by receiving fees and retaining reimbursement through Defendants' alleged scheme of improperly reducing LIA's reimbursement rates.  AC ¶¶ 313–30.  Having dismissed all of Plaintiff's claims over which I have "original jurisdiction," I "may decline to exercise supplemental jurisdiction over" Plaintiff's pendent state law claims.  *See* 28 U.S.C. § 1367(c)(3).  As is well established, Section 1367 does not create "a mandatory rule to be applied inflexibly in all cases." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).  Nevertheless, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity— will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.*; *see also Kolari v. N. Y.-Presbyterian Hosp.*, 455 F.3d 118, 123 (2d Cir. 2006) (reversing a district court decision to retain supplemental jurisdiction over state law claims after dismissal of the federal claim, citing "the absence of a clearly articulated federal interest").

Despite the general presumption, I conclude that judicial economy calls for exercising supplemental jurisdiction over Plaintiff's Donnelly Act Claim.  The Donnelly Act "is modeled after the Sherman Act and should generally be construed in light of Federal precedent." *Biocad JSC v. F. Hoffman-La Roche*, 942 F.3d 88, 101 (2d Cir. 2019).  Accordingly, "[t]he standard for a well-pleaded Donnelly Act claim is the same as a claim under Section 1 of the Sherman Act." *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 370 (S.D.N.Y.

---

[6]    In the original complaint, Plaintiff asserted its unjust enrichment claim against both United and MultiPlan.  *See* ECF No. 1 ¶¶ 204–09.  Plaintiff now asserts this claim only against United.  *See* AC ¶¶ 319–30.

2012).  Given my decision on Plaintiff's Section 1 claim, "it would be the height of inefficiency to defer a decision on [its Donnelly Act] claim to a state court."  *Nunez v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 14-cv-6647, 2017 WL 3475494, at *4 (S.D.N.Y. Aug. 11, 2017), *aff'd sub nom. Nunez v. Lima*, 762 F. App'x 65 (2d Cir. 2019); *accord Avery v. DiFiore*, No. 18-cv-9150, 2019 WL 3564570, at *5 (S.D.N.Y. Aug. 6, 2019).  Having already determined that Plaintiff's AC failed to state a claim under Section 1, it necessarily follows that Plaintiff's Donnelly Act claim also fails and Defendants' motions to dismiss are granted.  *See Biocad*, 942 F.3d at 101 ("As [plaintiff] has not stated a plausible claim for relief under the Sherman Act, its Donnelly Act claim similarly fails.").

By contrast, I decline to exercise supplemental jurisdiction over Plaintiff's unjust enrichment claim.  Plaintiff's unjust enrichment claim is subject to different standards than Plaintiff's antitrust claims and must be analyzed separately.  Thus, this is the "usual case" in which the balance of relevant factors "point toward declining to exercise jurisdiction."  *Carnegie-Mellon Univ.*, 484 U.S. at 350 n.7.

## IV.    Leave to Amend

Plaintiff asks that, in the event that the Court dismisses its claims, the Court allow it another opportunity to amend.  *See* ECF No. 64 at 31.  Although the Second Circuit "strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6)," the Court declines to grant Plaintiff leave to amend yet again.  *See Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107 (2d Cir. 2022) (affirming denial of leave to amend).  "A court should freely give leave when justice so requires, but it may, in its discretion, deny leave to amend for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 90 (2d Cir. 2023) (affirming denial of leave to amend).  The mere fact that Plaintiff's opposition brief

provides no explanation about how it intends to amend its complaint to address any deficiencies I have identified is sufficient reason to deny leave to amend. *See Gregory v. ProNAi Therapeutics Inc.*, 757 F. App'x 35, 39 (2d Cir. 2018) (affirming denial of leave to amend where "plaintiffs sought leave to amend in a footnote at the end of their opposition to defendants' motion to dismiss" and "included no proposed amendments"). Moreover, "[a] court may deny leave to amend where the plaintiff has already had the opportunity to amend its [c]omplaint, and there is no indication that amendment would not be futile." *Champions League, Inc. v. Woodard*, 224 F. Supp. 3d 317, 326 (S.D.N.Y. 2016). That is especially so here, where Plaintiff has already had the "benefit of a [full] ruling." *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015). The defects in Plaintiff's antitrust claims "are substantive and arise from [Plaintiff's] own allegations, not from inadequate or inartful pleading." *Apotex*, 2020 WL 58247, at *7. Accordingly, leave to amend is denied.

## CONCLUSION

For the reasons set forth above, the Court GRANTS with prejudice Defendants' motions to dismiss Plaintiff's Sherman Act and Donnelly Act claims and declines to exercise supplemental jurisdiction over Plaintiff's unjust enrichment claim, which it dismisses without prejudice. *See* ECF No. 61-1; ECF No. 62-1. The Clerk of Court is respectfully requested to enter judgment and close this case.

SO ORDERED.

/s/ Hector Gonzalez
HECTOR GONZALEZ
United States District Judge

Dated: Brooklyn, New York
April 7, 2025

31